EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Luis M. Sánchez Valle<br><br>Peticionario<br>_____<br>El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Jaime Gómez Vázquez<br><br>Peticionario<br>_____<br>El Pueblo de Puerto Rico<br><br>v.<br><br>René Rivero Betancourt<br>_____<br>El Pueblo de Puerto Rico<br><br>v.<br><br>Rafael A. Delgado Rodríguez | CERTIORARI<br><br>2015 TSPR 25<br><br>192 DPR ____ |

Número del Caso: CC-2013-68
                 CC-2013-72


Fecha: 20 de marzo de 2015


Tribunal de Apelaciones:

        Región Judicial de Carolina y San Juan
        Panel VIII


Abogada de la Parte Peticionaria:

        Lcda. Wanda Tamara Castro Alemán
        Sociedad para Asistencia Legal

Oficina de la Procuradora General:

      Lcda. Margarita Mercado Echegaray
      Procuradora General

      Lcda. Mónica Cordero Vázquez
      Procuradora General Auxiliar

Materia: Derecho Constitucional – Cláusula contra la doble exposición; doctrina de la doble soberanía primigenia; se revoca la norma establecida en Pueblo v. Castro García 120 DPR 740 (1988).

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Luis M. Sánchez Valle<br><br>Peticionario<br>_____<br>El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Jaime Gómez Vázquez<br><br>Peticionario<br>_____<br>El Pueblo de Puerto Rico<br><br>v.<br><br>René Rivero Betancourt<br>_____<br>El Pueblo de Puerto Rico<br><br>v.<br><br>Rafael A. Delgado Rodríguez | CC-2013-0068<br>CC-2013-0072 |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 20 de marzo de 2015.

Para resolver estos casos consolidados nos vemos precisados a revisar la norma que establecimos en Pueblo v. Castro García, 120 DPR 740 (1988). Por los fundamentos que exponemos a continuación, revocamos ese precedente y resolvemos que, de acuerdo a la protección constitucional contra la doble exposición y debido a que Puerto Rico no es un estado federado, no se puede procesar en los tribunales

de Puerto Rico a una persona que haya sido absuelta, convicta o expuesta a serlo por el mismo delito en los tribunales federales.

I

**A. CC-2013-0068**

El 28 de septiembre de 2008, el Ministerio Público presentó tres denuncias en contra del Sr. Luis M. Sánchez del Valle y se le imputó: 1) una violación del Artículo 5.01 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458, por vender sin licencia un arma de fuego; 2) una segunda violación del Artículo 5.01 de la Ley de Armas de Puerto Rico, _supra_, por vender sin licencia unas municiones; y 3) una violación del Artículo 5.04 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458c, por portar ilegalmente un arma de fuego.

Por los mismos hechos, un Gran Jurado federal acusó al señor Sánchez del Valle de comercio ilegal de armas y municiones en el comercio interestatal. En particular, se le acusó de violar el 18 USC secs. 922(a)(1)(A), 923(a), 924(a)(1)(D) y 2. Contrario al foro estatal, no se le acusó por un delito de portación ilegal de armas. Eventualmente, el Tribunal Federal para el Distrito de Puerto Rico sentenció al señor Sánchez del Valle a cinco meses de prisión, cinco meses de restricción domiciliaria y tres años de libertad supervisada.

Ante ello, el señor Sánchez del Valle presentó una moción de desestimación en el Tribunal de Primera

Instancia, Sala de Carolina, y alegó que, de acuerdo a la protección constitucional contra la doble exposición, no podía ser procesado en Puerto Rico por los mismos delitos que el Tribunal Federal lo declaró culpable.

Por su parte, el Ministerio Público argumentó que, según lo resuelto en Pueblo v. Castro García, supra, Estados Unidos y el Estado Libre Asociado de Puerto Rico (ELA) derivan su autoridad de fuentes distintas y ambas tienen poder para castigar los delitos sin ofender la garantía constitucional contra la doble exposición.

El Tribunal de Primera Instancia desestimó las acusaciones presentadas en contra del señor Sánchez del Valle. Resolvió que el señor Sánchez del Valle no podía ser encausado dos veces por los mismos delitos y ante el mismo ente soberano. De acuerdo al foro primario, Puerto Rico no es una jurisdicción distinta e independiente a Estados Unidos, porque la soberanía de ambas dimana de la misma fuente, a saber, el Congreso de los Estados Unidos. Concluyó que, dado el dictamen del Tribunal Federal, las denuncias presentadas en el foro estatal contravenían la protección constitucional contra la doble exposición.

Inconforme, el Ministerio Público acudió ante el Tribunal de Apelaciones.

**B. CC-2013-0072**

El 28 de septiembre de 2008, el Ministerio Público presentó, por hechos relacionados al caso anterior, tres denuncias en contra del Sr. Jaime Gómez Vázquez y se le

imputó: 1) una violación del Artículo 5.01 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458, por vender y traspasar ilegalmente un arma de fuego; 2) una violación del Artículo 5.07 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458f, por portar un rifle; y 3) una violación del artículo 5.10 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458i, por traspasar un arma mutilada. En esa misma fecha se determinó causa probable en su ausencia, se ordenó su arresto y se le impuso una fianza de $325,000.

Posteriormente, en el Tribunal Federal para el Distrito de Puerto Rico, un Gran Jurado presentó cinco cargos en contra de los señores Gómez Vázquez, Gómez Pastrana, Delgado Rodríguez y Rodríguez Betancourt por los mismos hechos que fueron denunciados en el foro estatal.[1] En específico, se le imputó al señor Gómez Vázquez la violación de los siguientes estatutos: 18 USC secs. 922(a)(1)(A), 923(a), 924(a)(1)(D), por la venta ilegal de armas en el comercio interestatal. Contrario al foro estatal, no se le acusó por un delito de portación ilegal de armas largas ni por un delito de mutilación de armas.

En marzo de 2010, el señor Gómez Vázquez presentó ante el Tribunal Federal, Distrito de Puerto Rico, una alegación preacordada mediante la que se declaró culpable de los

---

[1] No hay disputa de que los cargos son por los mismos hechos. Apéndice, págs. 205 y 214.

cargos imputados. Apéndice, pág. 205. El 26 de junio de 2010, el Tribunal Federal lo sentenció a 18 meses de cárcel y 3 años de libertad supervisada.

El 27 de agosto de 2010, el señor Gómez Vázquez presentó ante el Tribunal de Primera Instancia, Sala Superior de Carolina, una moción de desestimación bajo la Regla 64(e) de Procedimiento Criminal, 34 LPRA Ap. II. Alegó que la cláusula contra la doble exposición de la Quinta Enmienda de la Constitución Federal y la Sección 11 del Artículo 11 de la Constitución de Puerto Rico, LPRA, Tomo I, prohibían que, luego de haber sido acusado y condenado ante el Tribunal Federal, fuera procesado en los tribunales de Puerto Rico por los mismos delitos. En esencia, el señor Gómez Vázquez sostuvo que Estados Unidos y Puerto Rico eran el mismo soberano a los fines de esa cláusula constitucional y no podían someterlo a dos procesos criminales distintos por la misma ofensa o conducta. En otras palabras, argumentó que la excepción a la protección constitucional contra la doble exposición, conocida como la doctrina de "soberanía dual", no aplicaba a Puerto Rico.

Ante ello, el Ministerio Público argumentó que, según lo resuelto por este Tribunal en Pueblo v. Castro García, supra, una conducta constitutiva de delito tanto en la jurisdicción federal como en la jurisdicción estatal podía ser penalizada de forma independiente en ambas jurisdicciones sin que ello constituyera una violación de la cláusula constitucional en contra de la doble exposición

o implicara castigos múltiples por la misma conducta. Argumentó que la soberanía de los Estados Unidos y la soberanía de Puerto Rico eran separadas e independientes a los fines de esa cláusula constitucional. Así, alegó que el señor Gómez Vázquez podía ser enjuiciado en los tribunales de Puerto Rico por los mismos delitos que el Tribunal Federal lo condenó.

Mediante una resolución de 26 de junio de 2012, el foro primario declaró con lugar la moción de desestimación presentada por el señor Gómez Vázquez. Resolvió que la soberanía o fuente de poder de Puerto Rico para procesar criminalmente a sus ciudadanos residía y dimanaba del gobierno federal a través del Congreso y que, por tal razón, no procedía la aplicación de la doctrina de la "soberanía dual". Concluyó que las denuncias en contra del señor Gómez Vázquez violaban la prohibición constitucional contra la doble exposición de la Constitución Federal y la Constitución de Puerto Rico. Inconforme, el Ministerio Público acudió ante el Tribunal de Apelaciones.

El foro apelativo intermedio consolidó los recursos arriba descritos y revocó las determinaciones del foro primario. Resolvió que conforme al estado de derecho vigente una persona podía ser sometida a procesos criminales en el foro federal y el foro estatal por la misma conducta delictiva sin violar la protección constitucional contra la doble exposición. El Juez González

Vargas emitió un voto particular y la Jueza Medina Monteserín emitió un voto concurrente.

Inconformes con el dictamen, los señores Sánchez del Valle y Gómez Vázquez presentaron independientemente sus peticiones ante este Tribunal. Expedimos los autos de certiorari y, por tratarse de la misma controversia, los consolidamos. Con el beneficio de la comparecencia de todas las partes, resolvemos.

## II

La protección constitucional contra la doble exposición cobija a todo imputado de delito en la medida en que se le garantiza no ser "puesto en riesgo de ser castigado dos veces por el mismo delito". Art. II, Sec. 10, Const. ELA, LPRA, Tomo 1. Véase Pueblo v. Santos Santos, 189 DPR 361 (2013). Asimismo, la Enmienda Quinta de la Constitución de Estados Unidos establece que "nadie podrá ser sometido por la misma ofensa dos veces a un juicio...".[2] Emda. V, Const. EE. UU., LPRA, Tomo 1. Véanse: Pueblo v. Santiago, 160 DPR 618 (2003); Pueblo v. Martínez Torres, 126 DPR 561 (1990); Ohio v. Johnson, 467 US 493 (1984); E.L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1992, Vol. II, sec. 16.1(B), pág. 354.

---

[2] El texto original en inglés lee: "*nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb*".

Para que se active la protección constitucional contra la doble exposición tienen que cumplirse varios requisitos. Pueblo v. Santos Santos, supra, pág. 367. En primer lugar, los procedimientos celebrados contra el acusado tienen que ser de naturaleza penal. Pueblo v. Santiago, supra, pág. 628. Es necesario también que se haya iniciado o celebrado un primer juicio, bajo un pliego acusatorio válido y en un tribunal con jurisdicción. Pueblo v. Martínez Torres, supra, pág. 568. Por último, el segundo proceso al cual se somete al individuo tiene que ser por el mismo delito por el cual ya fue convicto, absuelto o expuesto. Pueblo v. Santiago, supra, pág. 629.

En ocasión de auscultar si constituye el mismo delito para efectos de la cláusula contra la doble exposición, hemos empleado la norma elaborada por el Tribunal Supremo de Estados Unidos en Blockburger v. United States, 284 US 299 (1932). Véase Pueblo v. Rivera Cintrón, 185 DPR 484, 494 (2012). De acuerdo a esta norma, el mismo acto, o la transacción, constituye una violación de dos disposiciones legales distintas si cada disposición penal infringida requiere prueba de un hecho adicional que la otra no exige. Pueblo v. Rivera Cintrón, supra, pág. 494.

En otras palabras, esa norma "exige que el tribunal compare [las] definiciones [de los delitos] para así verificar que cada uno requiera, a lo menos, un elemento que el otro no requiere. Si esto se da, entonces puede castigarse por más de un delito". Íd., pág. 494, citando a

J.P. Mañalich Raffo, El concurso de delitos: bases para su reconstrucción en el derecho penal de Puerto Rico, 74 Rev. Jur. UPR 1021, 1068 (2005). Resaltamos, sin embargo, que "si la definición de uno de los delitos incorpora todos los elementos que exige la definición del otro, entonces se trata de un solo delito, en la medida en que el segundo constituye un delito 'menor incluido' (lesser included offense)". Pueblo v. Rivera Cintrón, supra, pág. 495.

Al analizar los delitos involucrados en este caso, notamos que uno de los delitos por los que se acusó a los peticionarios en la esfera estatal constituye un delito menor incluido en uno de los delitos federales.

El Artículo 5.01 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458, establece lo siguiente:

> Se necesitará una licencia expedida conforme a los requisitos exigidos por este capítulo para fabricar, importar, ofrecer, vender o tener para la venta, alquilar o traspasar cualquier arma de fuego, municiones o aquella parte o pieza de un arma de fuego donde el fabricante de la misma coloca el número de serie del arma. Toda infracción a esta sección constituirá delito grave.

Por su parte, el estatuto federal, 18 USC sec. 922 (a)(1)(A), establece:

> It shall be unlawful-- for any person-- except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

Nótese que el Artículo 5.01 de la Ley de Armas de Puerto Rico, supra, contiene todos los elementos del 18 USC

sec. 922 (a)(1)(A), a saber, que una persona sin licencia no puede importar (*importing*), fabricar (*manufacturing*), vender o tener para la venta (*dealing*) un arma de fuego o municiones. No encontramos en el delito estatal algún elemento distinto a los que contiene el delito federal. La única diferencia es que el delito estatal no requiere que los hechos se hayan cometido en el curso del comercio interestatal o internacional. Pero lo cierto es que al probarse el delito federal se prueba cada uno de los elementos del delito estatal. En otras palabras, el delito estatal es uno menor incluido en el delito federal. Por tal razón, se activa la cláusula constitucional de doble exposición de la Enmienda Quinta de la Constitución federal.

El resto de los delitos imputados en la esfera estatal realmente son delitos distintos y separados. El Artículo 5.04 de la Ley de Armas de Puerto Rico, supra, tipifica el delito de portación y transportación de armas, y no se procesó a los peticionarios en la esfera federal por un delito similar. Lo mismo ocurre por las violaciones del Artículo 5.07 de la Ley de Armas de Puerto Rico, supra, y del Artículo 5.10 de la Ley de Armas de Puerto Rico, supra. El proceso en el Tribunal Federal se limitó a violaciones por vender armas y municiones sin licencias.

Esto significa que el planteamiento constitucional se limita a las denuncias que les imputa a los señores Sánchez

del Valle y Gómez Vázquez la venta ilegal de armas y municiones.

**III**

Es una noción básica de derecho que la Constitución de Estados Unidos estableció un sistema de doble soberanía entre los estados y el gobierno federal. Gregory v. Ashcroft, 501 US 452 (1997). Antes de la adopción de la Constitución, los estados estaban unidos bajo los Artículos de la Confederación. U.S. Term Limits, Inc. v. Thornton, 514 US 779, 803 (1995). En ese sistema, los estados retenían la mayor parte de la soberanía como si fueran naciones independientes unidas solamente por tratados. Íd. Luego de la Convención Constituyente, los Padres Fundadores adoptaron un plan, no para enmendar los Artículos de la Confederación, sino para crear un nuevo gobierno nacional con sus propias ramas de gobierno. Íd. Al adoptar ese nuevo sistema, concibieron un sistema nacional uniforme y rechazaron la idea de que Estados Unidos era un grupo de naciones independientes. Íd. Por el contrario, crearon un sistema en el que había un vínculo directo entre el pueblo de Estados Unidos y el nuevo gobierno nacional. Íd. ("*In adopting that plan, the Framers envisioned a uniform national system, rejecting the notion that the Nation was a collection of States, and instead creating a direct link between the National Government and the people of the*

*United States*"). Así pues, los ciudadanos de un estado forman parte del pueblo del estado soberano y, simultáneamente, forman parte del pueblo de Estados Unidos.

Ese nuevo sistema no contempló una consolidación total de los estados, sino una consolidación parcial mediante la que los gobiernos estatales claramente retendrían todos los atributos de soberanía que ya poseían y que no fueron delegados exclusivamente al gobierno federal. Íd., pág. 801 ("[T]*he Constitutional Convention did not contemplate "[a]n entire consolidation of the States into one complete national sovereignty," but only a partial consolidation in which "the State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, exclusively delegated to the United States*").

Así, en nuestro sistema de gobierno los estados retienen una autoridad soberana sustancial dentro del sistema constitucional. En palabras de James Madison:

> *The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.... The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.* The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). (Citado en Gregory v. Ashcroft, supra, pág. 458.)

A pesar de que al momento de la creación de este nuevo sistema solo existían 13 estados, los mismos conceptos

aplicaron a todos los estados que subsiguientemente pasaron a formar parte de la Unión. Como resumió el Tribunal Supremo federal en uno de los casos más importantes del constitucionalismo estadounidense, M'Culloch v. State, 17 US 316, 410 (1819):

> In America, the powers of sovereignty are divided between the government of the Union, and those of the states. They are each sovereign, with respect to the objects committed to it, and neither sovereign, with respect to the objects committed to the other. **We cannot comprehend that train of reasoning, which would maintain, that the extent of power granted by the people is to be ascertained, not by the nature and terms of the grant, but by its date.** Some state constitutions were formed before, some since that of the United States. We cannot believe, that their relation to each other is in any degree dependent upon this circumstance. Their respective powers must, we think, be precisely the same, as if they had been formed at the same time.(Énfasis suplido.)

Este sistema federal no fue un mero capricho de los Padres Fundadores, sino que fue un sistema concebido para que, a través del balance de poder entre el gobierno federal y los gobiernos estatales, se protegieran las libertades más fundamentales. Atascadero State Hospital v. Scanlon, 473 US 234, 242 (1985). Además, este sistema promueve gobiernos descentralizados que sean más sensitivos a las diversas necesidades de una sociedad heterogénea, aumenta la oportunidad para que el pueblo se involucre en el proceso democrático, permite mayor innovación y experimentación en el gobierno y hace más responsivos a los gobiernos, que tendrán que competir por la movilidad de la población. Véanse: McConnell, Federalism: Evaluating the

Founders' Design, 54 U.Chi.L.Rev. 1484, 1491-1511 (1987); Merritt, The Guarantee Clause and State Autonomy: Federalism for a Third Century, 88 Colum.L.Rev. 1, 3-10 (1988).

Las esferas de acción de esos dos entes a menudo crean tensiones entre lo que pueden o no hacer cada una de ellas. Gregory v. Ashcroft, supra, pág. 461. Para atender algunas preocupaciones que podían suscitarse dentro de los sistemas de justicia criminal que coexisten dentro de Estados Unidos, el Tribunal Supremo federal creó la doctrina de soberanía dual.

**A. La doctrina de soberanía dual**

La doctrina de la soberanía dual es una excepción a la aplicación de la protección contra la doble exposición. De acuerdo a esta, si dos entes soberanos separados procesan criminalmente a un individuo por la misma ofensa, la protección constitucional contra la doble exposición no se activa. Hollander, Bergman and Stephenson, Wharton´s Criminal Procedure, 13 ed., New York, Lawyers Cooperative, 2010, Vol. 3, Sec. 13:12 ("*The Fifth Amendment´s Double Jeopardy Clause is not violated by multiple prosecutions for the same offense when those prosecutions are undertaken by separate sovereigns*".).

El Tribunal Supremo federal aplicó la doctrina de la soberanía dual por primera vez en United States v. Lanza,

260 US 377 (1922).[3] En ese caso se acusó a ciertas personas en una corte federal por manufacturar, transportar y poseer licores tóxicos en violación de la *National Prohibition Act*. Los acusados alegaron que un tribunal estatal en Washington los había condenado por el mismo delito que se le estaba procesando en el tribunal federal y argumentaron que eso constituía una doble exposición. El foro primario federal acogió los reclamos y desestimó los cargos. Eventualmente, el Tribunal Supremo revocó esa decisión y declaró que eran dos actuaciones de dos soberanos diferentes:

> *We have here two sovereignties, **deriving power from different sources,** capable of dealing with the same subject-matter within the same territory. Each may, without interference by the other, enact laws to secure prohibition, with the limitation that no legislation can give validity to acts prohibited by the amendment. Each government in determining what shall be an offense against its peace and dignity **is exercising its own sovereignty, not that of the other.*** Íd., pág. 382. (Énfasis suplido).

---

[3] La controversia no era nueva; aunque no se había resuelto definitivamente, había sido reconocida en casos anteriores. Véase, por ejemplo, Moore v. Illinois, 55 US 13, 20 (1852) ("*An offence, in its legal signification, means the transgression of a law…. Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offence or transgression of the laws of both… That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable*".). Véanse, además, Cross v. North Carolina, 132 US 131 (1889); United States v. Marygold, 50 US 257 (1850); Fox v. Ohio, 46 US 410 (1850).

Concluyó que una actuación denominada como delito a nivel nacional y estatal es una ofensa en contra de la paz y dignidad de ambos soberanos y puede ser castigada tanto por el tribunal federal como el estatal, o ambos. Los acusados cometieron dos ofensas diferentes con un mismo acto, una contra la paz y dignidad del Estado de Washington y otra contra los Estados Unidos. Eso no constituía doble exposición. Íd., pág. 382.[4]

Tiempo después, el Tribunal Supremo federal reafirmó la doctrina de soberanía dual en dos casos resueltos el mismo día: Bartkus v. Illinois, 359 US 121 (1959) y Abbate v. United States, 359 US 187 (1959). En el primero se resolvió que una absolución en un tribunal federal no impedía un segundo proceso criminal por los mismos hechos en la esfera estatal.[5] Wharton´s Criminal Procedure, op. cit., Sec.

---

[4] El texto en inglés lee: "*It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.... The defendants thus committed two different offenses by the same act, and a conviction by a court of Washington of the offense against that state is not a conviction of the different offense against the United States, and so is not double jeopardy*".

[5] Se utilizó como fundamento el debido proceso de ley de la Enmienda Decimocuarta porque en ese momento la protección contra la doble exposición de la Quinta Enmienda no aplicaba a los Estados. Palko v. Connecticut, 302 US 319 (1937). Por eso gran parte de la discusión en ese caso se centra en si la actuación impugnada violaba el debido proceso de ley ("*With this body of precedent as irrefutable evidence that state and federal courts have for years refused to bar a second trial even though there had been a prior trial by another government for a similar offense, it would be disregard of a long, unbroken, unquestioned course of impressive adjudication for the Court now to rule that due process compels such a bar*".). Bartkus v. Illinois, supra, pág. 136. En Benton v. Maryland, 395 US 784 (1969), se aplicó

13:12. Por su parte, en Abatte v. United States, supra, el Tribunal Supremo federal se enfrentó a ~~la misma~~ una situación a la inversa y resolvió que la doctrina de soberanía dual permite acusar a una persona en el foro federal, aunque haya sido convicta en la esfera estatal. Véase LaFave, Israel, King and Kerr, Criminal Procedure, 3ra ed., Minnesota, Ed. West Publishing Co., 2007, Vol. 3, Sec. 25.5(a). El Tribunal Supremo declinó expresamente revocar United States v. Lanza, supra, y afirmó lo siguiente: "*[I]f the States are free to prosecute criminal acts violating their laws, and the resultant state prosecutions bar federal prosecutions based on the same acts, federal law enforcement must necessarily be hindered*". Abbate v. United States, supra, pág. 671.

En United States v. Wheeler, 435 US 313 (1978), el Tribunal Supremo federal explicó en detalle los fundamentos para aplicar la doctrina de soberanía dual. En ese caso la tribu de los Navajo acusó una en corte tribal a uno de sus miembros por alteración al orden público. La corte tribal lo condenó. Un año después, un Gran Jurado federal en el estado de Arizona lo acusó por hechos relacionados. El acusado alegó que el proceso en la corte tribal impedía el segundo proceso en el tribunal federal. El tribunal federal desestimó los cargos. El Tribunal Supremo resolvió que las tribus nativo-americanas, para efectos de la cláusula de doble exposición, eran soberanas distintas a Estados

---

finalmente a los estados la protección contra la doble

Unidos, por lo que también podía acusarse a la persona en el tribunal federal.

El Tribunal Supremo enmarcó la controversia de la siguiente forma: "*the controlling question in this case is the source of this power to punish tribal offenders*". Íd., pág. 322. Así, el Tribunal Supremo auscultó si ese poder para castigar a los ofensores de la ley emanaba de alguna soberanía propia o era el ejercicio de la soberanía del gobierno federal por delegación del Congreso.[6] Íd.

El Tribunal resolvió que las tribus nativo-americanas en Estados Unidos tienen una soberanía original propia que existía antes de la llegada de los europeos al Nuevo Mundo. Íd. Al incorporarse al territorio de Estados Unidos, las tribus se despojaron de ciertos atributos de su soberanía original, pero retuvieron otros. Íd. La autoridad para castigar a los ofensores de la ley fue uno de esos atributos que las tribus no cedieron al Congreso de los Estados Unidos. Íd. Por tal razón, el Tribunal Supremo concluyó que "cuando la Tribu Navajo ejerció este poder lo hizo como parte de la soberanía que retuvo y no como un brazo del gobierno federal". Íd., pág. 328 ("[W]*hen the Navajo Tribe exercises this power, it does so as part of its retained sovereignty and not as an arm of the Federal Government*"). (Traducción nuestra). Véase, además, D. S.

_____

exposición de la Quinta Enmienda.
[6] ("*Is it a part of inherent tribal sovereignty, or an aspect of the sovereignty of the Federal Government which has been delegated to the tribes by Congress?*"). United States v. Wheeler, supra, pág. 322.

Rudstein, Double Jeopardy: A Reference Guide to the United States Constitution, Connecticut, Praeger Publishers, 2004, pág. 87.

Este caso demuestra que, para el Tribunal Supremo federal, lo crucial no es que el ente tenga un gobierno propio ni que tenga poder para legislar un código penal o autoridad para acusar a las personas por infracciones a sus leyes. Lo determinante, para aplicar la doctrina de soberanía dual, es la última fuente de poder de donde las acusaciones provinieron. United States v. Wheeler, supra, pág. 320. ("[T]he **ultimate source of the power** under which the respective prosecutions were undertaken"). (Énfasis Suplido). Si se trata de un poder delegado por el Congreso, la doctrina de soberanía dual no aplica.

Ese es el análisis preciso que el Tribunal Supremo federal ha utilizado reiteradamente para resolver este tipo de casos. El uso de la palabra "soberanía" en otro contexto y para otros propósitos es irrelevante para resolver la controversia que nos ocupa. Para un estudio más exhaustivo, véase, Z. S. Price, Dividing Sovereignty in Tribal and Territorial Criminal Jurisdiction, 113 Colum. L. Rev. 657 (2013).

Asimismo, en Heath v. Alabama, 474 US 82 (1985), el Tribunal Supremo federal aplicó la doctrina de soberanía dual a procesos criminales por la misma ofensa en dos estados distintos. Wharton's Criminal Procedure, op. cit.,

Sec. 13:12. En ese caso, el Tribunal validó una acusación de un gran jurado estatal de Alabama contra una persona que había sido convicta en Georgia por los mismos hechos. El Tribunal recalcó el análisis de United States v. Wheeler, supra, pág. 320 y afirmó que para aplicar la doctrina de soberanía dual la determinación crucial es si las dos entidades derivan su autoridad para castigar al ofensor de distintas fuentes de poder. Heath v. Alabama, supra, pág. 88 ("*In applying the dual sovereignty doctrine, then, the crucial determination is whether[...]* **the two entities draw their authority to punish the offender from distinct sources of power**"). (Énfasis suplido). Véase, además, Wharton's Criminal Procedure, op. cit., Sec. 13:12.

El Tribunal Supremo resolvió que los estados son soberanos separados respecto al gobierno federal, pues sus poderes para llevar a cabo procesos criminales se derivan de fuentes de poder separadas e independientes que poseían como soberanos antes de ser admitidos a la Unión y que preservaron a través de la Enmienda Décima. Heath v. Alabama, supra, pág. 89 ("*Their powers to undertake criminal prosecutions derive from separate and independent sources of power and authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment*").

En United States v. Lara, 541 US 193 (2004), el Tribunal Supremo federal volvió a atender una controversia relacionada con las tribus nativo-americanas. En este caso

una tribu juzgó a un nativo-americano que, contrario al caso de United States v. Wheeler, supra, no era uno de sus miembros. Posteriormente, un tribunal federal lo procesó por el mismo delito. Para determinar si el segundo proceso violaba la cláusula contra la doble exposición, el Tribunal Supremo afirmó que la controversia principal era si el poder para castigar una persona que no era miembro de la tribu derivaba de la soberanía tribal inherente o era un poder delegado por el gobierno federal. Íd., pág. 199 (“*What is ‘the source of [the] power’ to punish nonmember Indian offenders, ‘inherent tribal sovereignty’ or delegated federal authority?*”). (Énfasis en el original).

El problema en ese caso residía en que el Tribunal Supremo había resuelto en Duro v. Reina, 495 US 676, 691-692 (1990), que las tribus no poseían autoridad soberana para procesar penalmente a personas indias que no eran miembro de la tribu que llevaba a cabo el proceso. Sin embargo, como reacción a lo resuelto en Duro v. Reina, supra, el Congreso aprobó una nueva legislación que reconocía y afirmaba el poder inherente de las tribus para procesar criminalmente a las personas nativo-americanas, fuesen de la misma tribu o no. Véase 25 USC sec. 1301 (“*means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise... criminal jurisdiction over all Indians*”).

El Tribunal Supremo resolvió que el Congreso, al permitirles esto a las tribus, no les delegaba un poder

perteneciente al gobierno federal, sino que le reconocía un poder que ellas poseían como soberanas United States v. Lara, supra, pág. 209. ("[T]*he Constitution authorizes Congress to permit tribes, as an exercise of their inherent tribal authority, to prosecute nonmember indians*"). Véase, además, United States v. Wheeler, supra. En otras palabras, el Congreso puede, a través de legislación, reconocer atributos adicionales a un ente que ya posee una soberanía anterior. United States v. Lara, supra, pág. 207 ("*Congress has enacted a new statute, relaxing restrictions on the bounds of the inherent tribal authority that the United States recognizes*"). Este caso demuestra que el hecho de que el Congreso pueda añadir, quitar o modificar esos atributos, no es pertinente para resolver cuál es la última fuente de poder de las tribus. Por esa razón, el Tribunal aplicó la doctrina de soberanía dual y resolvió que no existía una violación al derecho contra la doble exposición.

**B. Situaciones en las que no se ha aplicado la doctrina de soberanía dual**

El Tribunal Supremo federal se ha negado a aplicar la doctrina de soberanía dual en ciertos casos en los que diferentes entidades llevan a cabo procesos criminales sucesivos por los mismos hechos. En estos casos, el Tribunal Supremo federal ha resuelto que las entidades involucradas, aunque nominalmente diferentes, obtienen su poder para acusar de la misma fuente. Heath v. Alabama, supra, pág. 90 ("*In those instances where the Court has*

*found the dual sovereignty doctrine inapplicable, it has done so because the two prosecuting entities did not derive their powers to prosecute from independent sources of authority*").

En <u>Grafton v. United States</u>, 206 US 333 (1907), el Tribunal resolvió que un territorio de los Estados Unidos no es un soberano para propósitos de la cláusula contra la doble exposición. Razonó que el gobierno de un territorio debe su existencia completamente al gobierno federal y sus tribunales ejercen todos sus poderes por la autoridad de Estados Unidos. <u>Íd.</u>, pág. 354 ("[O]*wes its existence wholly to the United States, and its judicial tribunals exert all their powers by authority of the United States*"). En otras palabras, un tribunal de un territorio y un tribunal federal ejercen la autoridad del mismo soberano: Estados Unidos. <u>Íd.</u>, pág. 355 ("[T]*he two tribunals that tried the accused exert all their powers under and by authority of the same government,—that of the United States*"). Véase, además, Rudstein, <u>op. cit.</u>, pág. 88. Por tal razón, los procesos criminales sucesivos entre un tribunal federal y un tribunal de un territorio constituyen doble exposición. Véase, además, <u>United States v. Wheeler</u>, <u>supra</u>, pág. 321 ("*City and State, or **Territory and Nation, are not two separate sovereigns**[...] but one alone. And the "dual sovereignty" concept[...] does not permit a single sovereign to impose multiple punishment for a single offense merely by the expedient of establishing multiple*

*political subdivisions with the power to punish crimes*".). (Énfasis Suplido).

De particular importancia para nosotros, en <u>Puerto Rico v. Shell Co.</u>, 302 US 253 (1937), el Tribunal Supremo federal aplicó a Puerto Rico la norma establecida en <u>Grafton v. United States</u>, <u>supra</u>. En específico, expresó que Puerto Rico, por ser un territorio de Estados Unidos, no es un soberano para efectos de la cláusula de doble exposición. En ese caso un fiscal de Puerto Rico acusó a una compañía por violaciones a las leyes antimonopolísticas locales. Los acusados alegaron que esas leyes locales eran nulas porque el Congreso había ocupado el campo con la Ley *Sherman*. Inicialmente, resolvimos a favor de los acusados. Véase <u>Pueblo v. The Shell Co. Ltd.</u>, 49 DPR 226 (1935). Sin embargo, el Tribunal Supremo federal nos revocó y concluyó que las leyes anti-monopolísticas aprobadas por la legislatura de Puerto Rico eran válidas.

La controversia sobre la cláusula de doble exposición surgió ante una de las alegaciones de la compañía acusada. La compañía, que no había sido sometida a un proceso criminal anterior, alegó que si el Tribunal sostenía la validez de la ley estatal antimonopolios la sometería al riesgo de ser castigada dos veces por los mismos hechos, es decir, una primera vez en el foro de Puerto Rico bajo la ley local y una segunda en el foro federal bajo la ley federal anti-monopolios. El Tribunal Supremo federal concluyó que ese riesgo no existía porque el poder de

legislar del territorio y el de los Estados Unidos emanaba de una misma fuente. Así, expresó lo siguiente:

> *It likewise is clear that the legislative duplication gives rise to no danger of a second prosecution and conviction, or of double punishment for the same offense. The risk of double jeopardy does not exist. Both the territorial and federal laws and the courts, whether exercising federal or local jurisdiction, are creations emanating from the same sovereignty. Prosecution under one of the laws in the appropriate court, necessarily, will bar a prosecution under the other law in another court.* Puerto Rico v. Shell Co., supra, pág. 264. (citas omitidas).

El Tribunal Supremo también se ha negado a expandir la doctrina de soberanía dual a los municipios. Waller v. Florida, 397 US 387 (1970). Véase, además, LaFave, Israel, King and Kerr, op. cit., Vol. 3, Sec. 25.5(c). Los municipios no son entidades soberanas; más bien, son entidades subordinadas del gobierno creadas por el estado para asistirle en las funciones gubernamentales. Waller v. Florida, supra, pág. 392, citando a Reynolds v. Sims, 377 US 533, 575 (1964).[7] El Tribunal analizó la controversia de la siguiente forma:

> *[T]he apt analogy to the relationship between municipal and state governments is to be found in the relationship between the government of a Territory and the Government of the United States. **The legal consequence of that relationship was settled in Grafton v. United States,...[supra] where this Court held that a prosecution in a court of the United States is a bar to a subsequent prosecution in a territorial***

---

[7] Es cierto que algunos han abogado por un enfoque más práctico en lugar del criterio de "soberanía". Véase, por ejemplo, Price, supra. Pero, la realidad es que el Tribunal Supremo federal nunca ha abandonado el criterio de la fuente última de poder.

*court,* *since both are arms of the same sovereign.* (Énfasis suplido) Waller v. Florida, supra, pág. 393.

En Government of the Virgin Islands v. Dowling, 633 F.2d 660, 667 (3er Cir. 1980), *certiorari* denegado, 449 US 960 (1980), el Tribunal de Apelaciones para el Tercer Circuito afirmó que el Territorio de las Islas Vírgenes Estadounidenses y el gobierno federal constituyen una sola soberanía para propósitos de la cláusula contra la doble exposición. Íd., pág. 669. Cónsono con esa aseveración, el foro apelativo resolvió que era improcedente declarar culpables a los acusados por delitos iguales tanto en la jurisdicción federal como en la jurisdicción de las Islas Vírgenes. Véase Blockburger v. United States, supra, 304. Específicamente, se dijo que no puede concluirse que las Islas Vírgenes Estadounidenses tienen una soberanía independiente a la del gobierno federal. Véase, además, Government of Virgin Islands v. Brathwaite, 782 F.2d 399, 406 (3er Cir. 1986). Nótese que esto no es más que la aplicación de la norma ya establecida en Grafton v. United States, supra, y reafirmada en Puerto Rico v. Shell Co., supra.

El caso del Estado Libre Asociado (*Commonwealth*) de las Islas Marianas del Norte, aunque no ha sido resuelto definitivamente por un tribunal competente, parece ser igual. La ley federal que regula su relación con el gobierno federal establece que las Islas Marianas es un territorio no incorporado de los Estados Unidos. Saipan

Stevedore Co. Inc. v. Director, Office of Workers' Compensation Programs, 133 F.3d 717 (9no Cir. 1998) ("*The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"), ratified by Congress by joint resolution, established the Commonwealth as an unincorporated territory of the United States*".). En otras palabras, el gobierno de las Islas Marianas del Norte, de acuerdo a la doctrina de soberanía dual esbozada por el Tribunal Supremo, no es un soberano distinto al gobierno federal.[8] El caso de Guam parece ser similar. Véase la sentencia no publicada United States v. Carriaga, 117 F.3d 1426 (9no Cir. 1997) (No. 96-10427) ("*The government concedes that Guam and the federal government are a single sovereign*".).[9]

---

[8] Véase, sin embargo, la sentencia no publicada del Tribunal para el Distrito de las Islas Marianas del Norte, United States ex rel. Richards v. De Leon Guerrero, Misc. No. 92-00001 ((D. N. Mar. I. 1992), confirmado, 4 F.3d 749 (9no Cir. 1993) ("*For purposes of criminal double jeopardy, the federal courts, state [and Commonwealth of the Northern Mariana Islands] courts, and courts martial are considered courts of separate 'sovereigns'*".). Esta sentencia no publicada no es cónsona con lo resuelto por el Tribunal Supremo federal en Grafton v. United States, supra, y Puerto Rico v. Shell Co., supra. Por eso no nos persuade el *dicta* citado.

[9] Véase 48 USC sec. 1704 ("*A judgment of conviction or acquittal on the merits under the laws of Guam, the Virgin Islands, or American Samoa shall be a bar to any prosecution under the criminal laws of the United States for the same act or acts, and a judgment of conviction or acquittal on the merits under the laws of the United States shall be a bar to any prosecution under the laws of Guam, the Virgin Islands, or American Samoa for the same act or acts*"). El hecho de que no se mencione a Puerto Rico en esa ley de ninguna forma significa que, como territorio, no le aplique la doctrina de soberanía dual. La doctrina de soberanía dual es una cuestión

En cuanto a Washington D.C., otras cortes han resuelto que conforme con la cláusula constitucional que prohíbe la doble exposición, una persona no puede ser castigada por el mismo delito tipificado tanto en una ley federal como en el Código Penal del Distrito de Columbia porque ambos códigos son aprobados por el Congreso. Véanse United States v. Sumler, 136 F.3d 188, 191 (D.C. Cir. 1998); United States v. Weathers, 186 F.3d 948, 951 esc. 3 (D.C. Cir. 1999).

**IV**

**A. La doctrina de soberanía dual y el Estado Libre Asociado (Commonwealth) de Puerto Rico, según las cortes federales**

En United States v. López Andino, 831 F.2d. 1164 (1er Cir. 1987), el Tribunal de Apelaciones para el Primer Circuito se enfrentó a la controversia de si el Estado Libre Asociado de Puerto Rico era un soberano para efectos de la doctrina de soberanía dual. Allí, el Sr. Luis López Andino y el Sr. Israel Méndez Santiago resultaron convictos en el Tribunal de Estados Unidos para el Distrito de Puerto Rico por la violación de varios delitos. En lo que nos atañe, los convictos argumentaron que las convicciones en ese foro federal no procedían porque ya habían sido juzgados por los mismos delitos en la jurisdicción de Puerto Rico. United States v. López Andino, supra, pág. 1167. Por eso, alegaron que aplicaba la cláusula constitucional federal que prohíbe la doble exposición en procesos penales. Const. EE. UU., supra, Enmda. V.

---

constitucional sobre la que los pronunciamientos del Tribunal Supremo federal tienen primacía.

El Tribunal de Apelaciones para el Primer Circuito concluyó que la Ley de Relaciones de Puerto Rico y la creación de la Constitución de Puerto Rico alteraron la relación entre Puerto Rico y los Estados Unidos. United States v. López Andino, supra, pág. 1168. A juicio de ese tribunal, Puerto Rico se convirtió en soberano para propósitos de la doctrina de soberanía dual. Íd.

El Juez Torruella concurrió con el resultado por entender que los delitos imputados en los tribunales de Puerto Rico **eran distintos** a los imputados en el Tribunal Federal de Distrito. Íd., págs. 1172-1177. Eso hacía inaplicable la cláusula que prohíbe la doble exposición en la esfera penal. Sin embargo, el Juez Torruella expresó que Puerto Rico en la actualidad continúa siendo un territorio de Estados Unidos, y por lo tanto, no le aplica la doctrina de la soberanía dual.

El Tribunal de Apelaciones para el Undécimo Circuito se enfrentó a la misma controversia en United States v. Sánchez, 992 F.2d 1143 (11mo Cir. 1993), *certiorari* denegado, 510 US 1110 (1994). Contrario al Primer Circuito, el Tribunal de Apelaciones para el Undécimo Circuito resolvió que Puerto Rico es un territorio de Estados Unidos para propósitos del Art. IV, Sec. 3 de la Constitución de Estados Unidos, LPRA Tomo I, y no un soberano separado. Allí se procesó a los Sres. Rafael y Luis Sánchez en un tribunal federal de distrito en el estado de Florida. Los acusados adujeron que ya habían estado expuestos por los

mismos delitos en el Tribunal General de Justicia de Puerto Rico.

En un ejercicio de honestidad intelectual, el foro apelativo intermedio citó con aprobación lo resuelto en Puerto Rico v. Shell Co., supra, y concluyó que ese era el precedente que se debía seguir. Acto seguido, discutió por qué el establecimiento de la Constitución de Puerto Rico no alteró lo resuelto en Puerto Rico v. Shell Co., supra. En particular, sostuvo que en United States v. Wheeler, supra, resuelto luego de 25 años del establecimiento del Estado Libre Asociado de Puerto Rico, el Tribunal Supremo federal utilizó Puerto Rico v. Shell Co., supra, para distinguir entre el estatus dependiente de un territorio, y el estatus separado y soberano de las tribus nativo-americanas. También sostuvo que el desarrollo del Estado Libre Asociado de Puerto Rico no ha conferido a nuestros tribunales una fuente de autoridad punitiva que se derive de una soberanía inherente. United States v. Sánchez, supra, pág. 1152.

Luego de ese estudio, el Tribunal de Apelaciones para el Undécimo Circuito analizó los delitos imputados y resolvió que la cláusula que prohíbe la doble exposición impedía el procesamiento por uno de los delitos imputados (murder for hire), 18 USC sec. 1958, ya que los acusados estuvieron expuestos por un delito idéntico en los tribunales de Puerto Rico. United States v. Sánchez, supra, pág. 1159.

**B.  La controversia de soberanía dual ante el Tribunal Supremo de Puerto Rico**

Finalmente, en Pueblo v. Castro García, supra, este Tribunal adoptó la tesis del Tribunal de Apelaciones para el Primer Circuito y resolvió que el Estado Libre Asociado de Puerto Rico era un soberano para efectos de la cláusula de la doble exposición. Véase J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, Editorial Temis S.A., 2009, págs. 536-537. Afirmamos específicamente que "el poder del Estado Libre Asociado de Puerto Rico para crear y poner en vigor delitos emana no solo del Congreso, sino del consentimiento del Pueblo y, por tanto de sí mismo, por lo que es de aplicación la doctrina de soberanía dual". Íd. págs. 779-781. El Juez Asociado señor Rebollo López emitió una opinión disidente en la que, en síntesis, argumentó que Puerto Rico no es un soberano, sino que bajo el esquema constitucional de Estados Unidos es un territorio sujeto al poder de legislación del Congreso, según establecido por la cláusula territorial del Art. IV, Sec. 3 de la Constitución federal.

Este Tribunal se basó fundamentalmente en dos premisas para concluir que al Estado Libre Asociado le aplicaba la doctrina de la soberanía dual. Primero, el Tribunal, después de analizar toda la jurisprudencia sobre la materia, aplicó un razonamiento que el Tribunal Supremo federal nunca ha utilizado. En aquella ocasión, reiteramos entonces una y otra vez que el Estado Libre Asociado de

Puerto Rico goza de un grado de soberanía igual al de los estados de la Unión y, por eso, debía aplicársele la doctrina de soberanía dual. Véase, por ejemplo, Pueblo v. Castro García, supra, pág. 765 ("Puerto Rico advino al ejercicio de una soberanía similar a la de los estados de la Unión en aspectos sumamente fundamentales"). Véase, además, íd., págs. 769-771, 773, 775-776.

La segunda premisa en la que nos basamos en Pueblo v. Castro García, supra, es que luego de la aprobación de la Constitución del ELA en 1952, "el poder político de la isla emana del consentimiento y voluntad del Pueblo de Puerto Rico". Íd., pág. 765. Por eso, se concluyó que, luego del 1952, Puerto Rico se encuentra en una situación legal y política muy diferente a la que se encontraba cuando el Tribunal Supremo federal resolvió el caso de Puerto Rico v. Shell Co., supra. Véase Pueblo v. Castro García, supra, págs. 778-779.

Los peticionarios en el caso que tenemos ante nuestra consideración solicitan que revoquemos Pueblo v. Castro García, supra, y que no apliquemos la doctrina de soberanía dual a Puerto Rico. Luego de analizar la controversia, concluimos que los peticionarios tienen razón. Los fundamentos que este Tribunal utilizó en esa ocasión son erróneos desde el punto de vista estrictamente jurídico. Nos corresponde analizar si en 1952 Puerto Rico adquirió una soberanía primigenia o una soberanía independiente a la del Congreso –una soberanía cedida, no delegada- que haga

inaplicable hoy lo resuelto en 1937 en <u>Puerto Rico v. Shell Co.</u>, <u>supra</u>.

**V**

**A.  Puerto Rico y la cláusula territorial de la Constitución de Estados Unidos**

Contrario a las tribus nativo-americanas o los estados, Puerto Rico nunca ha ejercido una soberanía original o primigenia. Con el propósito de acabar con la Guerra Hispanoamericana de 1898, España cedió a los Estados Unidos la isla de Puerto Rico y las demás que estaban bajo su soberanía en las Indias Occidentales y el Pacífico, mediante el Tratado de París. Art. II, Tratado de París, LPRA, Tomo 1. Véase, además, J. Trías Monge, <u>Historia Constitucional de Puerto Rico</u>, Río Piedras, Ed. UPR, 1980, Vol. I, págs. 144-148. Se especificó que "los derechos civiles y la condición política de los habitantes de..." Puerto Rico serían determinados por el Congreso de los Estados Unidos. Art. IX del Tratado de París, <u>supra</u>.

En 1900, luego de dos años de gobierno militar, se estableció un gobierno civil en Puerto Rico mediante la Carta Orgánica de 12 de abril de 1900, conocida como la Ley Foraker. LPRA, Tomo 1. Esta ley del Congreso dispuso para un gobernador nombrado por el Presidente de Estados Unidos, una legislatura bicameral, un tribunal supremo y otros aspectos tributarios.

La controversia sobre la validez constitucional de la adquisición de Puerto Rico y otras posesiones no tardó en llegar al Tribunal Supremo de Estados Unidos. J.R.

Torruella, The Insular Cases: The Establishment of a Regime of Political Apartheid, 77 Rev. Jur. UPR 1 (2007). El mismo día, 27 de mayo de 1901, el Tribunal resolvió varios casos en los que se plantearon diversas controversias sobre la posesión y administración de los nuevos territorios. Véanse The Diamond Rings, 183 US 176 (1901); Huus v. New York & Porto Rico S.S. Co., 182 US 392 (1901); Downes v. Bidwell, 182 US 244 (1901); Armstrong v. United States, 182 US 243 (1901); Dooley v. United States, 182 US 222 (1901); Goetze v. United States, 182 US 221 (1901); Dooley v. United States, 183 US 151 (1901); De Lima v. Bidwell, 182 US 1 (1901). De estos casos, que llegaron a conocerse como los casos insulares, el más importante es Downes v. Bidwell, supra. Véase Álvarez González, op. cit., pág. 388.

En Downes v. Bidwell, supra, se cuestionó la validez constitucional de una de las secciones de la Ley Foraker que establecía una barrera arancelaria entre el comercio de Estados Unidos y Puerto Rico. Álvarez González, op. cit., pág. 388. Los demandantes alegaron que el impuesto violaba la Cláusula de Uniformidad de la Constitución. C. Duffy Burnett & A. I. Cepeda Derieux, Los casos insulares: Doctrina desanexionista, 78 Rev. Jur. UPR 661, 667 (2009). Esa cláusula dispone: "all Duties, Imposts and Excises shall be uniform throughout the United States". Art. I, Sec. 8 Const. EE. UU., LPRA, Tomo I. El Tribunal Supremo, sin poder esbozar una opinión que recogiera los fundamentos

de una mayoría de los jueces, resolvió a favor de la validez del impuesto. Downes v. Bidwell, supra, pág. 287.

El Tribunal concluyó que Puerto Rico es un territorio que pertenece a Estados Unidos, pero no es parte de la frase "Estados Unidos" para efectos del Art. 1, Sec. 8 de la Constitución federal. Íd. Véase, además, E. Rivera Ramos, The Legal Construction of Identity: The Judicial and Social Legacy of American Colonialism in Puerto Rico, Baltimore, American Psychological Association, 2001, pág. 80. De acuerdo al Juez Brown, el poder de adquirir territorios incluía el poder de gobernarlos, pautar bajo qué términos serían recibidos sus habitantes y cuál sería su *status*. Esos poderes plenarios sobre los territorios estarían sujetos a limitaciones fundamentales a favor de derechos personales. Downes v. Bidwell, supra, pág. 780.

El Juez White emitió una opinión concurrente y esbozó la teoría que más tarde se convirtió en la norma jurídica definitiva sobre los territorios: la doctrina de la incorporación. J. R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal, Río Piedras, Ed. UPR, 1985, pág. 53. El Juez White estuvo de acuerdo con que el Congreso tiene poderes plenarios sobre los territorios y que esos poderes están sujetos a ciertos principios fundamentales que, aunque no expresados en la

Constitución, no podían ser transgredidos. <u>Downes v. Bidwell</u>, <u>supra</u>, págs. 289-290.[10]

Sin embargo, el Juez White propuso que cuando se invoca una cláusula constitucional, la pregunta fundamental no es si la Constitución opera *ex proprio vigore*, sino si la cláusula invocada es aplicable a ese territorio en particular.[11] <u>Íd.</u>, pág. 292. La aplicabilidad de las cláusulas iba a depender entonces de la situación particular del territorio y su relación con los Estados Unidos.[12]

---

[10] El texto en inglés lee: "*The Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States, whether they have been incorporated or not, to give to the inhabitants as respects the local governments such degree of representation as may be conducive to the public well-being, to deprive such territory of representative government if it is considered just to do so, and to change such local governments at discretion*". <u>Íd.</u> págs. 289-290. El Juez White también expresó: "*While, therefore, there is no express or implied limitation on Congress in exercising its power to create local governments for any and all of the territories, by which that body is restrained from the widest latitude of discretion, it does not follow that there may not be inherent, although unexpressed, principles which are the basis of all free government which cannot be with impunity transcended*". <u>Íd.</u>, págs. 290-291.

[11] "*In the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable*". <u>Íd.</u>, pág. 292.

[12] Véase Duffy Burnett & Cepeda Derieux, <u>supra</u>, págs. 667-668 ("Según el Juez White, algunos de los territorios sujetos a la soberanía de Estados Unidos habían sido incorporados a la nación y ya formaban, para entonces, parte integral de Estados Unidos. Otros territorios habían sido anexados a Estados Unidos pero no incorporados formalmente; simplemente pertenecían a Estados Unidos o, en las palabras de White, eran '*appurtenant thereto as possessions*'. White describió a

El Juez White planteó que para resolver si la cláusula de uniformidad aplicaba a Puerto Rico, había que resolver si este había sido incorporado a los Estados Unidos y si se había convertido en parte integral de esa ente, según nombrado en la Constitución. Concluyó que, según los términos del Tratado de París, Puerto Rico no había sido incorporado a los Estados Unidos. Por tal razón, solo le aplicaban aquellas disposiciones constitucionales que se consideraran fundamentales.

De 1903 a 1914, el Tribunal Supremo federal resolvió otra serie de casos relacionados a diferentes cuestiones sobre los territorios. Véanse Ocampo v. United States, 234 US 91 (1914); Ochoa v. Hernández, 230 US 139 (1913); Dowdell v. United States, 221 US 325 (1911); Kopel v. Bingham, 211 US 468 (1909); Kent v. Porto Rico, 207 US 113 (1907); Trono v. United States, 199 US 521 (1905); Rasmussen v. United States, 197 US 516 (1905); Dorr v. United States, 195 US 158 (1904); Kepner v. United States, 195 US 158 (1904); González v. Williams, 192 US 1 (1904); Hawaii v. Mankichi, 190 US 197 (1903). Véase, Rivera Ramos, op. cit. pág. 75. Durante ese período se resolvió Grafton v. United States, supra, y se estableció la norma

---

estos territorios como 'foreign to the United States in a domestic sense'. Eventualmente, estos territorios adquirieron el título poco elegante de territorios no-incorporados"). Ahora bien, el Juez White aclara que para el resto de las naciones, como cuestión de derecho internacional, Puerto Rico no es un país extranjero, sino que es parte de Estados Unidos ("in an international sense Porto Rico was not a foreign country, since it was subject to the sovereignty of and was

anteriormente discutida de que un territorio no es un soberano para efectos de la cláusula constitucional contra la doble exposición ("*a territorial government is entirely the creation of Congress, `and its judicial tribunals exert all their powers by authority of the United States´*"). Véase, además, United States v. Wheeler, supra, pág. 322.

En 1917, el Congreso de los Estados Unidos aprobó una nueva Carta Orgánica conocida como la Ley Jones-Shafroth, 1 LPRA. Véase Trías Monge, op. cit., Vol. II, pág. 88. El cambio más importante de esta ley fue que le otorgó la ciudadanía de los Estados Unidos a los puertorriqueños. Eso hizo que el Tribunal Supremo federal tuviera que resolver si la otorgación de la ciudadanía americana a los puertorriqueños equivalía a la incorporación de Puerto Rico.

En Balzac v. Porto Rico, 258 US 298 (1922), una persona fue condenada a nueve meses de cárcel por emitir en contra del gobernador ciertos comentarios considerados libelosos. El acusado alegó que, bajo la Enmienda Sexta de la Constitución federal, tenía derecho a ser juzgado por un jurado. El Tribunal Supremo rechazó ese argumento.

El Tribunal Supremo adoptó unánimemente la teoría de la incorporación territorial del Juez White y afirmó que el derecho a ser juzgado por un jurado no aplicaba en aquellos

---

*owned by the United States*"). Downes v. Bidwell, supra, pág. 341.

territorios que no habían sido incorporados a la Unión.[13] A renglón seguido, el Tribunal Supremo analizó si la Ley Orgánica Jones incorporó finalmente a Puerto Rico. Contestó que no.

Entre otras cosas, concluyó que si el Congreso hubiera querido incorporar el territorio lo habría declarado con claridad y no lo hubiera dejado a la mera inferencia. Balzac v. Porto Rico, supra, pág. 306 (*"Had Congress intended to take the important step of changing the treaty status of Porto Rico by incorporating it into the Union, it is reasonable to suppose that it would have done so by the plain declaration, and would not have left it to mere inference"*.).

Muchos de los estudiosos del tema resumen la doctrina sobre Puerto Rico de la siguiente manera: "La Constitución aplica en su totalidad dentro de Estados Unidos (si esta frase se define para incluir únicamente a los estados de la unión, a Washington, D.C., y a los territorios incorporados), mientras que en los territorios no-incorporados aplican solamente las disposiciones fundamentales de la Constitución". Duffy Burnett & Cepeda Derieux, supra, págs. 667-668.

---

[13] En Pueblo v. Santana Vélez, 177 DPR 61 (2009), resolvimos, citando al profesor Álvarez González, que a pesar de lo resuelto en Balzac, "'[d]esde que Duncan v. Louisiana, 391 U.S. 145 (1968), resolvió que [el derecho a juicio por jurado] es 'fundamental' y, como tal, aplicable a los estados... parece razonable concluir que ese derecho es aplicable a Puerto Rico bajo la doctrina de incorporación territorial'".

A pesar de las críticas por su tono desdeñoso y despectivo hacia los habitantes de los territorios, y de la obsolescencia de mucho de lo resuelto en los casos insulares, la parte medular de la doctrina se ha seguido utilizando. Véanse, por ejemplo: Boumediene v. Bush, 553 US 723, 759 (2008)("*the Court devised in the Insular Cases a doctrine that allowed it to use its power sparingly and where it would be most needed. This century-old doctrine informs our analysis in the present matter*"); United States v. Verdugo-Urquidez, 494 US 259, 268 (1990) ("*The global view taken by the Court of Appeals of the application of the Constitution is also contrary to this Court's decisions in the Insular Cases, which held that not every constitutional provision applies to governmental activity even where the United States has sovereign power.*"). Para una discusión sobre estos últimos casos, véase G. A. Gelpí, Los casos insulares: Un estudio histórico comparativo de Puerto Rico, Hawái y las Islas Filipinas, 45 Rev. Jur. U. Inter. P.R. 215, 223-224 (2011) ("A la luz de Boumediene, el Tribunal Supremo en un futuro tendrá que reexaminar la doctrina de los Casos Insulares en su aplicación a Puerto Rico y otros territorios de los EE.UU."); C. Saavedra Gutiérrez, Incorporación *de jure* o incorporación *de facto*: Dos propuestas para erradicar fantasmas constitucionales, 80 Rev. Jur. UPR 967, 981 (2011) ("en cuanto a los territorios se refiere, la doctrina de los casos insulares

no ha salido intacta de los constantes ataques constitucionales que sufrió durante el siglo XX").

**B.    La situación de Puerto Rico después de la aprobación de la Constitución del Estado Libre Asociado (Commonwealth)**

Tras muchos años en los que diferentes sectores reclamaron más autonomía para Puerto Rico en sus asuntos internos, el 13 de marzo de 1950 se presentó un proyecto de ley ante el Congreso para viabilizar la adopción de una constitución. Trías Monge, op. cit., Vol. III, pág. 40. Ese proyecto desembocaría en la Ley Pública 600, 48 USC sec. 731b *et seq*. El tracto legislativo revela claramente que la adopción de esa constitución no representó un cambio en el *status* territorial de Puerto Rico.

Durante las vistas ante el Comité de Terrenos Públicos de la Cámara de Representantes del Congreso, el entonces Gobernador de Puerto Rico, Luis Muñoz Marín, expresó lo siguiente:

> *You know, of course, that if the people of Puerto Rico should go crazy, Congress can always get around and legislate again. But I am confident that the Puerto Ricans will not do that, and invite congressional legislation that would take back something that was given to the people of Puerto Rico as good United States citizens.* A. Leibowitz, The Commonwealth of Puerto Rico: Trying to Gain Dignity and Maintain Culture, 17 Rev. Jur. U. Inter. P.R. 1, 23 (1982), citando a Puerto Rico Constitution: Hearings on H.R. 7674 and S. 3336 Before the House Comm. on Public Lands, 81st Cong., 1st & 2nd Sess. 63 (1949-1950).

Antonio Fernós Isern, entonces Comisionado Residente de Puerto Rico en Washington D.C., afirmó, en la misma línea, lo siguiente:

*As already pointed out, H.R. 7674 would not change the status of the island of Puerto Rico relative to the United States. It would not commit the United States for or against any specific future form of political formula for the people of Puerto Rico. It would not alter the powers of sovereignty acquired by the United States over Puerto Rico under the terms of the Treaty of Paris.* Leibowitz, supra, 23. Véase además, Pueblo v. Castro García, supra, pág. 790 (Opinión disidente del Juez Asociado Señor Rebollo López).

El señor Fernós Isern añadió:

*I would like to make two comments: One, the road to the courts would always be open to anybody who found that an amendment to the constitution went beyond the framework laid down by Congress; and, secondly, the authority of the Government of the United States, of the Congress, to legislate in case of need would always be there.* Trías Monge, op. cit., Vol. III, pág. 45.

El informe del Secretario del Interior también dejaba claro que no existiría un cambio en la relación entre el gobierno federal y Puerto Rico. Así, afirmó:

*It is important at the outset to avoid any misunderstanding as to the nature and general scope of the proposed legislation. Let me say that enactment of S. 3336 will in no way commit the Congress to the enactment of statehood legislation for Puerto Rico in the future. Nor will it in any way preclude a future determination by the Congress of Puerto Rico's ultimate political status. The bill merely authorizes the people of Puerto Rico to adopt their own constitution and to organize a local government which, under the terms of S. 3336, would be required to be republican in form and contain the fundamental civil guaranties of a bill of rights.... The bill under consideration would not change Puerto Rico's political, social, and economic relationship to the United States.* Leibowitz, supra, pág. 24.

Los respectivos informes de la Cámara de Representantes y el Senado federal sobre el proyecto

endosaron la visión del Departamento del Interior. Así, los informes expresaron lo siguiente:

> *The bill under consideration would not change Puerto Rico's fundamental, political, social and economic relationship to the United States.... This bill does not commit the Congress, either expressly or by implication, to the enactment of statehood legislation for Puerto Rico in the future. Nor will it in any way preclude a future determination by the Congress of Puerto Rico's ultimate political status.* <u>Íd.</u> pág. 24. Véase, además, Trías Monge, <u>op. cit.</u>, Vol. III, págs. 51-54.

Ambas cámaras del Congreso aprobaron la medida y el 3 de julio de 1950, entró en vigor la Ley Pública 600. Trías Monge, <u>op. cit.</u>, Vol. III, pág. 56. Esta ley establecía que se aprobaba la Constitución con el carácter de un convenio que, como veremos, no significó que Puerto Rico dejara de ser un territorio de Estados Unidos. La ley derogó múltiples aspectos de la Ley Orgánica Jones-Shafroth de 1917 y dispuso para que aquellas disposiciones que quedaran vigentes se citaran como la Ley de Relaciones Federales con Puerto Rico. Trías Monge, <u>op. cit.</u>, Vol. III, pág. 38. De hecho, el estatuto mantuvo en vigor el Art. 1 de la Ley Orgánica Jones-Shafroth de 1917, que establece que sus disposiciones "se aplicarán a la Isla de Puerto Rico e islas adyacentes pertenecientes a los Estados Unidos, y a las aguas de esas islas". Ley de Relaciones Federales, Sec. 1, 1 LPRA, 48 USC sec. 731.

La Ley 600 tenía que ser aprobada por una mayoría de los electores de Puerto Rico, lo que ocurrió. Trías Monge, <u>op. cit.</u>, Vol. III, pág. 62. La Convención Constituyente se

reunió desde el 17 de septiembre hasta el 6 de febrero de 1952. Íd., pág. 78. Una mayoría de los delegados aprobó el borrador de la Constitución el 3 de marzo de 1952 y se sometió para la aprobación del Congreso. Íd. págs. 270-273.

El informe sobre la ratificación de la Constitución de la Comisión de lo Interior y Asuntos Insulares de la Cámara de Representantes volvió a repetir que la nueva constitución no alteraba las relaciones políticas, sociales y económicas fundamentales entre Estados Unidos y Puerto Rico. Trías Monge, op. cit., Vol. III, págs. 278-279. El informe del Senado, aunque no incluyó una disposición tan categórica, también hizo alusión a que el ejercicio de la autoridad federal en Puerto Rico no quedaba afectado por la Constitución de Puerto Rico. Íd., pág. 300.[14]

El Congreso aprobó la Constitución, pero requirió que se eliminara la Sección 20 del Art. II, que establecía ciertos derechos económicos, y que se clarificara otra de las disposiciones que requería asistir a las escuelas públicas elementales en la medida permitida por las posibilidades del Estado. Íd. Además, exigió que se incluyera una sección que especificara que cualquier enmienda a la Constitución debía estar de acuerdo con la Constitución federal, la Ley de Relaciones Federales de

---

[14] El texto en inglés lee: "*The enforcement of the Puerto Rican Federal Relations Act and the exercise of Federal Authority in Puerto Rico under its provisions are in no way impaired by the Constitution of Puerto Rico, and may not be affected by future amendments to that constitution, or by any law of Puerto Rico adopted under its constitution*".

Puerto Rico y la Ley 600. Íd. El Presidente Truman firmó la resolución mediante la que se aprobó la Constitución. Luego, la Convención Constituyente hizo lo propio. Íd. La Constitución del Estado Libre Asociado de Puerto Rico (ELA) entró en vigor el 25 de julio de 1952. Íd.

**C.   La interpretación judicial de la relación entre el Estado Libre Asociado (*Commonwealth*) de Puerto Rico y el gobierno federal**

El análisis jurídico de las relaciones entre Estados Unidos y Puerto Rico después de la creación del ELA tardó en llegar al Tribunal Supremo de Estados Unidos. Álvarez González, op. cit., pág. 473. No fue hasta 1970 que el Tribunal se expresó. Íd. Desde entonces el Tribunal ha tratado varias veces el tema. Véanse, por ejemplo: Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 US 572 (1976); Calero-Toledo v. Pearson Yacht Leasing Co., 416 US 663 (1974). Un análisis de estas opiniones confirma que, para el Tribunal Supremo federal, la adopción de la Constitución no representó un cambio en la base fundamental de las relaciones constitucionales entre Puerto Rico y Estados Unidos. El Tribunal Supremo siguió tratando a Puerto Rico como un ente político sujeto a la cláusula territorial de la Constitución federal.

El primer caso que llegó al Tribunal Supremo federal fue Fornaris v. Ridge Tool Co., 400 US 41 (1970). En este caso el Tribunal Federal de Apelaciones para el Primer Circuito concluyó que una ley aprobada por la legislatura

de Puerto Rico violaba la Constitución federal, sin especificar si violaba la Decimocuarta Enmienda o la Quinta. El Tribunal Supremo revocó y decidió devolver el caso a los tribunales de Puerto Rico porque no existían precedentes claros para resolver la disputa.

En Calero-Toledo v. Pearson Yacht Leasing Co., supra, una persona cuestionó la validez constitucional de una incautación que realizó la Policía de Puerto Rico sin notificación previa. Aunque el Tribunal resolvió en los méritos a favor de la validez de la incautación, no especificó si la disposición constitucional aplicable a Puerto Rico era la Enmienda Quinta o la Enmienda Decimocuarta de la Constitución federal.[15] Íd. pág. 669 esc. 5.

La mayoría de las expresiones respecto al *status* de Puerto Rico se dieron en torno a la jurisdicción del Tribunal Supremo para atender el caso. La controversia era si Puerto Rico podía ser considerado como un estado para propósitos de la ley que creaba un tribunal de tres jueces (*Three-Judge Court Act*), 28 USC sec. 2281. El Tribunal resolvió que, aunque no se había convertido en un estado de la Unión, Puerto Rico podría ser considerado como un estado para efectos de esa ley. Íd., pág. 672, citando a Mora v.

---

[15] "Respecto a la Enmienda Quinta, el problema consistía en que los requisitos del debido proceso de ley se aplican a los estados por vía de la Enmienda Decimocuarta, mientras que al gobierno federal y sus agencias, así como a los territorios y posesiones, se extienden en virtud de la Enmienda Quinta". J. Trías Monge, El Estado Libre Asociado ante los tribunales, 1952-1994, 64 Rev. Jur. UPR 1 (1995).

Mejías, 206 F.2d 377 (1er Cir. 1953) ("*Puerto Rico has thus not become a State in the federal Union like the 48 States, but it would seem to have become a State within a common and accepted meaning of the word*").

Para llegar a esa conclusión el Tribunal hace referencia, entre otras cosas, a uno de los artículos de la Ley 600 que establece que "se aprueba esta Ley, con el carácter de un convenio, de manera, que el pueblo de Puerto Rico pueda organizar un gobierno basado en una constitución adoptada por él mismo". Íd., pág. 672. (citando a Mora v. Mejías, supra) ("*It is a political entity created by the act and with the consent of the people of Puerto Rico and joined in union with the United States of America under the terms of the compact*").

En ciertas ocasiones se le ha adjudicado un alcance extremadamente amplio a esa frase que habla de un pacto o convenio. Véase, por ejemplo, Ramírez de Ferrer v. Mari Brás, 144 DPR 141, 154-169 (1997). Véase, además, R. Hernández Colón, Hacia la meta final: el nuevo pacto—un paso adelante (J. Hernández Mayoral, P. Hernández Rivera, eds.), San Juan, Ed. Calle Sol, 2011, pág. 8. Sin embargo, hoy está claro que lo único que abarcaba ese pacto o convenio al que se refería la Ley 600 era que si los puertorriqueños seguían el proceso allí dispuesto y daban su aprobación al estatuto, este entraría en vigor y el Congreso aprobaría una constitución para Puerto Rico, redactada por los habitantes del territorio. Así lo aclaró

el Congreso al seguir un proceso similar para el establecimiento del Estado Libre Asociado de las Islas Marianas del Norte (*Commonwealth of the Northern Mariana Islands*). Véase S. Rep. No. 94-596, pág. 1 (1976) ("*The essential difference between the Covenant and the usual territorial relationship... is the provision in the Covenant that the Marianas constitution and government structure will be a product of a Marianas constitutional convention, as was the case with Puerto Rico, rather than through an organic act of the United States Congress*").

Ese proceso, además, es similar al que ha utilizado el Congreso con otros territorios desde los primeros años de la Unión.[16] E. Biber, The Price of Admission: Causes, Effects, and Patterns of Condition Imposed on States Entering the Union, 46 Am. J. Legal Hist. 119, 125-129 (2004). Véanse, además: Ohio Enabling Act secs. 1, 4-5, 2 Stat. 173 (1802); Louisiana Enabling Act secs. 1-4, 2 Stat. 641 (1811); Illinois Enabling Act secs. 1, 3-4, 3 Stat. 429 (1818); Omnibus Enabling Act, 25 Stat. 676 (1889). El

---

[16] Biber, supra, págs. 125-129 ("*Admission of a territory to statehood requires at least one Act of Congress (or an equivalent thereof, such as a joint resolution). The process usually begins with Congress passing an enabling act which establishes a process by which a territory can hold a constitutional convention to draft a state constitution and elections for the first state officers and Congressional representatives. An enabling act can be prompted by petitions from the territory or by Congress's own initiative. The enabling act is important because it is usually the bill which spells out the conditions that Congress expects the new state to meet before (and after) admission; these conditions are often required to be drafted into the new state constitution itself and/or to be part of an "irrevocable" ordinance passed by the state constitutional convention.*").

Congreso, a través de leyes habilitadoras (*enabling acts*), autoriza al territorio a realizar una convención constituyente y redactar una constitución. Biber, supra, pág. 127. Si el territorio sigue el proceso dispuesto, puede remitir esa constitución al Congreso para su aprobación. Íd., pág. 128. El Congreso puede aprobar la constitución, rechazarla, modificarla o condicionarla. Íd. Ahí, el Congreso decide si acepta o no al territorio como un estado federado. Si no acepta al territorio como un estado de la Unión, este necesariamente continuará siendo un territorio. Véase National Bank v. County of Yankton, 101 US 129, 133 (1879) ("*All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress*"). Esa etapa de aceptación como un estado federado no ha ocurrido con Puerto Rico; no fue contemplada como parte del proceso que el Congreso estableció en la Ley 600.

Por su parte, la Sec. 2 del Art. I de la Constitución del ELA que establece que "[e]l gobierno del Estado Libre Asociado de Puerto Rico y sus Poderes Legislativo, Ejecutivo y Judicial… estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico" no significa que Puerto Rico haya sido investido de una soberanía propia ni que el Congreso haya perdido la suya. Lo único que significa esa frase es que el Congreso le delegó a los puertorriqueños la facultad de manejar el gobierno de la

Isla y sus propios asuntos internos, sujeto a la voluntad popular.[17] En ese sentido, el Pueblo de Puerto Rico es soberano solamente en aquellas materias locales que no están regidas por la Constitución de Estados Unidos. Calero-Toledo v. Pearson Yacht Leasing Co., supra, pág. 673. Sin embargo, eso no significa que Puerto Rico dejó de ser, como cuestión de derecho constitucional, un territorio de Estados Unidos; nunca hubo una cesión de soberanía, lo que hubo fue una delegación de poderes. Eso quedaría claro en los próximos casos.

En Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, supra, se cuestionó la validez de una ley de Puerto Rico que requería la ciudadanía americana para obtener una licencia de ingeniero. El Tribunal Supremo federal la invalidó sin especificar nuevamente por cuál disposición de la Constitución federal actuaba, fuere la cláusula de igual protección de la Enmienda Decimocuarta o la cláusula de debido proceso de la Enmienda Quinta. Sin embargo, el

---

[17] El 25 de noviembre de 1953, la Asamblea General de la Organización de Naciones Unidas (ONU) decidió que Estados Unidos podía dejar de enviar información sobre Puerto Rico, según el esquema de derecho internacional que prevalecía entonces. Posteriormente la ONU adoptó criterios específicos para determinar cuándo un Estado miembro tiene la obligación de transmitir información acerca de un territorio no-autónomo. Res. 1541(XV) de 1960. Esto no afecta la vigencia de las actuaciones tomadas antes de la aprobación de esos criterios. Sobre esto plantea el propio Trías Monge que "[e]l Congreso no le daría el menor peso en los años futuros a lo hecho por las Naciones Unidas". IV Trías Monge, op. cit., pág. 57. Lo pertinente aquí es que el trámite en la ONU no alteró el status de Puerto Rico dentro del esquema constitucional estadounidense.

Tribunal reconoció la aplicación y la vigencia de los casos insulares y citó con aprobación a Downes v. Bidwell, supra, y Balzac v. Porto Rico, supra. Fue más allá y dijo que lo que hizo en Calero-Toledo v. Pearson Yacht Leasing Co., supra, fue reafirmar la doctrina de los casos insulares.[18] En otras palabras, al resolver si ciertas disposiciones de la Constitución federal aplican a Puerto Rico, el Tribunal Supremo continuó tratando a Puerto Rico como un territorio.

Pero no fue hasta Torres v. Puerto Rico, 442 US 465 (1979), que el Tribunal Supremo utilizó sin ambages la doctrina de los casos insulares para ver si aplicaba una de las cláusulas de la Constitución federal a Puerto Rico. Ese caso trató sobre la validez de un registro que le hizo un agente estatal a una persona en el aeropuerto de Isla Verde. El Tribunal resolvió que el registro fue irrazonable. Para decidir si la protección de la Enmienda Cuarta contra registros y allanamientos irrazonables

---

[18] El Tribunal Supremo federal afirmó lo siguiente: "*It is clear now, however, that the protections accorded by either the Due Process Clause of the Fifth Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment apply to residents of Puerto Rico. The Court recognized the applicability of these guarantees as long ago as its decisions in Downes v. Bidwell, 182 US 244, 283-284, 21 S.Ct. 770, 785, 45 L.Ed. 1088 (1901), and Balzac v. Porto Rico, 258 U.S. 298, 312-313, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922). The principle was reaffirmed and strengthened in Reid v. Covert, 354 US 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), and then again in Calero-Toledo, 601 6 US 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), where we held that inhabitants of Puerto Rico are protected, under either the Fifth Amendment or the Fourteenth, from the official taking of property without due process of law*". Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, supra, pág. 600.

aplicaba a Puerto Rico, analizó toda la doctrina de los casos insulares y, luego, la aplicó:

> *Congress may make constitutional provisions applicable to territories in which they would not otherwise be controlling.... Congress generally has left to this Court the question of what constitutional guarantees apply to Puerto Rico.... However, because* **the limitation on the application of the Constitution in unincorporated territories is based in part on the need to preserve Congress' ability to govern such possessions**, *and may be overruled by Congress, a legislative determination that a constitutional provision practically and beneficially may be implemented in a territory is entitled to great weight.* (Énfasis suplido.) Íd. pág. 470.

Acto seguido, el Tribunal Supremo concluyó que la intención del Congreso, según evidenciada por la Ley Jones-Shafroth (ahora conocida como Ley de Relaciones Federales) y por la Ley 600, era que la protección de la Enmienda Cuarta aplicara a Puerto Rico. Íd., pág. 470 ("*Both Congress' implicit determinations in this respect and long experience establish that the Fourth Amendment's restrictions on searches and seizures may be applied to Puerto Rico without danger to national interests or risk of unfairness*").[19] Es incuestionable que en Torres v. Puerto

---

[19] "*From 1917 until 1952, Congress by statute afforded equivalent personal rights to the residents of Puerto Rico. Act of Mar. 2, 1917, § 2, cl. 13-14, 39 Stat. 952, repealed, Act of July 3, 1950, § 5(1), 64 Stat. 320 (effective July 25, 1952). When Congress authorized the people of Puerto Rico to adopt a constitution, its only express substantive requirements were that the document should provide for a republican form of government and "include a bill of rights." Act of July 3, 1950, § 2, 64 Stat. 319, 48 U.S.C., § 731c. A constitution containing the language of the Fourth Amendment, as well as additional language reflecting this Court's exegesis thereof, P.R. Const., Art. II, § 10, was adopted by the people of Puerto Rico and approved by Congress. See Act*

Rico, supra, el Tribunal trató a Puerto Rico como un territorio.[20] Véase, Álvarez González, op. cit., pág. 510.

En otra línea de casos, en los que se cuestionó la validez de algunas normas federales relacionadas a Puerto Rico, también surge con claridad que Puerto Rico continuó siendo un territorio. Álvarez González, op. cit., pág. 510. En Califano v. Torres, 435 US 1 (1978), se impugnó un programa de ayudas federales que excluía a los residentes de Puerto Rico y el Tribunal Supremo sostuvo su validez.

En Harris v. Rosario, 446 US 651, 651-652 (1980), en el que se presentó una controversia similar, el Tribunal Supremo aclaró los fundamentos para ese trato desigual hacia Puerto Rico:

> *Congress, which is empowered under the Territory Clause of the Constitution, to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," may treat Puerto Rico differently from States so long as there is a rational basis for its actions.* (Citas omitidas).[21]

---

*of July 3, 1952, 66 Stat. 327. That constitutional provision remains in effect"*. Torres v. Puerto Rico, supra, pág. 270.

[20] La diferencia entre territorio incorporado o no incorporado es inconsecuente para el análisis que hay que hacer en este caso. La jurisprudencia del Tribunal Supremo federal, al resolver que los territorios derivan su autoridad del mismo soberano que Estados Unidos, no hace esa diferencia.

[21] El Tribunal Supremo concluyó que al igual que en Califano, existen tres razones que justifican la actuación del Congreso: "*Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State under the statute would be high; and greater benefits could disrupt the Puerto Rican economy*". Harris v. Rosario, supra, pág. 652. Para una crítica a estos casos véase, J. Trías Monge, El Estado Libre Asociado ante los tribunales, 1952-1994, 64 Rev. Jur. UPR 1 (1995).

Lo que queda claro de estos casos es que el Tribunal Supremo federal siguió tratando a Puerto Rico como un territorio sujeto a la cláusula territorial y, por ende, a los poderes del Congreso. En el ejercicio de su poder sobre el territorio, el Congreso dispuso que la vigencia de la Ley 600 sería contingente, pues entraría en vigor solamente si el pueblo de Puerto Rico asentía a ello, lo que en efecto ocurrió. Por eso, esa autoridad se ejerce hoy dentro de los parámetros de la Ley 600 y la Constitución que el Congreso aprobó en el ejercicio de su poder plenario sobre el territorio. Como señaló el Juez Breyer, hoy Juez Asociado del Tribunal Supremo federal, en Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 41 (1er Cir. 1981), después de la creación del ELA, las relaciones entre Estados Unidos y Puerto Rico cesaron de estar sujetas solamente a la cláusula territorial y se añadieron nuevas restricciones legales que el Congreso se autoimpuso ("*the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rican Federal Relations Act and the rights of the people of Puerto Rico as United States citizens*").

Sin embargo, lejos de representar una renuncia irrevocable a su poder sobre el territorio, esas

limitaciones legales que el Congreso aprobó son parte del ejercicio de ese poder legislativo. Así, del mismo modo que las relaciones entre el Distrito de Columbia dejaron de estar sujetas meramente a la voluntad del Congreso autorizada por el Art. I, Sec. 8, Cl. 17 de la Constitución al aprobarse legislación que le dio al Distrito un gobierno municipal electivo, las relaciones entre Puerto Rico y el gobierno federal se rigen no solo por el Art. I, Sec. 8, de la Constitución, sino también por la legislación que el Congreso aprobó. Véanse *District of Columbia Home Rule Act*, D.C. Code secs. 1-201.01-1-207.71 (2001); Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia, 44 A.3d 299 (D.C. 2012).

Esa delegación de poder no constituye una renuncia irrevocable ni una terminación del poder del Congreso. El Pueblo de Estados Unidos le otorgó al Congreso, por medio de la Constitución, un poder amplio para administrar los territorios. Por esa razón, el Congreso no puede renunciar de manera irrevocable a un poder que le fue conferido por el Pueblo de Estados Unidos. Véase Clinton v. City of New York, 524 US 417, 452 (1998) ("*The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow*"). Véanse, además: R. S. Mariani, Sovereignty At Issue, Supreme Court´s Ambiguity and the Circuits' Conflict on the Application of the Dual Sovereignty Doctrine to Puerto Rico, 63 Rev. Jur. UPR 807

(1993); E. Rivera Pérez, Puerto Rico: Tres caminos hacia un futuro, Publicaciones Puertorriqueñas, San Juan, 1991, págs. 25-26.[22] Por eso, la propuesta alterna de algunos autores no es persuasiva. Véanse: D. M. Helfeld, Understanding United States-Puerto Rico Constitutional and Statutory Relations Through Multidimensional Analysis, 82 Rev. Jur. UPR 841, 874-875 (2013);[23] Hernández Colón, op. cit.

Es cierto, también, que algunos Jueces del Tribunal Supremo federal han planteado que la doctrina de los casos insulares se debe revisar. Véanse Harris v. Rosario, supra, pág. 653 (Opinión disidente del Juez Asociado Marshall) ("While some early opinions of this Court suggested that various protections of the Constitution do not apply to Puerto Rico,... the present validity of those decisions is questionable".); Torres v. Puerto Rico, supra, pág. 475.

---

[22] El caso de las Islas Marianas del Norte es un claro ejemplo de cómo el Congreso puede otorgar unos atributos a un territorio y después suprimirlos sin más. Las Islas Marianas administraban su propio sistema de inmigración, aun luego de haberse constituido en el Commonwealth of the Northern Mariana Islands. Sin embargo, en 2008 el Congreso, mediante la Consolidated Natural Resources Act of 2008, Pub. L. No. 110-229, 122 Stat. 754-876, le quitó todas las facultades para administrar su propio sistema de inmigración. Véase R. J. Misulich, A Lesser-Known Immigration Crisis: Federal Immigration Law in the Commonwealth of the Northern Mariana Islands, 20 Pac. Rim L. & Pol'y J. 211 (2011).

[23] Véase, sin embargo, D. M. Helfeld, Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico, 21 Rev. Jur. UPR 255, 307 (1952) ("Though the formal title has changed, in constitutional theory Puerto Rico remains a territory. This means that Congress continues to possess plenary but unexercised authority over Puerto Rico. Constitutionally, Congress may repeal Public Law 600, annul the Constitution of Puerto Rico

(Opinión concurrente del Juez Asociado Brennan) ("*Whatever the validity of the [Insular Cases] in the particular historical context in which they were decided, those cases are clearly not authority for questioning the application of the Fourth Amendment —or any other provision of the Bill of Rights— to the Commonwealth of Puerto Rico in the 1970's*".). Sin embargo, no se ha señalado que Puerto Rico haya dejado de ser un territorio sujeto a los poderes plenarios del Congreso.

**D.   Posición de la Rama Ejecutiva federal**

La Rama Ejecutiva del gobierno federal también ha confirmado que Puerto Rico sigue siendo un territorio de los Estados Unidos, lo que deja inalterada la autoridad soberana que el Congreso ejerce. En el 2000, el Presidente de los Estados Unidos Bill Clinton constituyó mediante un decreto el Grupo de Trabajo del Presidente sobre el Estatus de Puerto Rico con el propósito de auscultar un *status* futuro para Puerto Rico.[24] Los Presidentes que le siguieron, George W. Bush y Barack Obama, renovaron el grupo de trabajo durante sus respectivas administraciones. Estos grupos realizaron varios informes sobre Puerto Rico. Sus hallazgos confirman que Puerto Rico sigue siendo un territorio de los Estados Unidos.

---

*and veto insular legislation which it deems unwise or improper*").

[24] http://www.whitehouse.gov/sites/default/files/uploads/Puerto_Rico_Report_Espanol.pdf (última visita, 20 de marzo de 2015).

En específico, los Informes del Grupo de Trabajo de diciembre de 2007, págs. 19-20, y de marzo de 2011, pág. 3, reconocen que la Constitución aprobada por Puerto Rico estuvo sujeta a condiciones por el Congreso. Tanto en el Informe de 2007 como en el de 2011 se explica que las relaciones actuales entre Puerto Rico y Estados Unidos las continúa definiendo la Constitución de Estados Unidos y la Ley de Relaciones Federales. Informe del Grupo de Trabajo del Presidente de EEUU de marzo de 2011, pág. 20; Informe del Grupo de Trabajo del Presidente de EEUU de diciembre de 2007, pág. 5. Esa aseveración coloca de manifiesto que el Estado Libre Asociado de Puerto Rico no tiene ninguna autoridad para cambiar su relación con Estados Unidos. El estatus legal de Puerto Rico es el de un territorio sujeto al poder plenario del Congreso. Informe del Grupo de Trabajo del Presidente de EEUU de diciembre de 2007, pág. 5. Su nombre oficial (Estado Libre Asociado de Puerto Rico) no define ni cambia su estatus de territorio.

Al discutir el actual estatus político de Puerto Rico, el Informe de marzo de 2011, pág. 28, afirma que el Estado Libre Asociado está regido por la Cláusula Territorial de la Constitución de Estados Unidos. En su consecuencia, está sujeto a los poderes plenarios del Congreso. También se afirma en el documento que es imposible establecer una relación entre el territorio y el gobierno federal que solo pueda alterarse por consentimiento mutuo. Íd. Véase, también, Informe del Grupo de Trabajo del Presidente de

EEUU de diciembre de 2007, pág. 6. Esa relación no se puede poner en práctica "porque un Congreso futuro podría optar por modificar la relación unilateralmente". Íd.

Ello significa que el Congreso puede permitir que el Estado Libre Asociado permanezca como sistema político de forma indefinida, o por el contrario, tiene la autoridad constitucional para enmendar o revocar los poderes de administración interna que ejerce el Gobierno de Puerto Rico. Informe del Grupo de Trabajo del Presidente de EEUU de diciembre de 2007, pág. 6. Dicho de otro modo, el sistema de gobierno que rige internamente en Puerto Rico está sujeto por completo a la voluntad política y la autoridad legal del Congreso. Íd. Eso explica por qué, por mandato de ley federal, las diligencias federales todavía se hacen a nombre de "Estados Unidos de América, SS el Presidente de los Estados Unidos". Sec. 10 de la Ley de Relaciones Federales, LPRA, Tomo I, 48 USC sec. 874.

Todo lo anterior nos lleva a concluir que la aprobación de una constitución para Puerto Rico no representó un cambio en la base de las relaciones con Estados Unidos y, por lo tanto, Puerto Rico continúa siendo un territorio sujeto a la cláusula territorial de la Constitución federal. Así lo revela el tracto legislativo de la Ley 600 y su posterior interpretación por el Tribunal Supremo federal. Así lo interpreta también la Rama Ejecutiva federal. En fin, existe unanimidad entre las tres ramas acerca de este tema.

**VI**

El Estado Libre Asociado de Puerto Rico tiene una relación única, sin paralelo en la historia de Estados Unidos[25], como el primer territorio cuyos habitantes redactaron su propia constitución para regir sus asuntos locales. No obstante, por todo lo expuesto tenemos que concluir que el poder que sin duda ejerce Puerto Rico para procesar el crimen emana realmente de la soberanía de los Estados Unidos y no de una soberanía primigenia. Grafton v. United States, supra; Puerto Rico v. Shell Co., supra. Aun así, el Tribunal de Apelaciones concluyó que la doctrina de la soberanía dual aplicaba a Puerto Rico y resolvió que los señores Sánchez del Valle y Gómez Vázquez podían ser procesados en los tribunales de Puerto Rico, aun cuando ya un tribunal federal los condenó por la misma ofensa. Esas conclusiones son erróneas.

Es cierto que el Tribunal Supremo federal ha dicho reiteradamente que Puerto Rico goza de un grado de autonomía e independencia normalmente asociada con los estados de la Unión. Véase, por ejemplo, Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, supra, pág. 595 ("*the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States*

---

[25] Véase Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, supra, pág. 596.

*of the Union*"). Nosotros también hemos dicho lo mismo. Véase E.L.A. v. Northwestern Selecta, 185 DPR 40 (2012).

Otros casos donde el Tribunal Supremo trató al Estado Libre Asociado de Puerto Rico como si fuera un estado de la Unión son: El Vocero de Puerto Rico (Caribbean Intern. News Corp.) v. Puerto Rico, 508 US 147 (1993) (Primera Enmienda); P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 US 139 (1993) (inmunidad de Enmienda Once); P.R. Dept. of Consumer Affairs v. Isla Petroleum, 485 US 495 (1988) [desplazamiento (*preemption*)]; Puerto Rico v. Branstad, 483 US 219 (1987) (extradición); Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico, 478 US 328 (1986) (expresión comercial según la Primera Enmienda); Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 US 592 (1982) (poder de *parens patriae* sobre trabajadores migrantes); Rodriguez v. Popular Democratic Party, 457 US 1 (1982) (igual protección de las leyes); Chardón v. Fernández, 454 US 6 (1981) (prescripción); Torres v. Puerto Rico, supra (Cuarta Enmienda); Calero-Toledo v. Pearson Yacht Leasing Co., supra (permitió la apelación de una controversia sobre la validez de una ley de Puerto Rico como si fuera una ley de un estado).

De hecho, desde antes de la creación del ELA, el Tribunal Supremo federal había aseverado que "[e]l objetivo de la Ley Foraker y de la Ley Orgánica [Jones] era darle a Puerto Rico el poder pleno de autodeterminación local, con una autonomía similar a la de los estados y los territorios

incorporados". <u>Puerto Rico v. Shell Co.</u>, <u>supra</u>, págs. 261-262. (Traducción nuestra.) Véase, además, en el mismo sentido, vigente la Ley Jones-Shafroth, <u>Bacardi Corp. of America v. Domenech</u>, 311 US 150 (1940). Lo mismo se dijo mientras estaba vigente la Ley Foraker: <u>Porto Rico v. Rosaly y Castillo</u>, 227 US 270 (1913); <u>Gromer v. Standard Dredging Co.</u>, 224 US 362 (1912). Eso demuestra que, para el 1952, ese lenguaje no tenía nada de novedoso.

También es correcta la alegación de la Procuradora General en el sentido de que Puerto Rico tiene la capacidad para adoptar y poner en vigor sus propias leyes civiles y criminales. Véase <u>Calero-Toledo v. Pearson Yacht Leasing Co.</u>, <u>supra</u>, pág. 671, citando a A. Leibowitz, <u>The applicability of Federal Law to the Commonwealth of Puerto Rico</u>, 56 Geo.L.J. 219, 221 (1967) (*"Pursuant to that constitution, the Commonwealth now 'elects its Governor and legislature; appoints its judges, all cabinet officials, and lesser officials in the executive branch; sets its own educational policies; determines its own budget; and amends its own civil and criminal code'"*).

Sin embargo, el análisis que hay que realizar para determinar si existen dos soberanos distintos bajo la cláusula constitucional de la doble exposición no es si el ente se parece, actúa o tiene ciertas atribuciones de un verdadero soberano. La pregunta fundamental, de acuerdo al Tribunal Supremo federal, es si las dos entidades derivan su autoridad de la misma fuente última de poder. <u>United</u>

States v. Wheeler, supra; Waller v. Florida, supra. Dicho de otro modo, la pregunta no es si el ente puede ejercer tal o cual poder, sino por autorización de qué o de quién en última instancia ejerce ese poder.

Luego de un análisis desapasionado de la historia y de la inmensa literatura jurídica sobre el tema, tenemos que concluir que, tras la adopción de una constitución, Puerto Rico no dejó de ser un territorio de los Estados Unidos sujeto al poder del Congreso, según lo dispuesto en la cláusula territorial de la Constitución federal (Art. IV, Sec. 3).

**La autoridad de Puerto Rico para enjuiciar personas se deriva de la delegación que efectuó el Congreso de los Estados Unidos y no en virtud de una soberanía propia.** Como vimos, y contrario a las tribus indias o los estados, **Puerto Rico nunca ha tenido una soberanía original o anterior bajo la cual delegó poderes al Congreso. Es al revés.** La soberanía sobre Puerto Rico que poseía España fue transferida formalmente a los Estados Unidos en 1899, por el Tratado de París. Desde entonces, Estados Unidos administró a Puerto Rico por legislación aprobada al amparo de la cláusula territorial de la Constitución federal. La adopción de una constitución, por delegación del Congreso, para organizar el gobierno local en sustitución de gran parte de la ley orgánica vigente entonces, no representó una cesión de soberanía a Puerto Rico. Por el contrario, Puerto Rico no dejó de ser un territorio de los Estados

Unidos. Como tal, le aplica la norma establecida en Grafton v. United States, supra, reafirmada en Puerto Rico v. Shell Co., supra.

**En conclusión, el Estado Libre Asociado de Puerto Rico no es un ente soberano, pues, como territorio, su fuente última de poder para procesar delitos se deriva del Congreso de los Estados Unidos.** Véase United States v. Lara, supra, pág. 226 (Opinión disidente del Juez Asociado Thomas) (Citas omitidas) ("[T]*he Court has held that the Territories are the United States for double jeopardy purposes.... It is for this reason as well that the degree of autonomy of Puerto Rico is beside the point*"). Su poder lo ejerce como parte de una **delegación** de poderes y no por una **cesión** de soberanía del Congreso de Estados Unidos.

Por lo tanto, los fundamentos que utilizamos en Pueblo v. Castro García, supra, y el resultado alcanzado entonces no tienen base en el derecho constitucional federal. Hemos señalado la importancia del precedente en el desarrollo de nuestra jurisprudencia (*stare decisis*). Sin embargo, ese principio general no puede llevarnos a perpetuar equivocaciones doctrinales. Nuestras decisiones no tienen "el alcance de un dogma que debe seguirse ciegamente aun cuando el tribunal se convenza posteriormente [de] que su decisión anterior es errónea". Am. Railroad Co. v. Comisión Industrial, 61 DPR 314, 326 (1943). Por ello, hemos identificado tres circunstancias que, como excepción, justifican dejar a un lado un precedente: "(1) si la

decisión anterior era claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". Pueblo v. Camacho Delgado, 175 DPR 1, 20 esc. 4 (2008). Véanse, además, Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 DPR 365, 391 (2012); E.L.A. v. Crespo Torres, 180 DPR 776, 796-797 (2011); Pueblo v. Díaz de León, 176 DPR 913, 920 (2009); San Miguel, etc. & Cía. v. Guevara, 64 DPR 966, 974 (1945).

El primero de estos principios dispone de la cuestión planteada. Al aplicarlo, revocamos Pueblo v. Castro García, supra, y resolvemos que una persona que fue procesada criminalmente en un tribunal federal no puede ser procesada por el mismo delito en los tribunales de Puerto Rico porque eso constituye una violación del derecho constitucional contra la doble exposición, según consagrado en la Quinta Enmienda de la Constitución de Estados Unidos. Los argumentos del Estado conllevan necesariamente negar la aplicación de un derecho claro y preciso de rango constitucional, como es la prohibición a la doble exposición en casos penales.

**El impedimento a procesar un acusado en ambas jurisdicciones se limita a causas por el mismo delito. Esa limitación no es consecuencia de nuestra decisión sino de la condición territorial de Puerto Rico. Ahora bien, esto no significa que el gobierno de Puerto Rico y el gobierno**

**federal no puedan trabajar en conjunto y hacer acuerdos de colaboración para combatir el crimen.**

**Concedemos que si Puerto Rico fuera un estado de la Unión aplicaría la norma de la soberanía dual y el gobierno local podría continuar con el caso penal contra los peticionarios. Sin embargo, declarar la estadidad federada no está dentro de nuestras facultades constitucionales.** Como territorio, Puerto Rico no tiene una soberanía primigenia, separada de la del gobierno federal. Por eso la doctrina de soberanía dual no exime de la aplicación en casos como éste de la garantía constitucional contra la doble exposición. Así se resolvió en Puerto Rico v. Shell Co., supra, y Grafton v. United States, supra. La delegación de poder congresional con la creación del gobierno del Estado Libre Asociado no cambió esa realidad jurídica objetiva.

Ese es el estado de derecho actual. No podemos revocar una decisión del Tribunal Supremo de Estados Unidos ni negarnos a seguirla, mucho menos por mera conveniencia. "'Convenience and efficiency,' [...] 'are not the primary objectives' of our constitutional framework". N.L.R.B. v. Noel Canning, 573 US ___, ___, 134 S.Ct. 2550, 2598 (2014) (Opinión Concurrente del Juez Asociado Scalia). Además, como dijo el Juez Asociado señor Rebollo López:

> Aun cuando en nuestro carácter personal tenemos el derecho constitucional absoluto a crear y pensar acorde con nuestra particular visión de la vida y del mundo en que nos desenvolvemos, los integrantes de este Tribunal no podemos darnos el lujo de actuar y resolver

los asuntos ante nuestra consideración conforme a esas creencias o deseos personales, con total abstracción de la realidad jurídica que nos rodea. Pueblo v. Castro García, supra, pág. 790 (Opinión disidente del Juez Asociado Señor Rebollo López).

Los precedentes del Tribunal Supremo federal nos obligan y el Estado no ha presentado un argumento convincente que los haga inaplicables. Es nuestro precedente el que es claramente erróneo y le niega reconocimiento al derecho constitucional de los peticionarios. Por eso no puede prevalecer. Así, los señores Sánchez del Valle y Gómez Vázquez no pueden ser procesados en los tribunales de Puerto Rico por el mismo delito (o uno menor incluido) por el cual el Tribunal Federal para el Distrito de Puerto Rico ya los condenó.

**VII**

Por todo lo anterior, revocamos el dictamen del Tribunal de Apelaciones y ordenamos la desestimación de las denuncias presentadas al amparo del Artículo 5.01 de la Ley de Armas de Puerto Rico, supra, en contra de los señores Sánchez del Valle y Gómez Vázquez.

Se dictará Sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Luis M. Sánchez Valle<br><br>Peticionario<br>_____<br><br>El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Jaime Gómez Vázquez<br><br>Peticionario<br>_____<br><br>El Pueblo de Puerto Rico<br><br>v.<br><br>René Rivero Betancourt<br>_____<br><br>El Pueblo de Puerto Rico<br><br>v.<br><br>Rafael A. Delgado Rodríguez | CC-2013-0068<br>CC-2013-0072 |

SENTENCIA

En San Juan, Puerto Rico, a 20 de marzo de 2015.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, revocamos el dictamen del Tribunal de Apelaciones y ordenamos la desestimación de las denuncias presentadas contra los señores Sánchez del Valle y Gómez Vázquez por violar el Artículo 5.01 de la Ley de Armas de Puerto Rico, supra.

Notifíquese y publíquese inmediatamente.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. La Jueza Presidenta señora Fiol Matta concurrió con opinión escrita, a la que se unió la Jueza Asociada Oronoz Rodríguez. La Juez Asociada señora Rodríguez Rodríguez disintió con opinión escrita.


                          Aida Ileana Oquendo Graulau
                          Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Luis M. Sánchez Valle<br><br>Peticionario<br>———————————————<br>El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Jaime Gómez Vázquez<br><br>Peticionario | CC-2013-68<br><br>cons. con<br><br>CC-2013-72 | *Certiorari* |

Opinión Concurrente emitida por la Jueza Presidenta SEÑORA FIOL MATTA a la cual se une la Jueza Asociada ORONOZ RODRÍGUEZ

En San Juan, Puerto Rico, a 20 de marzo de 2015.

Coincido con la Opinión mayoritaria de este Tribunal en que un individuo no debe ser juzgado en nuestros tribunales por el mismo delito por el cual ya fue juzgado en un tribunal federal. Sostengo lo anterior, no al amparo de la protección contra la doble exposición de la Quinta Enmienda de la Constitución de Estados Unidos, sino en virtud de la protección fundamental contra la doble exposición reconocida por la Constitución del Estado Libre Asociado de Puerto Rico. Lo que me parece insostenible es el razonamiento en el que se apoya la Opinión, una interpretación totalmente descontextualizada, no sólo de nuestra historia

constitucional, sino de los fundamentos de la doctrina de la doble soberanía en la jurisprudencia federal.

La Mayoría razona que Puerto Rico carece de autoridad para encausar a los dos peticionarios porque "no tiene una soberanía primigenia, separada de la del gobierno federal" y porque "la creación del gobierno del Estado Libre Asociado no cambió esa realidad jurídica objetiva".[26] Para evitar esto, según su análisis, tendríamos que haber sido como las tribus indígenas de Norteamérica o ser un estado federado. La Opinión se equivoca en su análisis de nuestra historia constitucional y relación actual con Estados Unidos. Esa historia demuestra que Puerto Rico tiene suficiente soberanía para procesar a los peticionarios nuevamente al amparo de nuestra legislación penal.

Esa historia también revela que cuando el Pueblo de Puerto Rico reclamó y asumió el poder para crear y castigar delitos al adoptar la Constitución del Estado Libre Asociado de Puerto Rico, decidió ejercerlo responsablemente, limitándolo según el principio que informa todo nuestro ordenamiento jurídico y, particularmente, nuestros derechos fundamentales, el respeto a la dignidad humana.[27] En su afán por desmerecer el espíritu de nuestra Constitución y nuestra gesta de afirmación nacional, la Mayoría hace caso omiso de la verdadera controversia que nos plantea este caso: la incompatibilidad esencial entre la posibilidad de enjuiciar

---

[26] Opinión mayoritaria, en la pág. 67.

[27] Const. PR, Art. II, Sec. 1.

a un individuo dos veces por los mismos hechos delictivos y el principio esencial normativo de la Constitución de Puerto Rico, la inviolabilidad de la dignidad del ser humano.

Consecuentemente, hoy concurro con el resultado de la Opinión mayoritaria, no porque Puerto Rico carezca de soberanía para encausar a los recurrentes, sino porque hacerlo en circunstancias como las de este caso violaría la protección contra la doble exposición que les garantiza nuestra Constitución.[28]

**I**

La Opinión mayoritaria relata adecuadamente el trámite procesal de los recursos de epígrafe. Destacamos, sin embargo, el hecho de que en ambos casos el Tribunal de Primera Instancia desestimó *todas* las denuncias contra los peticionarios tras razonar que a pesar de lo resuelto por este Tribunal en *Pueblo v. Castro García*, Puerto Rico no posee soberanía propia y distinta a la del Gobierno federal, ya que ambos derivan su poder para encausar a sus ciudadanos de la misma fuente: el Congreso de Estados Unidos.[29] Por lo tanto, el foro primario concluyó que someter a los peticionarios a un juicio criminal por los mismos hechos ya adjudicados en el Tribunal de Distrito federal violaría la protección constitucional contra la doble exposición.

---

[28] Const. PR, Art. II, Sec. 11.

[29] Pueblo v. Castro García, 120 DPR 740 (1988).

El Ministerio Público acudió al Tribunal de Apelaciones y solicitó la revisión de ambas desestimaciones. El Tribunal de Apelaciones consolidó los recursos y revocó la desestimación de las denuncias por entender que según el estado de derecho vigente en Puerto Rico pronunciado en *Pueblo v. Castro García*, el Estado Libre Asociado de Puerto Rico y el Gobierno federal constituyen soberanías distintas y separadas, y cuentan con autoridad independiente para proscribir y castigar la conducta delictiva de sus ciudadanos.[30]

Inconformes, tanto el señor Sánchez Valle como el señor Gómez Vázquez presentaron recursos de *certiorari* ante este Tribunal. Expedimos ambos recursos y los consolidamos por tratarse de la misma controversia.

## II

La protección contra la doble exposición es un principio básico de nuestro ordenamiento jurídico, pues la Carta de Derechos de la Constitución del Estado Libre Asociado prohíbe que un ciudadano sea castigado dos veces por el mismo hecho delictivo.[31] Esta disposición se deriva de la protección similar que otorga la Quinta Enmienda de la

---

[30] Íd.

[31] Const. PR Art II, Sec. 11. Pueblo v. Rivera Cintrón, 185 DPR 484, 493 (2012); Pueblo v. Santiago, 160 DPR 618, 626 (2003).

Constitución de Estados Unidos, la cual provee el contenido mínimo que debe otorgar nuestra protección constitucional.[32]

La protección constitucional contra la doble exposición encarna unos principios con raíces profundas en la historia de la civilización occidental.[33] El Derecho Romano, al igual que derecho griego y el derecho canónico, protegían al individuo de procedimientos y castigos múltiples por el mismo delito o infracción.[34] Aunque se desconocen los orígenes precisos de la protección contra la doble exposición en el *common law*, para mediados del siglo XIII ya se reconocía cierto tipo de protección contra la doble exposición.[35] La jurisprudencia inglesa desarrolló este concepto en dos defensas, *autrefois acquit* (absolución previa) y *autrefois convict* (convicción previa). Ya para el Siglo XVIII, el comentarista Blackstone expresó que el principio de que ningún ser humano arriesgará su cuerpo más de una vez por la misma ofensa constituía una "máxima universal del derecho común".[36]

---

[32] Para una comparación entre la cláusula de la Constitución federal y la protección de nuestra Constitución, véase Ernesto L. Chiesa, II Derecho Procesal Penal de Puerto Rico y Estados Unidos, Sec. 16.1, pág. 349 (1995).

[33] David S. Rudstein, Double Jeopardy: A Reference Guide to the United States Constitution 1 (2004).

[34] Rudstein, op. cit., págs. 2-3. Véase también Erin M. Cranman, The Dual Sovereignty Exception to Double Jeopardy: a Champon of Justice or a Violation of a Fundamental Right, 14 Emory Int´l L. Rev. 1641, 1644 (2000).

[35] Rudstein, op. cit., págs. 1 y 4.
[36] Íd., pág. 4, citando a 4 Blackstone Commentaries 335. (Traducción nuestra).

En Estados Unidos, los principios que eventualmente informaron la redacción de la Quinta Enmienda estaban presentes en las colonias desde el siglo XVI, cuando varias reconocieron estatutariamente la protección contra la doble exposición.[37] En 1784, New Hampshire fue el primer estado en incluir la protección contra la doble exposición en su constitución, aun antes de que se adoptara la Constitución de Estados Unidos en 1789 y se ratificara la Quinta Enmienda de la Constitución federal en 1791.[38]

Éstos son los antecedentes históricos de la protección que brinda la sección 11 de nuestra Carta de Derechos. La protección que otorga nuestra Constitución es una criatura del *common law*, o derecho común angloamericano, incorporada al Derecho puertorriqueño como resultado de nuestra relación con Estados Unidos. Por lo tanto, este es particularmente importante como fuente para interpretar su alcance.[39]

**A**

---

[37] Íd, págs. 11-12.

[38] Íd, pág. 15.

[39] <u>Pueblo v. Santiago</u>, *supra*, pág. 627, n. 8. Nos referimos al *common law* o derecho común angloamericano como derecho común, reconociendo que el término tiene una acepción distinta en el Derecho Civil español. En los países de tradición jurídica civilista, al igual que en el derecho penal internacional, los principios de la protección contra la doble exposición se encuentran en la norma llamada *non bis in idem* (no dos veces por lo mismo). Esta máxima se deriva a su vez del derecho Romano que establecía que "*nemo debet bis vexari pro una et eadam causa*" (un hombre no debe ser castigado o procesado dos veces por la misma causa). *Véase* Gerard Conway, <u>Ne bis in idem in International Law</u>, 3 Int. Crim. L. Rev. 217, 221-222 (2003).

La protección constitucional contra la doble exposición se fundamenta en varias consideraciones de política pública. Intenta evitar que el gobierno tenga una segunda oportunidad para encausar a un individuo con el beneficio del conocimiento estratégico y sustantivo que pudo adquirir sobre la defensa del acusado en el primer procedimiento. También evita que el individuo sea sometido a procesos múltiples, protegiéndolo de ser hostigado por el estado y vivir ansioso ante la incertidumbre de que pueda ser encontrado culpable en cualquier ocasión, aun siendo inocente o absuelto de responsabilidad. Permitir que el Estado utilice todos sus recursos y poderes contra una persona supuestamente autor de un delito en repetidas ocasiones y sin restricción alguna constituiría un abuso de poder.[40] En fin, esta disposición protege al individuo al limitar el ejercicio del enorme poder punitivo del Estado.

La garantía constitucional contra la doble exposición brinda cuatro tipos de protecciones: a no ser expuesto a otro procedimiento criminal tras ser absuelto por la misma ofensa; a no ser expuesto tras ser convicto por la misma ofensa; a no ser expuesto tras iniciarse un juicio por la misma ofensa; y a no ser castigado múltiples veces por la misma ofensa. Es decir, protege a las personas contra

---

[40] Pueblo v. Rivera Cintrón, *supra*, pág. 493; Pueblo v. Santiago, *supra*; Pueblo v. Martínez Torres, *supra*, pág. 568. Véase, Ernesto L. Chiesa, Doble exposición, 59 Rev. Jur. UPR 479, 482 (1990).

castigos y procedimientos múltiples por la misma conducta delictiva.[41]

El requisito principal que activa la protección contra la doble exposición es que ambos procedimientos sean un intento de encausar o castigar al ciudadano por el mismo delito. Si se le intenta castigar por delitos distintos, no aplica la protección constitucional contra la doble exposición, aunque el ciudadano podría estar cobijado por protecciones estatutarias que encarnan los mismos principios de política pública, como la figura del concurso de delitos.[42]

Al evaluar si la persona fue expuesta dos veces por el mismo delito, los tribunales deben aplicar el criterio enunciado en *Blockburger v. US*: dos delitos no son los mismos si cada uno requiere prueba que el otro no requiere.[43] Así, el tribunal deberá comparar la definición de los

---

[41] Pueblo v. Santiago, *supra*, pág. 628; Pueblo v. Martínez Torres, *supra*, págs. 568-69; Ohio v. Johnson, 467 US 493, 498 (1984); Brown v. Ohio, 432 US 161, 165 (1977).

[42] Aunque la Ley de Armas expresamente dispone que la figura del concurso de delitos no aplicará a los delitos allí tipificados, en otras circunstancias podrían incidir la figura del concurso de delitos y la doctrina de la doble soberanía. 25 LPRA Sec. 460b. Véase, Ernesto L. Chiesa, Doble exposición, *supra*, pág. 544.

[43] Blockburger v. US, 284 US 299 (1932). Chiesa, Doble exposición, *supra*, pág. 485 (1990). El criterio de *Blockburger* fue revocado en Grady v. Corbin, 495 US 508 (1990), donde el Tribunal Supremo federal interpretó liberalmente el término *misma ofensa* de la Quinta Enmienda para activar la protección contra la doble exposición cuando dos delitos compartan por lo menos un elemento de tipo. Posteriormente el Tribunal Supremo federal revocó *Grady* y reinstaló el criterio de *Blockburger*, por lo que es la norma vigente. US v. Dixon, 509 US 688 (1993).

delitos en controversia para determinar si los elementos que deben probarse son los mismos. Si ese es el caso, se trata del mismo delito y se activa la protección constitucional contra la doble exposición. Igualmente, se activa dicha protección si uno de los delitos es un delito menor incluido en el otro.[44] En varias ocasiones hemos validado el criterio de *Blockburger* para determinar el alcance de la protección contra la doble exposición bajo nuestra Constitución, pues nuestro texto constitucional limita la protección al mismo *delito*.[45]

La Regla 64(e) de Procedimiento Criminal provee eficacia procesal a la garantía contra la doble exposición.[46] Para poder invocar la protección constitucional y solicitar la desestimación de una segunda denuncia o acusación, el acusado debe demostrar que se inició o celebró un primer juicio por el mismo delito por el cual se le acusa en el segundo procedimiento — o por un delito subsumido en éste. El primer juicio debió haberse celebrado ante un tribunal con jurisdicción y mediante un pliego acusatorio válido, y

---

[44] Véase <u>Pueblo v Rivera Cintrón</u>, *supra*, pág. 495, para un listado de nuestras opiniones al respecto.

[45] Véase, Ernesto L. Chiesa, <u>Doble exposición</u>, *supra*, para un análisis de las implicaciones de las diferencias en la redacción del derecho en cada constitución.

[46] 34 LPRA Ap. II, R.64e.

el procedimiento o sanción tiene que haber sido de naturaleza criminal.[47]

**B**

Tanto el artículo 5.01 de la Ley de Armas como el estatuto federal tipifican como delito el que una persona fabrique, importe o venda un arma de fuego sin poseer licencia para ello.[48] Ambos requieren que el Estado pruebe los mismos elementos delictivos — aunque en la jurisdicción federal también se requiere demostrar que la venta ocurrió en el comercio interestatal o internacional. Como bien señala la Opinión mayoritaria, uno de los delitos por los cuales se encausó a ambos peticionarios ante el Tribunal de Primera Instancia es un delito menor incluido en los delitos federales y constituyen el mismo delito bajo el criterio de *Blockburger*.[49] Consecuentemente, concurrimos con la Opinión mayoritaria en que solamente las denuncias por violaciones al Art. 5.01 están en conflicto con la protección constitucional contra la doble exposición, pues exponen a los recurrentes a un segundo procedimiento criminal y a la posibilidad de recibir un segundo castigo por la misma

---

[47] Pueblo v. Santiago, *supra*, pág. 626; Pueblo v. Martínez Torres, *supra*, pág. 568. Véase también, Chiesa, op. cit., Sec. 16A.

[48] 25 LPRA sec. 458; 18 USCA sec. 922(a)(1)(a).

[49] Opinión mayoritaria, pág. 9.

conducta delictiva castigada en el Tribunal de Distrito federal.[50]

Sin embargo, como los procedimientos criminales se iniciaron en los tribunales de dos jurisdicciones distintas — la del Gobierno federal de Estados Unidos y la del Gobierno del Estado Libre Asociado de Puerto Rico — debemos examinar la situación de los peticionarios a la luz de la doctrina de la doble soberanía.

**III**

A pesar de la primacía de los principios que encarnan las protecciones de la Quinta Enmienda en la estructura constitucional estadounidense, el Tribunal Supremo de Estados Unidos ha desarrollado una excepción a la prohibición contra la doble exposición: la doctrina de la doble soberanía. Según esta excepción, la protección constitucional contra la doble exposición de la Quinta Enmienda no aplica cuando dos soberanos distintos inician procedimientos criminales contra un ciudadano por el mismo delito.

Según ha expresado el Tribunal Supremo federal, como el delito es una ofensa contra la autoridad y dignidad de un soberano, al tipificar un delito el gobierno ejerce su propia soberanía. Cuando un mismo acto viola las leyes de dos soberanos ofende la paz y dignidad de cada uno y, por

---

[50] Aunque el Tribunal de Primera Instancia desestimó todas las denuncias contra los peticionarios, los demás delitos no chocan con la protección contra la doble exposición, pues

consiguiente, se cometen dos delitos distintos, aun cuando tengan los mismos elementos y se trate de los mismos hechos. Por tanto, como cada soberanía procesa al individuo por un delito distinto, la Quinta Enmienda no impide que el otro soberano inicie un segundo procedimiento criminal.[51]

Aunque el Tribunal Supremo aplicó esta doctrina por primera vez en el 1922, en *US v. Lanza*, sus cimientos se articularon en varias decisiones emitidas en el Siglo XIX.[52] En *Lanza*, el Tribunal de Distrito federal desestimó cinco cargos contra varios ciudadanos por violaciones al *National Prohibition Act*, pues un tribunal del estado de Washington

---

constituyen delitos distintos según el criterio de *Blockburger*.

[51] Heath v Alabama, 474 US 82, 88-89 (1985); Wheeler v US, 435 US 313, 320; Lanza v. US, 260 US 377, 382 (1922).

[52] US v. Lanza, *supra*. En el 1833, el Tribunal Supremo federal resolvió que la Carta de Derechos de la Constitución de Estados Unidos no vinculaba a los Estados. Barron v. Baltimore, 32 US (7 Pet.) 243. Esto implica que la Quinta Enmienda no impedía que los estados encausaran a sus ciudadanos una y otra vez — aunque bien podrían existir protecciones análogas en la constitución o legislación estatal. Por el contrario, la Quinta Enmienda sí impedía que el Gobierno federal procesara a un individuo múltiples veces por el mismo delito. Akhil Reed Amar y Jonathan L. Marcus, Double Jeopardy Law After Rodney King, 95 Col. L. Rev. 1, 4 (1995). Apoyándose en el razonamiento de *Barron,* el Tribunal luego expresó que castigos sucesivos por el gobierno estatal y federal no estarían prohibidos, pues la prohibición de la Quinta Enmienda sólo ataba al Gobierno federal. Fox v. Ohio, 46 US (5 How) 410 (1847). Luego, en *Moore v. Illinois*, el peticionario argumentó que la posibilidad de un encausamiento en el tribunal federal invalidaba su convicción en el tribunal estatal. El Tribunal rechazó el planteamiento y se enfocó en el concepto de *ofensa* o *delito* desde el punto de vista del gobierno y razonó que como el acusado era a la misma vez ciudadano de dos soberanos — Illinois y Estados Unidos — le debía lealtad a ambos. Como su conducta violó las leyes de ambos, cada soberano lo podía castigar, hipotéticamente por delitos distintos. 55 US (14 How.) 13, 20 (1852). *Véase* Reed Amar, *supra*, pág. 7.

había condenado a estos ciudadanos por los mismos hechos y por delitos idénticos bajo la ley estatal.[53] No obstante, el Tribunal Supremo federal entendió que al tipificar la venta de alcohol y los demás delitos en controversia, Washington ejerció su propia soberanía y, por lo tanto, un poder independiente al del Gobierno federal para castigar los delitos.[54]

La doctrina de la doble soberanía parte de la concepción del delito como una ofensa cometida contra la soberanía del gobierno y descansa en la premisa de que los ciudadanos de Estados Unidos son a la misma vez ciudadanos de un Estado o territorio, por lo cual le deben lealtad a dos soberanos, cada uno con autoridad para castigarlo independientemente de cómo proceda el otro.[55] Por lo tanto, para propósitos de la prohibición contra la doble exposición y la excepción de la doble soberanía, un soberano es el cuerpo político con autoridad para definir qué conducta constituirá un delito.

Sin embargo, según la doctrina de la doble soberanía, no basta la mera autoridad para crear y castigar delitos, sino que ambas jurisdicciones tienen que derivar esa

---

[53] El *National Prohibition Act*, 41 Stat. 305, codificó la prohibición de la manufactura, venta y posesión de alcohol que la XVIII Enmienda a la Constitución federal, hoy derogada, impuso en todo Estados Unidos. US v. Lanza*, supra*, pág. 379.

[54] US v. Lanza, *supra*, pág. 382.
[55] Heath v. Alabama, *supra*, pág. 88; Bartkus v. People of State of Ill., *supra*, pág. 131-32, citando a Moore v. People of State of Illinois, 55 US (14 How.) 13, 19-20 (1855).

autoridad de fuentes distintas.[56] **Serán consideradas soberanías distintas, para propósitos de la doctrina de la doble soberanía, si las entidades gubernamentales derivan su autoridad para castigar de fuentes distintas de poder.**[57] Cuando se ha avalado la excepción de la doble soberanía, el Tribunal Supremo federal ha examinado si existe una autoridad soberana independiente para encausar, en lugar de analizar la naturaleza de las relaciones políticas entre ambas entidades.

El escrutinio de la fuente última del poder para definir y castigar delitos descansa en una ficción jurídica que permite el buen funcionamiento del federalismo estadounidense: dentro de un mismo territorio, soberano ante las demás naciones en el ámbito internacional, existen dos entidades políticas principales — los estados miembros de la Unión y el Gobierno federal — que ejercen poderes y competencias particulares, distribuidos a través de la Constitución federal. Esta distribución de poderes es más complicada que el simple binomio estado—Gobierno federal, pues dentro del territorio de Estados Unidos hay una pluralidad de entes políticos y jurisdicciones cuyos poderes a veces se superponen unos a otros, tales como el Distrito de Columbia, las tribus indígenas, los territorios, los enclaves militares y el Estado Libre Asociado de Puerto

---

[56] Heath v. Alabama, *supra*, pág. 88; US v. Lanza, *supra*, pág. 382.

[57] US v. Wheeler, *supra*, pág. 320.

Rico, entre otros.[58] La historia y el desarrollo jurídico del federalismo estadounidense ofuscan la distinción entre la soberanía del Gobierno federal y la soberanía de las demás

---

[58] La Opinión mayoritaria, págs. 25-27, menciona unas decisiones de dos Circuitos distintos del Tribunal de Apelaciones de Estados Unidos que han determinado que las Islas Vírgenes estadounidenses y Guam no son soberanos para propósitos de la doctrina de la doble soberanía. Entiende además, aunque los tribunales federales no lo han decidido aún, que probablemente ese sea el caso de las Islas Marianas del Norte. La superficialidad con la que la Mayoría del Tribunal atiende el tema le hace caer en un grave error. Primero, Estados Unidos tiene varios territorios no incorporados sujetos a su soberanía con distintos grados de gobierno propio. Los casos de las Islas Vírgenes Americanas, Guam y Samoa Americana son claramente distinguibles del caso de Puerto Rico. Estos tres territorios se encuentran actualmente gobernados por leyes orgánicas legisladas por el Congreso, que se ha reservado en cada una de ellas la facultad para legislar localmente y vetar o anular leyes aprobadas por los territorios. Así, la Asamblea Legislativa de las Islas Vírgenes puede enmendar o derogar cualquier ley local y aprobar nueva legislación que no sea inconsistente con las leyes de Estados Unidos aplicables al territorio, "sujeto al poder del Congreso de anular dicha legislación". 48 USCA sec. 1574(c) (Traducción nuestra). En el caso de Guam, el Gobernador deberá enviar al Departamento del Interior de Estados Unidos toda legislación promulgada por el territorio. Este, a su vez, la envía al Congreso el cual "se reserva el poder y autoridad de anularlas". 48 USCA sec. 1423(i) (Traducción nuestra). Por último, las enmiendas o modificaciones a la constitución de Samoa Americana las podrá realizar el Congreso únicamente. 48 USCA sec. 1662(a). Lo anterior es cónsono con el lenguaje citado en la Opinión Mayoritaria del 42 USCA sec. 1704 que establece que cualquier proceso criminal en las Islas Vírgenes, Guam y Samoa Americana constituirá un impedimento para celebrar otro procedimiento criminal por los mismos hechos ante un Tribunal federal, y *vice versa*. Claramente, estos tres territorios se encuentran gobernados por leyes territoriales donde el Congreso es el legislador último e inapelable. Por el contrario, otros territorios con arreglos políticos distintos con Estados Unidos que no padezcan de las mismas ataduras legislativas podrían considerarse soberanos distintos para propósitos de la doctrina de la doble soberanía. Véase José Trías Monge, <u>Puerto Rico: Las penas de la colonia más antigua del mundo</u>, Editorial UPR, 1era Edición, págs. 191-205 (1999) (en adelante, Trías Monge, <u>Las Penas</u>). Véase también, Jon M. Van Dyke, <u>The Evolving Legal</u>

entidades políticas dentro de su territorio y bajo su control. Más allá, el acomodo federalista demuestra que dentro del sistema político y jurídico estadounidense no hay una concepción universal o singular de *soberanía* y que, por el contrario, coexisten una pluralidad de concepciones sobre la misma.

Cuando el Tribunal Supremo federal comenzó a desarrollar las bases de lo que luego se convertiría en la doctrina de la doble soberanía, no estaba claro cuáles entidades políticas dentro de Estados Unidos tenían atributos de soberano y cuáles no. En *Moore v. Illinois*, se habla indistintamente de estados y territorios de Estados Unidos expresando que un ciudadano le debe obediencia tanto a éstos como al Gobierno federal:

> Every citizen of the United States is also a citizen of every **State or territory**. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction on the laws of either. The same act may be an offence or transgression of the laws of both.[59] (Énfasis suplido).

A pesar de que en 1907 se resolvió, en *Grafton*, que los territorios no se consideran soberanos distintos al Gobierno federal, en 1959, tanto en *Bartkus* como *Abatte*, el Tribunal Supremo federal cita con aprobación las expresiones de *Moore v. Illinois*, *supra*, las cuales dan a entender que un mismo acto puede ofender las leyes de los soberanos al que un ciudadano le debe lealtad: el Gobierno federal y los estados

---

Relationships Between the United States and Its Affiliated U.S.-Flag Islands, 14 Uni. Hawai´i Law Review 444 (1992).
[59] Moore v. Illinois, *supra*, págs. 19-20; Bartkus, *supra*, a la página 131; Abatte, *supra*, pág. 192.

o los territorios. Tampoco se le intentó dar ninguna clase de contenido a la expresión "soberanía" que permitiera determinar en qué momento y cómo se alcanzaba o disfrutaba de tal condición.

Por otro lado, bajo el concepto de soberanía del derecho común inglés no se entendería que los estados de la Unión y el Gobierno federal constituyen soberanos distintos. Según el derecho común, "soberanía" se refiere al poder último, indivisible e ilimitado que tiene que existir en toda sociedad política.[60] Una simple lectura de la Constitución de Estados Unidos revela que la fuente última del poder de Estados Unidos, en todas sus manifestaciones, es el Pueblo estadounidense.[61] Éste es quien posee esa última voluntad soberana de la cual se derivan tanto los poderes del Gobierno federal como los de los estados.

---

[60] "The conventional British position understood ´sovereignty´ as that indivisible final, and unlimited power that necessarily had to exist somewhere in every political society. A single nation could not operate with two sovereigns any more than a single person could operate with two heads; some single supreme political will had to prevail, and the only limitations on that sovereign will were those that the sovereign itself voluntarily choose to observe." Daniel A. Braun, Praying to False Sovereign: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism, 20 Am. J. of Crim. L. 1, 26 (1992) citando a Akhil R. Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1430 (1987).

[61] "Nosotros, El Pueblo de los Estados Unidos, a fin de formar una Unión más perfecta, establecer la justicia, garantizar la tranquilidad nacional, tender a la defensa común, fomentar el bienestar general y asegurar los beneficios de la libertad para nosotros y para nuestra posteridad, por la presente promulgamos y establecemos esta Constitución para los Estados Unidos de América". I LPRA. (Énfasis suplido).

A diferencia de los Artículos de la Confederación, la constitución de Estados Unidos no se asemeja a un tratado entre estados soberanos independientes, sino que es un acuerdo de voluntades mediante el cual el Pueblo estadounidense creó una nueva unión federal luego del fracaso inicial de la Confederación. Los Artículos de Confederación fueron acordados por los Estados y no conferían jurisdicción al gobierno federal sobre los habitantes de Estados Unidos. Ante la debilidad del arreglo político de la Confederación y los problemas de legitimidad y gobernanza que engendró, la Constitución de Estados Unidos se animó en la soberanía popular — la voluntad del pueblo — para legitimar los poderes que posee el Gobierno federal y otorgarle jurisdicción sobre los ciudadanos de los estados.[62]

En 1816, el Juez Asociado Story identificó con claridad la fuente del poder político en Estados Unidos al expresar lo siguiente, en *Martin v. Hunter´s Lessee*:

The constitution of the United States was ordained and established, not by the states in their sovereign capacities, but emphatically, as the preamble of the Constitution declares, by "the People of the United States". There can be no doubt, that it was competent to the people to invest the general government with all the powers which they might deem proper and necessary; to extend or restrain those powers according to their own good pleasure, and to give them a paramount and supreme authority. As little doubt can there be, that the people had a right... to make the powers of the state governments, in given cases, subordinate to those of the nation, or to reserve to themselves those

---

[62] José J. Álvarez González, <u>Derecho Constitucional de Puerto Rico y relaciones constitucionales con Estados Unidos</u>, Editorial TEMIS, págs. 4-5 (2009).

sovereign authorities which they might not choose to delegate to either...[63]

Por consiguiente, si aplicamos el estándar articulado por el Tribunal Supremo federal, la fuente última de la autoridad para crear y castigar delitos recae verdaderamente en el Pueblo de Estados Unidos y no en el Gobierno federal ni los estados de la Unión.

Al aplicar la doctrina de la doble soberanía, el Tribunal Supremo federal ha resuelto que ésta permite que un Estado castigue a un individuo aún después que otro Estado lo haya castigado por el mismo delito.[64] También permite lo mismo cuando quien castiga originalmente por el mismo delito es el Gobierno federal,[65] al igual que permite al Gobierno federal castigar al individuo cuando el Estado lo ha castigado antes por el mismo delito.[66] Finalmente, permite que el Gobierno federal castigue a una persona por el mismo delito por el cual una tribu indígena lo ha castigado previamente.[67] Las únicas instancias donde el Tribunal Supremo ha resuelto que no aplica la doctrina de la doble soberanía es cuando los procedimientos criminales ocurren bajo la autoridad del Gobierno federal y un territorio de

---

[63] Martin v. Hunter´s Lessee, 14 US (1 Wheat) 304, 324-25 (1816).
[64] Heath v. Alabama, *supra*.

[65] Bartkus v. People of State of Ill., *supra*.

[66] Abbate v. US, *supra*.

[67] US v. Lara, 541 US 193 (2004); US v. Wheeler, *supra*.

Estados Unidos,[68] o bajo la autoridad de un municipio y el estado al que pertenece.[69]

Evaluemos el tratamiento que el Supremo federal ha dado a cada una de las soberanías que coexisten en la jurisdicción estadounidense.

### A

### Los estados de la Unión: *E Pluribus Unum*

Como vimos, el Tribunal Supremo federal no ha encontrado inconvenientes en resolver que los estados de la Unión son soberanos distintos para fines de la doctrina de la doble soberanía. Esto se enmarca en los principios del federalismo estadounidense: como el Gobierno federal es un gobierno de poderes enumerados, los estados retienen, a través de la Décima Enmienda, los poderes que no se delegaron expresamente al Gobierno federal. Entre los poderes retenidos se encuentra la autoridad para crear y castigar delitos.[70]

En *Bartkus v. People of Ill.*, se validó el encausamiento criminal por el estado de Illinois después que los acusados fueran absueltos del mismo delito en el Tribunal federal.[71] En *Abbate v. US* se atendió la situación

---

[68] Grafton v. US, 206 US 333 (1907).

[69] Waller v. Florida, 397 US 387 (1970).
[70] Heath v. Alabama, *supra*, pág. 89, citando a US v. Lanza, *supra*, pág. 382.

[71] Bartkus v. People of Ill., *supra*, pág. 129. Tras descartar la aplicación de la Quinta Enmienda al Estado de Illinois, el Tribunal Supremo analizó la controversia a la luz del debido proceso de ley de la Decimocuarta Enmienda.

inversa, pues los acusados se declararon culpables en el tribunal de Illinois antes de ser encausados en el foro federal. Ambas decisiones, emitidas el mismo día, validaron la doctrina de la doble soberanía y reiteraron lo dicho en *Lanza*.[72]

Lo decidido en *Bartkus y Abbate* descansa en la siguiente premisa: que dentro de la estructura del sistema federal estadounidense los Estados y el gobierno federal son comunidades políticas independientes.[73] Es por eso que el grado de control que ejerza el Gobierno federal sobre el estatal no impide que un estado, a su vez, ejerza su propia soberanía para castigar.[74]

Una vez articulada la doctrina, el Tribunal Supremo federal continuó extendiendo su aplicación en varios casos. En *Heath v. Alabama*, el Estado de Alabama acusó a Larry Gene Heath de ordenar el secuestro y posterior asesinato de su esposa. Heath ya había sido procesado en el Estado de Georgia, donde se consumó el asesinato, y se había declarado culpable a cambio de una condena de cadena perpetua. Acto seguido el Estado de Alabama, donde residían Heath y su esposa y donde ésta fue secuestrada, instó un procedimiento criminal por los mismos hechos y eventualmente condenó a Heath a la pena de muerte. El Tribunal Supremo federal reiteró lo dicho en *Bartkus*, *Abbatte* y *Wheeler*, y expresó

---

[72] Abbate v. US, *supra*, pág. 195.

[73] US v. Wheeler, *supra*, pág. 320.

[74] Íd., citando a US v. Lanza, *supra*, pág. 382.

que Georgia y Alabama eran soberanos distintos, por lo cual aplicaba la excepción de la doble soberanía. Según el Tribunal, la controversia requería determinar si la doctrina de la doble soberanía permitía procesos criminales sucesivos al amparo de las leyes de estados diferentes en situaciones en las que, de ordinario, aplicaría la protección constitucional en contra de la doble exposición.[75] Explicó que la doctrina de la doble soberanía se activa cuando los dos gobiernos derivan su autoridad para castigar de fuentes distintas.[76] Citando lo ya resuelto en sus opiniones anteriores, el Tribunal Supremo federal reafirmó que los estados derivan su poder para procesar a quienes violan sus leyes de lo que llamó su "soberanía inherente", la cual caracterizó de la siguiente manera:

Los Estados no son menos soberanos entre ellos, que respecto al gobierno federal. Sus poderes para iniciar procedimientos criminales se derivan de fuentes separadas e independientes de poder y autoridad, que les pertenecían antes de ser admitidos en la Unión y se preservaron mediante la Décima Enmienda.[77]

Vemos que el Tribunal articuló dos razones por las cuales considera que los estados son soberanos: poseían una soberanía inherente *antes* de ser admitidos a la Unión — que la Décima Enmienda les preservó — y la distribución de poderes entre los estados y el Gobierno federal les reconoce

---

[75] Heath v. Alabama, *supra*, pág. 88.

[76] Íd.

[77] Íd., pág. 89.

su soberanía.[78] Como Georgia y Alabama son soberanos distintos, Alabama no quebrantó la protección constitucional contra de la doble exposición al procesar y condenar al señor Heath por el mismo delito por el cual se había declarado culpable en Georgia. El Tribunal resolvió que Heath cometió dos delitos de asesinato distintos pues con un mismo acto, violó las leyes de dos estados soberanos, quebrantando la paz y la dignidad de cada uno. En el 1992, el estado de Alabama ejecutó a Larry Gene Heath.[79]

Según el Tribunal Supremo federal, los estados eran soberanos antes de ser admitidos a la Unión. Sin embargo, su análisis en torno a la soberanía de los estados resulta inadecuado desde una perspectiva histórica pues ignora por completo el proceso de incorporación y admisión de los territorios como estados de la Unión. Este proceso apunta en una dirección muy distinta.

La tesis de que los estados que hoy forman parte de la Unión alguna vez gozaron de una soberanía "original" o "inherente" sólo podría ser cierta respecto a los primeros estados que lograron su independencia del Imperio Británico antes de pactar los Artículos de Confederación. Los estados que crearon la Confederación pactaron bajo su poder soberano

---

[78] Íd., citando a Coyle v. Oklahoma, 221 US 559, 567 (1911). Véase, acápite VI de la Opinión concurrente, infra.

[79] La sentencia de muerte de Heath se ejecutó el 20 de marzo de 1992. *Ver*, Alabama Executes Man Who Arranged his Wife´s Murder, The New York Times, publicado el 21 de marzo de 1992.                    Disponible                    en http://www.nytimes.com/1992/03/21/us/alabama-executes-man-who-arranged-his-wife-s-murder.html (última visita el 12 de febrero de 2015).

y se reservaron todo poder no delegado expresamente al gobierno general.[80] Sin embargo, difícilmente se podría decir que la mayoría de los demás estados que se incorporaron a la Unión alguna vez disfrutó de soberanía original o inherente, pues la "soberanía" de cada uno de estos como estado nació en el mismo momento en que fue admitido a la Unión.[81]

En el esquema constitucional estadounidense, el Congreso tiene el poder para admitir nuevos territorios como estados de la Unión al amparo del Artículo IV de la Constitución federal.[82] La ley conocida como la *Northwest Ordinance* de 1787, la primera de las leyes territoriales que precedieron a las constituciones de muchos estados, disponía para la creación de un gobierno civil territorial de tres etapas; la última de ellas permitía que se autorizara la redacción de una constitución estatal una vez el territorio

---

[80] Una relación detallada del proceso de la creación y el desarrollo de Estados Unidos está fuera del alcance y propósito de esta Opinión. Nuestro objetivo es analizar en términos generales el proceso de colonización, incorporación y posterior admisión como estado federado de los territorios que fue anexando Estados Unidos en su proceso de expansión. De este modo intentaremos descubrir dónde residía, si es que alguna vez existió, esa soberanía original o inherente que el Tribunal Supremo federal y la Mayoría de este Tribunal le atribuyen a los estados de la Unión.

[81] Eric Biber, The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union, 46 Am. J. of L. History 119, 121-22 (2004).

[82] "New States may be admitted by the Congress into this Union". Const. EEUU, Art. IV, Sec. 3, cl. 1.

hubiera alcanzado una población y nivel de "americanización" aceptable para el Congreso.[83]

La ley obligaba a los territorios a crear un gobierno republicano, a proteger las libertades civiles y religiosas de los habitantes del territorio y mantenerse siempre dentro de la Unión, sujetos a los límites impuestos por la Constitución de Estados Unidos y las normas de su ley orgánica.[84] Según el lenguaje del estatuto, las disposiciones que contenían las obligaciones impuestas al territorio se conocerían como los "artículos del convenio" y jamás podrían ser alterados a menos que se obtuviera el consentimiento de ambas partes.[85] Como vemos, no hubo tal "soberanía original". Los territorios convertidos en estados no estaban en libertad de crear un gobierno con una constitución que

---

[83] Biber, *supra*, pág. 135, citando a Andrew R. L. Cayton, The Northwest Ordinance from the Perspective of the Frontier, en el libro de Robert M. Taylor, Jr., The Northwest Ordinance 1787: A Bicentennial Handbook, Ed. 1987. Para entender el esquema original de la ley*, véase, Northwest Ordinance* de 1787, 1 Stat 50-53. Esta Ley del Congreso sustituyó la *Northwest Ordinance* de 1784. Luego de la ratificación de la Constitución de Estados Unidos, la *Northwest Ordinance* de 1787 fue promulgada nuevamente por el Congreso con cambios menores. Véase, Biber, *supra*, pág. 134, n. 39.

[84] *Northwest Ordinance* de 1787, sec. 14, Arts. I-VI.

[85] "It is hereby ordained and declared, by the authority aforesaid, that the following articles shall be considered as articles of compact between the original States, and the people and States in the said territory, and forever remain unalterable, unless by common consent". Id. El Artículo VI de los "artículos del convenio" establecía en su última cláusula que la constitución estatal que se autorizaba a los habitantes del territorio a establecer debía crear un gobierno republicano y de conformidad con los artículos del "convenio". Tal como revelaría luego Fernós Isern, éste fue el modelo que se utilizó para la Ley 600. Trías Monge, Historia, Vol. 3, pág. 50.

respondiera a su voluntad absoluta, sino que la misma debía ceñirse a las exigencias mínimas impuestas por el Congreso y la Constitución de Estados Unidos. Por el lenguaje expresamente dispuesto en la *Northwest Ordinance*, las obligaciones y compromisos impuestos a los habitantes del territorio mediante esta ley orgánica no desaparecían una vez se alcanzaba la estadidad federada. Es decir, ni siquiera después de lograda la estadidad quedaban libres estos nuevos estados de las ataduras impuestas por los "artículos del convenio" de la *Northwest Ordinance*: estos seguirían aplicando a los nuevos estados quienes estaban imposibilitados de cambiarlos o derogarlos.[86]

Aunque lo dispuesto en la *Northwest Ordinance* de 1787 varió según se adoptaron las leyes orgánicas para los distintos territorios, el Congreso utilizó sus elementos principales al autorizar la admisión de varios territorios como estados de la Unión.[87] El proceso de admitir un nuevo estado comenzaba con la aprobación por el Congreso de una ley habilitadora (*enabling act* o "ley de bases" como las llamaba Trías Monge) estableciendo un procedimiento para que el territorio celebrara una asamblea constituyente, redactara una constitución estatal y eligiera sus representantes al Congreso.[88] Luego la constitución estatal

---

[86] Véase, Biber, *supra*, págs. 132-35.

[87] Íd., pág. 126, n. 19.

[88] Íd., págs. 127-28. Estas leyes establecen unas condiciones que los territorios debían satisfacer antes e incluso después de lograr la admisión mediante la adopción de las

se enviaba al Congreso para que revisara que la misma cumplía con las condiciones y restricciones impuestas en la ley habilitadora. Si el Congreso entendía que la constitución estatal cumplía con lo requerido, emitía una resolución en la cual simultáneamente aprobaba la constitución y admitía al territorio como nuevo estado de la Unión.[89]

El breve análisis histórico anterior nos permite derivar dos conclusiones. Primero, la pregonada soberanía original o inherente de los estados de la Unión no existe, o al menos es muy imprecisa desde el punto de vista histórico.[90] La realidad es que los territorios, en su inmensa mayoría, tuvieron que pasar por un proceso de colonización y desarrollo del gobierno territorial antes de ser admitidos como estados de la Unión. En este proceso, las realidades socio-culturales de los territorios y la política de Estados Unidos jugaron un papel determinante al momento de decidir qué condiciones se impondrían y cuánto tiempo duraría el periodo de tutela del Congreso sobre el

---

mismas en las constituciones estatales o a través de "ordenanzas irrevocables" aprobadas por las asambleas constituyentes de los territorios. Id. Véase *Ohio Enabling Act*, 2 Stat. 173; *Louisiana Enabling Act*, 2 Stat 641 Secc. 3 (1811); *Omnibus Enabling Act,* 25 Stat. 676, Sec. 4 (1889). Sin embargo, algunos estados no tuvieron una ley habilitadora. Biber, *supra*, pág. 128, n. 25.

[89] Íd. Véase, *An Act for the Admission of the State of Louisiana*, 2 Stat 701 (1812).

[90] Véase, Biber, *supra*.

territorio.[91] Por lo tanto, el que la inmensa mayoría de los estados de la Unión gozara de una soberanía original o inherente es tan sólo una ficción jurídica que nace en el mismo instante en que el estado es admitido a la Unión.[92] Segundo, aún después de ser admitidos como estados, éstos siguen atados y obligados por las condiciones que el Congreso impuso unilateralmente, por lo cual el Tribunal Supremo federal le reconoce una soberanía independiente a la del Gobierno federal que no llega a ser absoluta o ilimitada.

Resulta claro que la teoría de la soberanía original o inherente sería aplicable tan sólo a los trece estados originales que se independizaron del Imperio Británico antes de entrar a la Unión. Por lo tanto, la doctrina de la doble soberanía no puede sostenerse en que los estados tenían una soberanía previa al entrar en la Unión. Sin embargo, es evidente que los estados tienen jurisdicción independiente

---

[91] Íd., pág. 126. Por ejemplo, California fue admitido como estado de la Unión casi inmediatamente luego de la cesión hecha por México, mientras que Nuevo México tuvo que esperar alrededor de 60 años.

[92] La naturaleza política del gobierno de Estados Unidos a la que hace referencia la Opinión mayoritaria, donde el poder soberano se encuentra distribuido entre dos esferas distinguibles de gobierno – uno general o federal y otro local o estatal - en nada cambia esta realidad histórica y sus implicaciones para la doctrina de la doble soberanía. Aunque en efecto éste sea el sistema y el arreglo político reconocido en dicho país, sigue fundamentado en una ficción jurídica.

para prescribir qué constituirá una ofensa a su "soberanía" y poner en vigor las leyes que castigan dicha conducta.[93]

**B**

**Las Tribus Indígenas y el poder plenario del Congreso**

El Tribunal Supremo federal ha resuelto que la doctrina de la doble soberanía permite que un Tribunal de Distrito federal encause a un miembro de una tribu por el mismo delito por el cual fue enjuiciado en los tribunales de una tribu indígena.[94] No obstante, la manera en que el Tribunal ha aplicado esta doctrina revela las inconsistencias internas del criterio articulado para determinar qué entidades pueden considerarse soberanas.

Aunque las tribus indígenas están físicamente dentro del territorio estadounidense y están sujetas a los poderes plenarios del Congreso, se consideran pueblos separados con poder para controlar sus asuntos internos y relaciones

---

[93] La Opinión Mayoritaria, pág. 49, hace un breve recuento del proceso que siguieron algunos de los estados antes de ser admitidos en la Unión. Según se explica, una vez el Congreso ratifica o modifica la constitución territorial, decide si acepta o no al territorio como estado de la Unión en un proceso posterior. Se afirma que "[e]sa etapa de aceptación como un estado federado no ha ocurrido con Puerto Rico". Íd. Sin embargo, como explicamos, el acto mediante el cual el Congreso ratifica la constitución de un territorio **es el mismo momento en que se le admite** como estado de la Unión, y no un acto posterior. Veáse Biber, *supra*, pág. 128. Es cierto que Puerto Rico, bajo la Ley 600, no fue admitido como estado de la Unión; pero esto se debió a que en dicha legislación nunca se contempló la admisión de Puerto Rico como un estado. La isla no cumplía entonces, ni cumple hoy, con los criterios de asimilación y homogeneidad que sirven de justificación a los "*enabling acts*" mediante el cual el Congreso acostumbra a admitir nuevos estados. Biber, *supra*, pág. 120-21. Nuevamente, *e pluribus unum*.

[94] US v. Lara, 541 US 193 (2004); US v. Wheeler, *supra*.

sociales.[95] El Tribunal Supremo federal ha resuelto que las tribus poseen una soberanía inherente que no se ha extinguido, aunque su incorporación dentro del territorio de Estados Unidos necesariamente les removió ciertos atributos soberanos. En fin, las tribus indígenas poseen todos los atributos soberanos que no han perdido mediante tratados o legislación, o como consecuencia necesaria de su estatus de dependencia del gobierno federal.[96]

El Tribunal Supremo atendió la doctrina de la doble soberanía en el contexto de las tribus indígenas en 1978, en *US v. Wheeler*. Un miembro de la Tribu Navajo fue sentenciado en el tribunal de la Tribu por infringir su código penal. Un año más tarde, un gran jurado federal encontró causa para acusarlo ante el Tribunal de Distrito federal de Arizona por el delito federal de agresión sexual estatutaria. El acusado solicitó la desestimación de la acusación por entender que el delito por el cual lo sentenció la Tribu era uno menor incluido en el delito federal. El Tribunal federal desestimó las acusaciones.

El Supremo federal revocó la desestimación y resolvió que la excepción de la doble soberanía aplicaba a las tribus indígenas, por lo menos respecto a su autoridad para castigar a los miembros de la propia tribu. Tras evaluar la excepción de la doble soberanía y las instancias donde había validado o invalidado su aplicación, el Supremo federal

---

[95] US v. Wheeler, *supra*, pág. 322, citando a US v. Kagma, 118 US 375, 381-82 (1886).

concluyó que la Tribu Navajo nunca renunció a su soberanía original (*primeval sovereignty*) para castigar delitos cometidos por miembros de su propia tribu. Por tanto, "cuando la Tribu Navajo ejerce su poder, lo hace como parte de la soberanía que retuvo y no como una extensión del Gobierno federal".[97]

En otras palabras, la fuente última del poder de las tribus para encausar es la soberanía "primitiva" que poseyeron antes de su conquista por Estados Unidos y no una delegación de autoridad por parte del Congreso. El que el Congreso regule la forma y extensión del gobierno propio de las tribus no significa que este sea la fuente de ese poder.[98] Aunque los tratados entre las tribus y Estados Unidos delegaron la autoridad para que Estados Unidos castigaran a miembros de la tribu que cometieran delitos contra individuos que no lo eran, no eliminaron la jurisdicción de la Tribu para castigar a sus propios miembros.[99] El poder para gobernar sobre asuntos internos tampoco era una delegación de autoridad por parte del Congreso, pues tal delegación no aparece en los tratados y leyes.[100]

Existe una tensión inherente entre aseverar que las tribus indígenas poseen soberanía para fines de la cláusula

---

[96] Íd., pág. 322.
[97] Íd., pág. 328 (Traducción nuestra).

[98] Íd.

[99] Íd., pág. 324.

contra la doble exposición y reconocer el control plenario que aún posee el Congreso sobre ellas. Aunque las tribus se consideran soberanos distintos para la doctrina de la doble soberanía, en virtud de la constitución federal el Congreso tiene poderes plenarios para legislar sobre ellas.[101] Por tanto, la soberanía de una tribu para crear delitos y castigarlos está sujeta al control federal que el Congreso puede ejercer unilateralmente, mediante legislación.[102]

El trato aparentemente paradójico hacia la soberanía de las tribus no tardó en producir resultados indeseables. En *Wheeler*, el Tribunal Supremo sólo reconoció que cuando una tribu indígena castiga a *sus propios miembros* está ejerciendo uno de los poderes inherentes a su soberanía limitada que nunca cedieron. Sin embargo, en *Duro v. Reina* el Tribunal Supremo federal resolvió que esos vestigios de soberanía no autorizaban a una tribu a encausar miembros de otras tribus, aun cuando los delitos se cometieran dentro de su territorio.[103] En respuesta directa a esta decisión, el Congreso legisló para reconocer y afirmar la autoridad inherente de una tribu para iniciar una acción penal contra un indio que no es miembro de la tribu.[104]

---

[100] Íd., pág. 326.

[101] US v. Lara, *supra*, pág. 200.

[102] US v. Wheeler, *supra*, pág. 327.

[103] Duro v. Reina, 495 US 676 (1990).

[104] 25 USC sec. 1301(2).

El Supremo federal analizó esta nueva autoridad estatutaria en el contexto de la excepción de la doble soberanía en *US v. Lara*.[105] Un miembro de otra tribu que habitaba dentro del territorio de la Tribu Spirit Lake se declaró culpable ante un tribunal de la Tribu por agredir a un oficial federal. Posteriormente fue encausado en el Tribunal de Distrito federal de North Dakota por el mismo delito. Considerando que el Congreso legisló para revocar el resultado de *Duro v. Reina*, al evaluar si la acusación federal constituía una violación a la protección contra la doble exposición, el Supremo federal afinó la controversia de la siguiente forma: ¿cuál era la fuente última de la autoridad de la Tribu para castigar a indios de otras tribus, su soberanía inherente o una delegación federal de autoridad?[106]

El lenguaje estatutario de la ley examinada en *Lara* fue redactado cuidadosamente, de forma tal que se ajustara a la norma pautada en *Wheeler*. El historial legislativo demostraba que el estatuto no delegaba jurisdicción a las tribus sobre más individuos, sino que reconocía y afirmaba que el poder de las tribus para castigar a miembros de otras tribus dentro de su territorio es uno de los poderes que las tribus no cedieron al Gobierno federal. En virtud de esta declaración de intención legislativa, el Supremo federal concluyó que la ley no fue una delegación de autoridad del

---

[105] US v. Lara, *supra*.
[106] Íd., pág. 199.

Congreso, sino un reconocimiento válido de la soberanía inherente de la tribu, la cual puede ser modificada al amparo de los poderes plenarios del Congreso.[107] Es decir, como la intención legislativa fue reconocer la soberanía inherente de las tribus, la ley que autoriza a la tribu a encausar a indios que no sean miembros de esa tribu no fue una delegación de poder de parte del Congreso, sino un ejercicio válido de la autoridad del Congreso para alterar las restricciones que las ramas políticas le habían impuesto al poder punitivo de las tribus.[108]

## C

**Sujetos a la voluntad del soberano: territorios y ciudades.**

Los tribunales federales han reconocido excepciones muy limitadas a la doctrina de la doble soberanía.[109] La excepción más importante — y a la cual se ancla hoy el razonamiento de la Mayoría — ocurre cuando los procedimientos criminales son iniciados por el gobierno de

---

[107] Íd., pág. 209. De hecho, en el 2013 el Congreso le confirió jurisdicción criminal a las tribus sobre individuos que no fueran miembros de alguna tribu. Zachary S Price, Dividing Sovereignty in Tribal and Territorial Criminal Jurisdiction, 117 Col. L. Rev. 657, 668, n. 40 (2013). Violence Against Women Reauthorization Act of 2013 (VAWA), Pub. L. No. 113-4, tit. IX, sec. 904.

[108] Íd., pág. 199.

[109] En cuanto a la soberanía de las ciudades frente al estado al que pertenecen, el Tribunal Supremo ha expresado que: "[a]ny power it has to define and punish crimes exists only because such power has been granted by the State, the power ́derive[s] ... from the source of [its] creation ... the judicial power to try petitioner ... in municipal court springs from the same organic law that created the state court of general jurisdiction ́". Waller v. State of Florida, 397 US 387 (1970).

un territorio de Estados Unidos y el Gobierno federal. Como el gobierno de un territorio deriva sus poderes del Congreso, sus tribunales territoriales no son más que una extensión de dicha autoridad, de manera que ambas entidades ejercen el poder punitivo del mismo soberano y las protecciones de la Quinta Enmienda impiden que ambos encausen a un individuo por el mismo delito.[110]

El Tribunal Supremo federal estableció que los territorios no eran soberanos distintos del Gobierno federal quince años antes de articular la doctrina de la doble soberanía en *Lanza*, *supra*. En *Grafton v. US*, resuelto en el 1907, un soldado estadounidense fue absuelto por un tribunal militar de cometer asesinato, pero luego fue hallado culpable por el mismo delito en el tribunal territorial de las Filipinas. El Tribunal Supremo federal razonó que el gobierno de las Filipinas debía su existencia absolutamente a la voluntad de Estados Unidos. Es decir, la legitimidad del gobierno de las Filipinas dependía de la jurisdicción y autoridad que Estados Unidos tenía sobre el archipiélago, y ambos tribunales — el militar y el territorial — ejercían sus poderes bajo la autoridad del mismo soberano, Estados Unidos.[111] Por lo tanto, revocó la convicción dictada por el tribunal del territorio de las Filipinas porque la Quinta

---

[110] <u>Grafton v. US</u>, 206 US 333, 354 (1907).

[111] Íd., págs. 354-55.

Enmienda impedía que el acusado fuera enjuiciado dos veces por el mismo delito.[112]

En 1907, Filipinas era un territorio de Estados Unidos obtenido como resultado de la guerra con España en 1898. En esa época, Filipinas tenía un gobierno civil creado en virtud de la Ley Orgánica de Filipinas de 1902, también conocida como la "Ley Cooper".[113] La Ley Cooper era una legislación del Congreso que le otorgaba un gobierno civil al país recién anexado y le autorizaba a elegir una asamblea legislativa una vez cesara toda rebelión armada en contra de Estados Unidos.[114] Sin embargo, a pesar de que esta ley orgánica le daba a la asamblea legislativa territorial facultades legislativas limitadas, el Congreso se reservó el poder de veto incondicional y podía anular toda aquella legislación con la que no estuviese de acuerdo.[115] No nos debe resultar extraño entonces que el Tribunal Supremo federal haya encontrado que las leyes aprobadas por la asamblea legislativa filipina en virtud de la Ley Cooper eran en realidad un poder delegado por el Congreso, del cual derivaba la autoridad para adoptarlas y quien se reservaba la última palabra para autorizar o anular las mismas.

---

[112] Íd., pág. 352.

[113] 32 Stat 691.

[114] Ley Orgánica de Filipinas, *supra*, sec. 7.

[115] Íd., sec. 86. El estatuto establecía que "all laws passed by the government of the Philippine Islands shall be reported to Congress, which hereby reserves the power and authority to annul the same". Íd.

Como veremos más adelante, la Ley Foraker de 12 de abril de 1900, que instituyó en Puerto Rico un gobierno civil sujeto fuertemente a la tutela del gobierno de Estados Unidos, tenía una disposición análoga que preservaba el poder de veto del Congreso sobre la legislatura territorial.[116] Por lo tanto, en la medida en que la ley territorial — ya fuera la promulgada por Filipinas bajo la Ley Cooper o la promulgada por Puerto Rico bajo la Ley Foraker o la Ley Jones — era en realidad una expresión de la autoridad del Congreso, los procesos judiciales en el tribunal federal o en el tribunal territorial se realizaban al amparo de la autoridad del mismo soberano, el Gobierno federal.

Es en este trasfondo que tenemos que analizar el caso de *People of Porto Rico v. Shell Co.*, donde el Supremo federal, en *dictum*, reafirma lo ya dicho en *Grafton* a los efectos de que en los territorios no aplica la excepción de la doble soberanía.[117] En *Shell Co.*, el Tribunal Supremo federal analizó la facultad de la Asamblea Legislativa territorial de Puerto Rico para legislar en contra de monopolios y prácticas ilícitas comerciales, un campo que

---

[116] 31 Stat. 77. Véase, Trías Monge, Las penas, página 61 y siguientes. "Disponiéndose, sin embargo, que toda ley decretada por la Asamblea Legislativa será comunicada al Congreso de los Estados Unidos, el que por la presente se reserva la facultad de anularla si lo tuviere por conveniente". 1 LPRA, pág. 43. La Ley Jones de 1917, la cual sustituyó a la Ley Foraker para proveer un gobierno civil a Puerto Rico, mantuvo esta disposición en la sec. 34.

[117] People of Porto Rico v. Shell Co., 302 US 253 (1937).

estaba gobernado por el *Sherman Anti-Trust Act* de 1890.[118] El Tribunal decidió que el hecho de que el Congreso ejerciera su poder para regular el comercio no significaba que toda otra iniciativa de los Estados o los territorios respecto a este tema estaba prohibida.

En su análisis, el Tribunal Supremo federal expresó que la autorización que la sec. 32 de la Ley *Foraker*, *supra*, dio a la legislatura insular para legislar sobre asuntos internos incluía el poder para crear leyes que penalizaran una conspiración para afectar negativamente el comercio. No estando eso en duda, la pregunta era si la ley territorial y la ley federal podían coexistir.[119] En su explicación, el Supremo federal expresó que el diseño del gobierno territorial, tanto en territorios continentales como en Puerto Rico, estaba pensado para permitir a los habitantes de dicho territorio tantos poderes de gobierno propio para atender los asuntos locales como fueran compatibles con la supremacía y supervisión del Gobierno federal, además de ciertos principios fundamentales establecidos por el Congreso.[120] No habiendo duda de que la ley anti monopolios local y la Ley *Sherman* podían coexistir, y que evitar que se realicen acuerdos contractuales ilegales que puedan afectar

---

[118] 15 USCA secs. 1-7. El 14 de marzo de 1907, la Legislatura de Puerto Rico, constituida bajo los limitadísimos poderes de gobierno propio que concedía la Ley *Foraker*, promulgó una ley territorial cuyo ámbito de acción y aplicación era el mismo que el *Sherman Act*.

[119] People of Porto Rico v. Shell Co., *supra*, pág. 261.

[120] Íd., pág. 260.

la economía era un interés local legítimo sobre el cual la legislatura territorial podía legislar, el Supremo federal resolvió que la ley local era válida. Una vez resuelto esto, el Supremo federal expresó, en *dictum*, lo ya dicho en *Grafton*, *supra*, en cuanto a que como la legislación y los tribunales federales y territoriales fueron creados por el mismo soberano — el Congreso — un encausamiento en un tribunal con competencia bajo las leyes de cualquiera de estos impediría, necesariamente, un encausamiento al amparo de la otra legislación o en el otro tribunal.[121]

En el contexto de las leyes orgánicas *Foraker* y *Jones*, que limitaban el gobierno de la isla y lo ponían prácticamente bajo el control de funcionarios estadounidenses y bajo la estricta supervisión y control del Congreso, era natural concluir que aplicaría la misma lógica articulada en *Grafton*. Bajo las leyes orgánicas la autoridad para legislar de nuestra legislatura insular era claramente una delegación de poderes por parte del Congreso, quien tenía poder para vetar o anular la ley anti monopolios de Puerto Rico que estaba en controversia en *Shell Co.* El Congreso expresó su voluntad al no vetar la ley puertorriqueña y permitir que fuese promulgada y continuara en vigor.[122]

---

[121] Íd., pág. 264.

[122] Esta visión queda claramente expresada en el párrafo final de *Shell*, Co.:"It is hard to see why a conflict as to which law shall be enforced and which jurisdiction shall be invoked should ever arise, since the officers charged with

Al analizar la postura del Tribunal Supremo federal en torno a la relación entre los territorios y el Congreso para propósitos de la doctrina de la doble soberanía, hemos visto que en las ocasiones en que se ha negado que existen dos soberanos el factor decisivo fue la ausencia de independencia para determinar qué conducta constituía un delito, pues la legitimidad del gobierno territorial y la legislación que este aprobara dependía, necesariamente, de los poderes que le delegara el Congreso.[123] Claramente, la ausencia de capacidad para tipificar conducta delictiva de manera independiente es lo que impedía que Filipinas fuera considerada entonces un soberano distinto al gobierno federal, pues la legislación territorial podía ser anulada o vetada unilateralmente por el Congreso, quien también intervenía en el nombramiento de sus principales oficiales ejecutivos. Esta misma ausencia de jurisdicción legislativa independiente, y no la condición territorial de Puerto Rico, es lo que explica el *dictum* del Tribunal Supremo en *Shell Co.*, *supra.*

La adecuación histórica de lo resuelto en *Shell Co.* y la manifestación soberana del Pueblo de Puerto Rico a través de nuestra Constitución del 1952 ponen en entredicho los

---

the administration and enforcement of both acts are, in the last analysis, under the control of the same sovereignty and, it well may be assumed, will work in harmony". Íd., pág. 271. No albergamos duda que en el momento en que se decidió *Shell* en 1937 y según la doctrina expresada en *Grafton* el entendido era que la autoridad del gobierno Puerto Rico residía exclusivamente en la soberanía que ejercía Estados Unidos sobre la isla.

fundamentos jurídicos que motivaron al Tribunal Supremo federal a expresar que Puerto Rico no posee soberanía propia para fines de la doctrina de la doble soberanía.[124]

**D**

A manera de resumen, intentemos realizar una descripción normativa del concepto de soberanía para fines de la protección contra la doble exposición de la Quinta Enmienda, según articulado en la jurisprudencia del Tribunal Supremo federal.

Como vimos, el verdadero soberano tanto para los estados de la Unión como para el Gobierno federal es el Pueblo estadounidense. Sin embargo, es un principio fundamental e incuestionable que en asuntos internos los Estados y el Gobierno federal son soberanos distintos, por lo que, al indagar sobre cuál es la fuente última del poder, el análisis del Tribunal tiene que circunscribirse a los límites que el federalismo estadounidense impone.

Los conflictos que genera el federalismo estadounidense demuestran que los estados y el Gobierno federal no sólo son soberanos diferentes, sino que también son soberanos de distinto tipo. Así, el Gobierno federal es un gobierno de poderes enumerados y su ámbito de acción está limitado a lo que le autorice la Constitución. Por otro lado, los estados tienen todos los poderes que no se delegaron al Gobierno

---

[123] <u>Grafton v. US</u>, *supra*, pág. 352.
[124] Véase también <u>Córdova & Simonpietri Ins. Angency Inc. v. Chase Manhattan Bank</u>, *infra*. [Debido al cambio ocurrido en las relaciones entre Puerto Rico y Estados Unidos la sec. 3

federal. Esta distribución de poderes entre los dos entes políticos principales en Estados Unidos ha fluctuado a través del tiempo, y hoy ambos ejercen poderes muy distintos a los vislumbrados cuando se redactó la Constitución estadounidense.[125] Podemos hacer la misma aseveración sobre las tribus indígenas, pues estas también poseen una soberanía cualitativamente distinta a la de los estados y el Gobierno federal. Las tribus, según explicamos, están sometidas a los poderes plenarios del Congreso, pero aun así son soberanos distintos para fines de la prohibición contra la doble exposición.

La soberanía, a estos efectos, no tiene que ser permanente, pues hemos visto que la soberanía de las tribus se puede ampliar, restringir, crear o extinguir unilateralmente por el Congreso. Tampoco tiene que ser una soberanía absoluta, pues puede estar sujeta a los poderes plenarios del Congreso, como en el caso de las tribus, o a los límites que impone la Constitución de Estados Unidos a los estados y al Gobierno federal. Tampoco tiene que ser una soberanía anterior a la existencia de Estados Unidos, pues si bien las tribus y las trece colonias tenían una soberanía previa, los estados incorporados posteriormente a la Unión nunca la tuvieron.

---

del *Sherman Act* ya no aplica a Puerto Rico porque éste dejó de ser un territorio de Estados Unidos.]
[125] Véase, por ejemplo, la expansión del poder federal a través de la interpretación de la cláusula de comercio. José J. Álvarez González, op cit., págs. 5-6.

Por otro lado, si observamos las instancias en las que el Tribunal encontró que no existía una soberanía con fuente distinta, vemos que los territorios carecen de autoridad independiente para crear delitos y castigar, pues no sólo están sujetos a los poderes plenarios del Congreso sino que el Congreso también puede vetar legislación local y hasta adoptar un código penal local que exceda los poderes enumerados del Congreso.

Con este trasfondo, tenemos que analizar si el Estado Libre Asociado de Puerto Rico es un soberano para fines de la doctrina de la doble soberanía. Es decir, debemos examinar si Puerto Rico cuenta con suficiente autoridad independiente a la del Gobierno federal para tipificar y castigar delitos de manera autónoma.

## IV

No es nuestro objetivo hacer un análisis exhaustivo del tema de las relaciones políticas y jurídicas de Puerto Rico y Estados Unidos durante más de un siglo.[126] Aun así es necesario adentrarnos brevemente en esa historia para entender el contexto en las que se desarrollaron.

## A

---

[126] Sobre el tema de las relaciones históricas, políticas y jurídicas ambos países, véase José Trías Monge, Historia Constitucional de Puerto Rico, Editorial UPR, 1era Edición, 1980 (en adelante, Trías Monge, Historia); José Trías Monge, Puerto Rico: Las penas de la colonia más antigua del mundo, Editorial UPR, 1era Edición, 1999 (en adelante, Trías Monge, Las Penas); José Julián Álvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con Estados Unidos, Editorial TEMIS (2009).

**La anexión a Estados Unidos**

Estados Unidos anexó a Puerto Rico como resultado de su breve guerra contra España de abril a agosto de 1898. Luego del armisticio entre ambos países, la firma del Tratado de París el 10 de diciembre de 1898 selló la suerte de Puerto Rico como posesión de ultramar indefinida de Estados Unidos.[127] El hecho que Estados Unidos pudiera adquirir nuevos territorios mediante cesión como resultado de una guerra no era un asunto nuevo, pues en el 1828 el Tribunal Supremo de Estados Unidos había resuelto que el poder constitucional de declarar la guerra y concertar tratados implicaba el poder de adquirir territorio por cualquiera de esos medios.[128]

Cuando en el 1898 Estados Unidos adquirió a Puerto Rico como territorio, el entendido general era que los territorios anexados serían incorporados inmediatamente y luego admitidos como estados de la Unión.[129] Aunque Estados

---

[127] Véase, Trías Monge, Historia, op. cit. Vol. 1, págs. 146–58. En su Artículo II, el Tratado de París establecía que: "España cede a los Estados Unidos la Isla de Puerto Rico y las demás que están ahora bajo su soberanía...", y en el último párrafo del Artículo IX que "[l]os derechos civiles y la condición política de los habitantes naturales de los territorios aquí cedidos... se determinarán por el Congreso". Tratado de París, 1 LPRA, Documentos Históricos, Arts. II y IX.

[128] American Insurance Co. v. One Hundred Bales of Cotton, 1 Peters 511, (1828).

[129] Downes v. Bidwell, 182 US 244 (1901), Op. concurrente del Juez White, págs. 299–300 y 311-12. Antes del 1898, Estados Unidos había anexado territorios mediante tratados que expresamente disponían para la incorporación del territorio: Louisiana (Francia, 1803); Florida (España, 1819); Oregon (Imperio Británico, 1846); New Mexico, California, Colorado,

Unidos eventualmente anexó como estados a todos los territorios que adquirió antes del 1898, los territorios adquiridos en el Tratado de París tendrían un futuro distinto.

La continuidad del territorio continental facilitó el proceso de expansión de Estados Unidos desde sus inicios. Esto permitió la homogenización o "americanización" de los territorios que serían admitidos eventualmente como estados de la Unión. De igual forma, las condiciones impuestas a los territorios fueron parte de una estrategia del Congreso para asimilar la sociedad y el gobierno del territorio al resto de la sociedad estadounidense.[130] Esta política pública fue muy eficaz, pues los territorios adquiridos antes del 1898 eran principalmente contiguos y escasamente habitados, permitiéndoles a los colonizadores estadounidenses poblarlos rápidamente.[131]

Además, a finales del Siglo XIX y comienzos del Siglo XX, las naciones europeas se habían embarcado en una vorágine expansionista, conquistando territorios y creando imperios coloniales tanto en África como en Asia y el Pacífico. Se entendía para entonces que Estados Unidos no podría participar en la aventura colonialista ni forjar su

---

Nevada, Utah y parte de Arizona (México, 1848); partes de New Mexico y Arizona (México, 1853); y Alaska, (Rusia, 1857). José López Baralt, The Policy of the United States Towards its Territories with special reference to Puerto Rico, pág. 11, n. 21 (1999).

[130] Biber, *supra*, pág. 132.

[131] López Baralt, op. cit., págs. 86-87. (Traducción nuestra).

propio imperio si no tenía la flexibilidad de anexar territorios sin que esto implicase necesariamente la incorporación del mismo.[132]

Los territorios adquiridos en esta época eran distintos a los previamente anexados, pues tenían su propia cultura e idiosincrasia. Por eso, Estados Unidos no deseaban anexarlos como estados de la Unión.[133] El Tribunal Supremo federal tendría entonces que justificar el que Estados Unidos ejerciera soberanía sobre un territorio sin que éste luego se convirtiese en estado de la Unión, con los derechos y obligaciones mutuas que ello implica. Es decir, tenía que justificar la existencia de colonias dentro del ordenamiento jurídico y político de Estados Unidos, una nación forjada por colonias que lucharon contra la tiranía del Imperio Británico para defender sus derechos y libertades y lograr su independencia. Eventualmente articuló esta justificación, la teoría de incorporación territorial, en las decisiones que hoy conocemos como los Casos Insulares.[134]

---

[132] Trías Monge, Las Penas, págs. 31-32.

[133] En su libro, López Baralt explica que esto respondía a que contrario al territorio adquirido por Estados Unidos antes de 1898, los territorios adquiridos después de 1898 "se encontraban fuera del continente, y estaban poblados por pueblos de diferente raza, lengua y cultura... No había posibilidad de que fueran colonizados por los estadounidenses. Bajo estas condiciones, difícilmente podría esperarse que los Estados Unidos fuesen a mantener su anterior política de incorporación". López Baralt, op. cit., págs. 86-87. (Traducción nuestra).

[134] Mucho se ha escrito sobre los tonos racistas e imperialistas de los Casos Insulares y el contexto social, cultural e histórico en el que decidieron. Véase, por ejemplo, Efrén Rivera Ramos, American Colonialism in Puerto

La primera expresión de la doctrina de incorporación territorial ocurrió en la Opinión concurrente del Juez White en *Downes v. Bidwell*, que luego fue adoptada unánimemente en *Balzac v. People of Porto Rico*. Luego de hacer un recuento histórico de todos los tratados mediante los cuales Estados Unidos había anexado e incorporado territorios antes de 1898, el Juez White concluye que desde el comienzo de la historia constitucional de Estados Unidos los poderes políticos entendían que la incorporación de los territorios no sería automática, sino que había que atenerse a lo que proveía cada uno de los tratados correspondientes.[135] Al analizar el Tratado de París, el Juez White no encontró ningún lenguaje que indicara la intención del Congreso de incorporar a los territorios adquiridos.[136]

Bajo la teoría de la incorporación, los territorios anexados por Estados Unidos se dividen en dos categorías: los incorporados y los no incorporados.[137] Los habitantes de los primeros gozarían de todos los derechos y privilegios que garantiza la Constitución de Estados Unidos y estarían

---

Rico: The Judicial and Social Legacy (2007); Cristina Duffy Burnett y otros, Foreign in a Domestic Sense (2001).

[135] Downes v. Bidwell, *supra*, pág. 319. Posteriormente, la Opinión mayoritaria en *Balzac* realizó el mismo análisis.

[136] Íd., pág. 340. El Juez Asociado White se refería a las estipulaciones del Tratado de París que se encuentran en los Artículos II y IX de dicho tratado. Véase, Downes v. Bidwell, *supra*, pág. 318-19.

[137] Véase, Downes v. Bidwell, *supra*, págs. 341-42. Véase también, Trías Monge, Las Penas, pág. 56; López Baralt, op. cit, pág. 298; y Christina Duffy Burnett y Adriel I. Cepeda Derieux, Los Casos Insulares: Doctrina Desanexionista, 78 Rev. Jur. UPR 661 (2009).

destinados eventualmente a entrar en la Unión como otro estado más. Los segundos pertenecerían a Estados Unidos como una posesión, teniendo sus habitantes sólo aquellos derechos constitucionales que fueran considerados fundamentales, sin promesa de incorporación o estadidad futura, pudiendo el Congreso renunciar, incluso, a la soberanía sobre éstos. Para incorporar a un territorio se requiere que el Congreso consienta expresamente a incorporarlo. Si no se manifiesta expresamente esta voluntad, que no se puede inferir, el territorio se considera no incorporado.[138]

Evidentemente, las diferencias en raza y cultura del pueblo puertorriqueño, y el ímpetu imperialista de la época, fueron los elementos que produjeron los Casos Insulares y la base de la política colonial que Estados Unidos estableció para Puerto Rico.[139] No podemos obviar estas consideraciones

---

[138] Según el Supremo federal, esto se debía a que antes de 1898 la diferencia entre los territorios incorporados y los no incorporados no era importante por lo que "[b]efore that, **the purpose of Congress might well be a matter of mere inference from various legislative acts**; but in these latter days, **incorporation is not to be assumed without express declaration, or an implication so strong as to exclude any other view**". Balzac v. People of Puerto Rico, *supra*, pág. 306. (Énfasis añadido).
[139] Claramente las razones del Supremo federal para elaborar la doctrina de incorporación fueron políticas y no jurídicas, como quedó evidenciado al diferenciar el caso de Puerto Rico del caso de Alaska:
"It is true that in the absence of other and countervailing evidence, a law of Congress ..., declaring an intention to confer political and civil rights on the inhabitants ..., may be properly interpreted to mean an incorporation of it into the Union. ... But Alaska was very different case from that of Porto Rico. It was an enormous territory, very sparsely settled, and offering opportunity for immigration and settlement by American

políticas al adentrarnos en la creación del Estado Libre Asociado de Puerto Rico y sus implicaciones para propósitos de la doctrina de la doble soberanía.

**B**

***Antecedentes inmediatos a la Ley 600 y el debate sobre la Constitución de Puerto Rico***

Al pasar a ser un territorio de Estados Unidos, Puerto Rico fue gobernado por un gobierno militar y luego por un gobierno civil de poderes limitados.[140] En 1917, el Congreso promulgó la Ley Jones, alterando el gobierno territorial para aumentar el grado de autonomía del gobierno insular. Sin embargo, el Congreso mantuvo el gobierno de Puerto Rico bajo el control federal, nombrando su Gobernador y reservándose el derecho a vetar la legislación local o anularla y legislar directamente sobre la materia.[141] Por lo tanto,

---

citizens. It was on the American continent and within easy reach of the then United States."
Balzac v. People of P[ue]rto Rico, *supra*, pág. 309. Véase también, López Baralt, op. cit., pág. 296.

[140] Ley Foraker. Véase Trías, Historia, Vol. 2, pág. 102.
[141] La *Ley Jones* creaba un gobierno territorial para la isla con un Gobernador nombrado por el Presidente con el consejo y consentimiento del Senado federal; siete departamentos insulares, de los cuales dos de sus ejecutivos, el Comisionado de Instrucción y el Procurador General, serían nombrados por el Presidente con el consejo y consentimiento del Senado federal hasta 1947 y una legislatura insular, con Cámara de Representantes y Senado cuyos miembros serían elegidos por los electores hábiles de Puerto Rico. En la Asamblea Legislativa de Puerto Rico recaían todos los poderes legislativos locales, exceptuando sólo aquellos que específicamente dispusiera el Congreso por Ley. Véase, Trías Monge, Historia, op. cit., Vol. 2, pág. 93. La legislación fortaleció considerablemente los poderes del Gobernador, quien era nombrado por el Gobierno federal, aumentando el poder e influencia del Negociado de Asuntos Insulares federal y el Departamento de Guerra sobre el gobierno

cuando el Tribunal Supremo federal se expresó sobre la soberanía de Puerto Rico y la doctrina de la doble soberanía en *Shell Co., supra*, el Gobierno federal supervisaba y ejercía control estricto sobre los asuntos internos de Puerto Rico. Al igual que las Filipinas en *Grafton, supra*, bajo el régimen de la *Ley Jones* el gobierno de Puerto Rico era claramente una extensión de la autoridad del Congreso, siendo éste su último e inapelable legislador, aún para asuntos internos, con jurisdicción prescriptiva o legislativa plena sobre la isla.

La Ley 600 también surgió en un contexto muy diferente al de las anteriores leyes orgánicas que Estados Unidos había promulgado para sus territorios. Terminada la Segunda Guerra Mundial, en 1945 se adoptó la Carta de las Naciones Unidas para establecer una nueva organización internacional que promoviera la paz y la seguridad luego del fracaso de la anterior Liga de las Naciones.[142] El Artículo 73 de dicha Carta expresó la entonces nueva norma internacional en contra del poder absoluto de una nación sobre el gobierno de otros pueblos o territorios que aún "no hayan alcanzado

---

insular, pues supervisaban directamente su labor. Id, pág. 92. Además, bajo la Ley *Jones*, una vez terminada la sesión de la Asamblea Legislativa de Puerto Rico, el Gobernador de Puerto Rico venía obligado a enviar toda la legislación aprobada por ésta al gobierno de Estados Unidos, quien a su vez la transmitiría al Congreso. Ley Jones, *supra*, Art. 23. El Congreso podía simplemente anular o vetar la misma y legislar directamente sobre la materia. Id, Art. 34. Véase, Trías Monge, Historia, op. cit. Vol. 2, pág. 100.

[142] Naciones Unidas, Carta de las Naciones Unidas, 24 de octubre de 1945, 1 UNTS XVI, disponible en: http://www.un.org/es/documents/charter/ (última visita el 22 de enero de 2015).

todavía la plenitud del gobierno propio".[143] Dicho artículo

impuso a estos países colonizadores la responsabilidad de

proteger la cultura de estos pueblos y fomentar que

alcanzaran a la brevedad posible la plenitud de gobierno

propio.[144]

No hay duda que la anterior norma internacional aplica

al caso de Puerto Rico: nuestro archipiélago es una nación

caribeña desde el punto de vista sociológico-cultural,

poseyendo todos los atributos de una cultura distinta, con

un lenguaje e idiosincrasias propias que nos distinguen de

cualquier otra nación.[145] Por esto el Artículo 73 de la Carta

---

[143] Artículo 73, Capítulo XI, Carta de las Naciones Unidas, *supra*.

[144] El derecho a la libre autodeterminación de los pueblos fue luego ratificado por las resoluciones 1514 (XV) y 1541 (XV). G.A. Res. 1514(XV), de 14 de diciembre de 1960; G.A. Res. 1541 (XV), de 15 de diciembre de 1960. Véase, José J. Álvarez González, Law, Language and Statehood: The Role of English in the Great State of Puerto Rico, 17 L. and Inequality 359, 384, n. 114-115 (1999).

[145] Según Trías Monge, ya para finales del siglo XIX, Puerto Rico tenía una identidad nacional definida y un fuerte sentimiento de su propia cultura. Trías Monge, Las Penas, pág. 19-20. Según el Profesor Álvarez González, "[u]nder any reasonable definition, Puerto Rico is a nation, with a separate culture, a distinct personality and a characteristic language... [t]he concept of nationality is cultural and sociological". Álvarez González, The Great State, *supra*, págs. 383 y 385. El Tribunal Supremo de Puerto Rico ha hecho expresiones en las que se reitera el carácter de Puerto Rico como nación. Véase, Ramírez de Ferrer v. Marí Brás, *infra*, Opinión de Conformidad del Juez Presidente Hernández Denton, pág. 253. [Esa ciudadanía de Puerto Rico fue conferida en sus orígenes por el Congreso federal como respuesta al hecho evidente de que el pueblo puertorriqueño era un pueblo de costumbres, hábitos y tradiciones extrañas a las del pueblo estadounidense. Esto es, la ciudadanía de Puerto Rico es la expresión jurídica de un hecho sociológico: Puerto Rico es a los ojos del mundo una nación.] Véase además, las expresiones del Juez Asociado

de las Naciones Unidas, y las Resoluciones 1514(XV) y 1541(XV) aplican, por ejemplo, a Puerto Rico y a las Islas Marianas, y no a Florida u Oregón. El Congreso de Estados Unidos, en las últimas ocasiones en que ha intentado atender cabalmente el problema del status político de Puerto Rico ha reconocido expresamente su derecho a la libre autodeterminación bajo el derecho internacional[146] y el Comité de Descolonización de las Naciones Unidas ejerce jurisdicción sobre el caso de Puerto Rico desde 1973.[147]

Con este trasfondo, pasemos a examinar la aprobación de la Ley Pública 600 en 1950 y la creación de la Constitución del Estado Libre Asociado de Puerto Rico. La naturaleza y la intención de la Ley 600 iban más allá de las leyes orgánicas que le precedieron, la Ley Foraker y la Ley Jones. Evidentemente, la intención no era crear otra ley orgánica para Puerto Rico. Se trataba de una legislación que buscaba satisfacer las exigencias presentadas durante muchos años por todas las fuerzas políticas en la isla y que aún no se habían satisfecho.

La Ley Pública 600 autorizó al Pueblo de Puerto Rico a elegir delegados para una Asamblea Constituyente que

---

Negrón García en De Paz Lisk v. Aponte Roque, 124 DPR 472, 507 (1989).

[146] Álvarez González, The Great State, supra, pág. 382. Véase tambipen S. 712, 101st Cong. (1990) [The United States of America recognizes the principle of self-determination and other applicable principles of international law with respect to Puerto Rico]; y H.R. 856, 105th Con. (1998), citado en Álvarez González, The Great State, supra, pág. 382, n. 111.

[147] Trías Monge, Las Penas, op. cit., págs. 175-76.

redactaría una constitución que estableciera un gobierno republicano e incluyera una carta de derechos.[148] Según los propios términos de la Ley 600, ésta se establecía ante el reconocimiento del "principio del gobierno por consentimiento de los gobernados" y con el carácter de un "convenio".[149] En ese sentido, la Ley 600 fue un mecanismo similar al que el Congreso utilizó para autorizar a los territorios incorporados a crear su propia constitución y anexionarlos como estados de la Unión.

Con la aprobación de la Ley 600, el Congreso y el Gobierno federal perdían el control total y efectivo de la administración de los asuntos internos de la isla, quedando estos exclusivamente en manos de los puertorriqueños y sujetos únicamente a lo dispuesto por la Constitución de Estados Unidos, la Ley 600, la Ley de Relaciones Federales y la Constitución de Puerto Rico.[150] Es decir, la Constitución puertorriqueña estaría limitada por las condiciones que impuso el Congreso unilateralmente, de manera similar a

---

[148] Ley 600, 64 Stat. 314, art. 2.

[149] Íd., Art. 1.

[150] Una vez puesta en vigor la constitución de Puerto Rico, varios artículos de la Ley Jones se convertirían en la "Ley de Relaciones Federales con Puerto Rico". Id, Art. 4. Sin embargo, quedarían automáticamente derogados los artículos 12, 23 y 34 de la Ley Jones. Íd., Art. 5. Con la derogación del Art. 34 se eliminó el poder del Congreso para anular las leyes locales. Sería ilógico pensar que el Congreso tenía la intensión de retener todo el poder legislativo sobre Puerto Rico, algo que tenía bajo la Ley Jones, cuando al mismo tiempo estaba derogando el andamiaje legal que le permitía hacerlo expresamente.

cuando los territorios incorporados aprueban su constitución según los límites impuestos en sus "enabling acts".

Una vez contextualizado el ambiente en que se legisló y autorizó la Ley 600, *supra*, y conscientes tanto de la naturaleza de las políticas coloniales de Estados Unidos respecto a sus territorios como de las verdaderas razones para implantar las mismas, estamos en mejor posición para entender lo ocurrido entre 1950 - 1952. La Opinión que emite hoy el Tribunal pone gran énfasis en las expresiones que hicieron tanto los representantes de Puerto Rico como los miembros del Congreso que participaron en el debate para la aprobación de la Ley 600 y de la Constitución del Estado Libre Asociado.[151] Claramente, si se analizan esas expresiones fuera del contexto en el que se emitieron, se llega fácilmente a la conclusión de que Puerto Rico no alteró su condición territorial totalmente subordinada a la voluntad del Congreso. Sin embargo, el objetivo de las expresiones de los congresistas estadounidenses durante los debates en el Congreso fue impedir que se interpretara la Ley 600 como una incorporación del territorio de Puerto Rico, pues ello implicaría que eventualmente se tendría que admitir a Puerto Rico como estado de la Unión. Como veremos, la creación del Estado Libre Asociado no fue el ejercicio fútil e insignificante que los detractores del actual modelo de gobierno insisten que representó.

---

[151] Opinión mayoritaria, págs. 41-45.

Según los informes positivos del Senado y el Congreso, cifrados en el lenguaje específico de *Balzac* y la doctrina de incorporación territorial, la nueva Ley 600 no podría interpretarse de ningún modo como legislación que incorporara a Puerto Rico a Estados Unidos, a la vez que hizo clara la intención de reconocerle a Puerto Rico todo el poder posible sobre sus asuntos internos. Al adoptar su Constitución, Puerto Rico poseería toda la autoridad legislativa, convirtiéndose en el legislador único y último de sus asuntos internos. Tal era el entendido, demostrado por el debate en el Congreso al momento de aprobarse la Ley 600.

### C

La nueva constitución se redactó entre el 17 de septiembre de 1951 y el 6 de febrero de 1952, cuando fue aprobada por 81 de los 92 delegados a la Convención Constituyente.[152] Las expresiones del Presidente Truman en su carta de envío de la nueva constitución al Congreso no deja dudas de la nueva autoridad que alcanzó Puerto Rico: "Con su aprobación [la constitución] inviste al pueblo de Puerto Rico con plena autoridad y responsabilidad para el gobierno propio local".[153] Al momento de la ratificación de la nueva constitución por el Congreso, se repitió que las relaciones

---

[152] Íd., págs. 145-46. El electorado puertorriqueño ratificó la nueva constitución el 3 de marzo de 1952, el 12 de marzo de 1952 se envió al Presidente Truman para que éste a su vez la transmitiera al Congreso, lo que ocurrió el 22 de abril de 1952.

[153] Íd., pág. 146.

políticas entre Puerto Rico y Estados Unidos permanecían inalteradas. En el proceso, el Congreso exigió que se eliminara la sección 20 de la nueva constitución y que se clarificara la disposición en torno a la educación obligatoria.[154] Estas condiciones fueron aprobadas por la Convención Constituyente en nombre del Pueblo de Puerto Rico y el 25 de julio de 1952, entró en vigor la Constitución del Estado Libre Asociado.

Como aclaramos desde el principio, no es nuestro propósito establecer de manera definitiva lo que significó el proceso que el Pueblo puertorriqueño y el Congreso estadounidense llevaron a cabo durante la década del 1950. Tampoco es una controversia que nos compete resolver.[155] Sin embargo, la redacción y ratificación de nuestra Constitución por el Pueblo de Puerto Rico no fue un evento marginal e insignificante, como insiste hoy la Mayoría, aferrándose a una definición irreal y obsoleta de lo que es soberanía. Con la aprobación de la Constitución de 1952, Puerto Rico exigió y obtuvo soberanía sobre sus asuntos internos. Nada en el historial legislativo sobre la aprobación de la Ley 600 y la Constitución del ELA por el Congreso sugiere que Puerto Rico no alcanzó la soberanía necesaria para los fines de la

---

[154] Íd., págs. 148-49.

[155] Como expresó este Tribunal en *Ramírez de Ferrer v. Marí Brás*, "[e]l asunto de si al amparo del ELA la relación entre Puerto Rico y los Estados Unidos perdió o no su carácter colonial, claro está, es uno que no nos compete dilucidar. Ello pertenece primordialmente al ámbito de los procesos políticos". Ramírez de Ferrer v. Marí Brás, *supra*, pág. 192.

doctrina de la doble soberanía.[156] Luego de la aprobación de la Constitución de Puerto Rico, la fuente última del poder y autoridad para crear y castigar delitos del Estado Libre Asociado es el Pueblo de Puerto Rico.

Claro está, esta soberanía no es absoluta, como tampoco lo es la del gobierno federal, los estados de la Unión, las tribus y las demás comunidades políticas dentro del sistema

---

[156] Por el contrario, el historial legislativo demuestra que la preocupación de los congresistas era que no se fuera a interpretar la Ley 600 como una incorporación de Puerto Rico a Estados Unidos, con la obligada promesa de admisión como estado que esto acarrearía. Incluso, expresiones realizadas en las vistas de la ratificación de la Constitución del ELA en el Senado federal militan en contra de esta teoría. Las palabras del congresista Lloyd M. Bentsen, miembro de la Comisión de la Cámara de Representantes que revisó la Constitución del ELA, en respuesta al congresista Meader, quien le preguntó si con la aprobación de la misma "Congress... would have made an irrevocable delegation of authority to Puerto Rico, similar to that granted when we admit a State into the Union", muestran el alcance de soberanía que el proyecto conferiría a Puerto Rico. Contestó Bentsen: "Yes. In my interpretation, I think we are doing that. I think that is what we should be doing for Puerto Rico, because I think they have shown a great deal of economic and political progress. I see no reason why we should treat them as a vassal or serf". Trías Monge, Historia, op. cit., Vol. 3, pág. 292. Otra señal del nivel de autoridad o "soberanía" interna que el Congreso tuvo la intensión de reconocer a Puerto Rico con la aprobación de la Constitución del ELA lo encontramos en las expresiones de Frances Bolton, congresista por Ohio y que participó en el proceso de aprobación de las leyes que resultaron en la creación del Estado Libre Asociado ante las Naciones Unidas el 3 de noviembre de 1953 durante el proceso que se siguió para relevar a Estados Unidos de su obligación de rendir informes sobre Puerto Rico bajo el Artículo 73 de la Carta de las Naciones Unidas. Expresó Bolton: "The nature of the relations established by compact between the people of Puerto Rico and the United States, far from preventing the existence of the Commonwealth as a fully self-governing entity, *gives the necessary guarantees for the untrammeled development and exercise of its political authority. The authority of the Commonwealth of Puerto Rico is not more limited than that of any State of the Union; in fact, in*

federal de Estados Unidos. El que Puerto Rico pueda estar sujeto al poder plenario del Congreso, aún luego de la aprobación de la Constitución del Estado Libre Asociado, algo que el Tribunal Supremo federal nunca ha establecido y que como veremos es contrario a la interpretación del Primer Circuito del Tribunal de Apelaciones de Estados Unidos, no impide que afirmemos, según la responsabilidad que nos delegó el Pueblo, que Puerto Rico es soberano para propósitos de la excepción de la doble soberanía.[157]

El que la autonomía y soberanía de Puerto Rico sobre asuntos no gobernados por la Constitución federal sea equiparable a la de los estados luego de la aprobación de la Constitución del Estado Libre Asociado significa que Puerto Rico, al igual que los estados, tiene en sus manos todo el poder de legislar sobre sus asuntos internos en la misma medida que los estados de la Unión.[158] Por esta razón es

---

*certain aspects is much wider"*. Véase Ramírez de Ferrer v. Marí Brás, *supra*, pág. 167.

[157] Como ya vimos, en *US v. Lara*, "Congress, with this Court's approval, has interpreted the Constitution's "plenary" grants of power as authorizing it to enact legislation that both restricts and, in turn, relaxes those restrictions on tribal sovereign authority." Lara, *supra*, pág. 202. El Tribunal Supremo federal fue más allá al decir que el poder y control plenario del Congreso sobre las tribus indias era tan amplio que podía incluso hacer desaparecer (*terminate*) la existencia de las tribus y después resucitarlas. Íd., pág. 203. Ciertamente, si la soberanía "inherente" de los estados de la Unión y de las tribus indígenas son equiparables, surgen serias dudas sobre lo que significa "soberanía" en el contexto de la protección contra la doble exposición y la excepción de la doble soberanía.

[158] Rodríguez v. Popular Democratic Party, 457 US 1, 8 (1982), citando a Calero Toledo v. Pearson Yacht Leasing Co., 416 US 663, 673 (1974) (Traducción nuestra).

importante analizar brevemente cómo los tribunales federales, y también este Tribunal Supremo, han interpretado los poderes de Puerto Rico bajo su Constitución.

**V**

Durante los primeros años después que entrara en vigor la Constitución del Estado Libre Asociado, el Tribunal Supremo federal guardó silencio sobre el nuevo régimen jurídico de la isla.[159] Por esta razón, las primeras interpretaciones de la naturaleza de la Constitución del Estado Libre Asociado y los cambios que ésta significó para las relaciones entre Puerto Rico y Estados Unidos se encuentran en las decisiones que emitió el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito.

El Juez federal Salvador E. Casellas señala en su artículo, *Commonwealth Status and the Federal Courts*, que "desde el 1952, es una norma jurídica bien establecida en el Primer Circuito que, con el advenimiento del Estado Libre Asociado en 1952, Puerto Rico cesó de ser un territorio de los Estados Unidos sujeto a los poderes plenarios del Congreso según dispuesto en la Constitución federal".[160] En efecto, la nueva relación política de Puerto Rico con

---

[159] Álvarez González, <u>Derecho Constitucional de Puerto Rico</u>, *supra*, pág. 473.

[160] Salvador E. Casellas, <u>Commonwealth Status and the Federal Courts</u>, 80 Rev. Jur. UPR 945, 954 (2011) "Desde entonces, la autoridad ejercida por el gobierno federal emana del convenio al que entraron el Pueblo de Puerto Rico y el Congreso de Estados Unidos". Íd. (Traducción nuestra).

Estados Unidos fue reconocida en al menos once ocasiones por el Tribunal de Distrito federal de Puerto Rico en el período de 1952 a 1970.[161] A nivel del Primer Circuito, en cuatro ocasiones antes de 1960 se estableció que Puerto Rico había alcanzado, bajo la Constitución del ELA, un nuevo status político en el cual el Congreso ya no ejercía un poder plenario sobre la isla.[162]

**A**

***Las decisiones del Primer Circuito***

En *Mora v. Mejías*, el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito (en adelante el Primer Circuito), atendió una controversia donde estaba en juego la inconstitucionalidad de una ley puertorriqueña que autorizó al Secretario de Agricultura y Comercio de Puerto Rico a controlar el precio del arroz.[163] Como parte de la controversia, el Primer Circuito tuvo que analizar si Puerto

---

[161] Mora v. Torres, 113 F.Supp. 309 (DPR 1953); Mora v. Mejías, 115 F.Supp. 610 (DPR 1953); Consentino v. ILA, 126 F. Supp. 420 (DPR 1954); Carrión v. González, 125 F. Supp. 819 (DPR 1954); Mitchell v. Rubiom, 139 F. Supp. 379 (DPR 1956); US v. Figueroa-Ríos, 140 F. Supp. 376 (DPR 1956); Alcoa Steamship Co. v. Pérez, 295 F. Supp. 187 (DPR 1968); US v. Valentine, 288 F. Supp. 957 (DPR 1968); Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Company, 303 F. Supp. 414 (DPR 1969); U.S. v. Feliciano-Grafals, 309 F. Supp. 1292 (DPR 1970); Long v. Continental Casualty Co., 323 F. Supp. 1158 (DPR 1970).

[162] Mora v. Mejías, 206 F.2d 377 (1er Cir. 1953); Figueroa v. People of Puerto Rico, 232 F.2d 615, 620 (1er Cir. 1956); Moreno Ríos v. US, 256 F.2d 68 (1er Cir. 1958) y Sánchez v. US, 256 F.2d 73 (1er Cir. 1958).

[163] Mora v. Mejías 206 F.2d 377, 379 (1er Cir. 1953). Esta decisión es particularmente importante porque fue citada con aprobación posteriormente en dos ocasiones por el Tribunal Supremo de Estados Unidos.

Rico era un "estado" para efectos de la sección 2281, que intenta evitar la interferencia innecesaria de los tribunales federales con las leyes de un estado, porque éstos son "soberanos sobre las materias que la Constitución no regula".[164] Si Puerto Rico se consideraba un estado para propósito de esta sección, sólo un Tribunal de Distrito compuesto por tres jueces podría ordenar el injunction solicitado por los demandantes.

El Primer Circuito concluyó que bajo la ley Jones evidentemente la sección 2281 no aplicaba a Puerto Rico ya que entonces la isla era un territorio de Estados Unidos.[165] Sin embargo, expresó que podría ser que Puerto Rico, organizado luego de 1952 como un cuerpo político bajo una constitución propia establecida conforme a los términos del "convenio" de la Ley 600, fuera un "estado" para efectos de la sección 2281.[166] Expresa la Opinión que:

[i]f the constitution of the Commonwealth of Puerto Rico is really a ¨constitution¨- as the Congress says it is, 66 Stat. 327,- and not just another Organic Act approved and enacted by the Congress, then the question is whether the Commonwealth of Puerto Rico is to be deemed ´sovereign over matters not ruled by the Constitution´ of the United States and thus a ´State´ within the policy of 28 USC Sec. 2281...[167]

Si bien la Opinión no contesta la pregunta por entender que dicha controversia ameritaba contar con el beneficio de los

---

[164] 28 USC sec. 2281. Mora v. Mejías, supra, pág. 387.
[165] Íd., pág. 387.

[166] Íd.

[167] Íd.

escritos de las partes, su texto claramente sugiere que hubiera contestado la interrogante en la afirmativa.[168]

De igual forma, no hay duda que el Primer Circuito entiende que ocurrió un cambio importante en términos de la autoridad de Puerto Rico sobre sus asuntos internos como resultado de la aprobación de la Constitución del Estado Libre Asociado.[169] La opinión del Primer Circuito en *Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank* es particularmente importante para el caso que nos ocupa ya que, al igual que en *Shell Co*, estaba en controversia la aplicación del *Sherman Act* en Puerto Rico. En su opinión, el Juez Stephen Breyer, hoy Juez Asociado del Tribunal Supremo federal, expuso la controversia del caso en los siguientes términos:

---

[168] "A serious argument could therefore be made that the Commonwealth of Puerto Rico is a State within the intendment and policy of 28 U.S.C. Sec. 2281". Id, pág. 387. Además, como veremos, el Tribunal Supremo federal en *Rodriguez v. Popular Democratic Party*, expresó que "Puerto Rico, like a state, is an autonomous political entity, ´sovereign over matters not ruled by the Constitution´". Íd., pág. 8.

[169] US v. Bonilla Romero, 836 F.2d 39 (1er Cir. 1987), nota al calce 2. Como expresáramos en *Ramírez de Ferrer v. Marí Brás*, despúes de 1970 el Tribunal federal de Distrito y el Primer Circuito reiteraron una y otra vez "el ámbito de autoridad gubernamental que le es privativo al ELA". Ramírez de Ferrer v. Marí Brás, *supra*, pág. 161. Entre estos casos se encuentran: Sanchez v. US, 376 F. Supp. 239 (DPR 1974); Garcia v. Friesecke, 597 F.2d 284 (1er Cir. 1979); First Fed. S. & L., Etc. v. Ruiz De Jesus, 644 F.2d 910 (1er Cir. 1981); Cordova & Simonpietri Ins. v. Chase Manhattan Bank, 649 F.2d 36 (1er Cir. 1981); Cintron-Garcia v. Romero Barcelo, 671 F.2d 1 (1er Cir. 1982); Enrique Molina-Estrada v. Puerto Rico Hwy. Auth., 680 F.2d 841 (1er Cir. 1982); US v. Quiñones, 758 F.2d 40 (1er Cir. 1985); US v. Lopez Andino, 831 F.2d 1164 (1er Cir. 1987); Camacho v. Autoridad de Telefonos de PR, 868 F.2d 482 (1er Cir. 1989); Romero v. US, 38 F.3d 1204 (Fed. Cir. 1994); Reeser v. Crowley Towing

The... question that this case presents is whether section 3 of the Sherman Act applies to Puerto Rico. ... The Supreme Court, in 1937, specifically held that section 3 applied to Puerto Rico. But, in 1951 Congress passed the Puerto Rican Federal Relations Act, 64 Stat. 319, ("FRA") pursuant to which Puerto Rico adopted its own Constitution. Does the coming into effect of the FRA and this Constitution mean that certain federal acts, such as the Sherman Act, which apply within territories but not within states, can no longer be given greater effect as applied to Puerto Rico than as applied to states of the Union?[170]

El Primer Circuito expresó que la Ley de Relaciones Federales y la Constitución del Estado Libre Asociado "tenían la intención de efectuar cambios significativos en la relación entre Puerto Rico y el resto de los Estados Unidos".[171] Sin duda, antes de que estas leyes fueran aprobadas la relación de Puerto Rico con Estados Unidos se aproximaba más a la de un territorio que a la de un estado.[172] Luego de un rápido análisis del proceso de aprobación y promulgación de la Constitución del Estado Libre Asociado, el Primer Circuito llegó a la siguiente conclusión:

**In sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth.** And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, … As the Supreme Court has written, "**the purpose of Congress** in the 1950 and 1952 legislation **was to accord to Puerto Rico the**

---

& Transp. Co., Inc., 937 F. Supp. 144 (DPR 1996); US v. Vega Figueroa, 984 F. Supp. 71 (DPR 1997).

[170] Cordova & Simonpietri Ins. v. Chase Manhattan Bank, *supra*, pág. 38.

[171] Íd., pág. 39.

[172] Íd., pág. 40. La Opinión menciona, como ejemplo del poder absoluto que tenía el Congreso sobre el territorio el hecho de que "Congress insisted that acts of the Puerto Rico legislature be reported to it, retaining the power to disapprove them". Íd., pág. 39.

**degree of autonomy and independence normally associated with a State of the Union**".[173]

Como resultado, luego de la aprobación de la Ley de Relaciones Federales y de la Constitución del ELA, la sección 3 del *Sherman Act* ya no aplicaba a Puerto Rico.[174]

Resulta evidente entonces que la norma establecida en el Primer Circuito es que con la aprobación de la Constitución de Puerto Rico ocurrió un cambio significativo en cuanto a la autoridad interna de la isla. Incluso, tal y como reconoce la Opinión Mayoritaria, el Primer Circuito ya adjudicó que Puerto Rico es un soberano para propósitos de la doctrina de la doble soberanía.[175] Otros tribunales apelativos federales, particularmente el Tribunal de Apelaciones para el Tercer Circuito y el Tribunal de Apelaciones para el Circuito federal, han seguido la norma

---

[173] Íd., pág. 41. (Énfasis añadido) (Cita omitida).

[174] Íd., pág. 44.

[175] Opinión Mayoritaria, pág. 29. En *US v. López Andino*, el Primer Circuito concluyó lo siguiente: "La pregunta ante nosotros, por lo tanto, es si Puerto Rico y los Estados Unidos son "dos soberanos" para propósitos de la doble exposición. Dos entidades [que procesan a un ciudadano] se entienden separadas para propósitos de [la protección] contra la doble exposición cuando éstas derivan su poder de diferentes fuentes. [Citas omitidas]. Está bien establecido [por la jurisprudencia] que cuando los estados promulgan y ponen en vigor sus propias leyes criminales, estos actúan conforme a su propio poder soberano, [y] no el del gobierno nacional. [Cita omitida]. El "status" de Puerto Rico no es el de un estado en la Unión federal, pero sus leyes penales, al igual que las de los estados, emanan de [una] fuente distinta al Gobierno federal". *López Andino*, *supra*, págs. 1167-68. (Traducción nuestra). *López Andino* es tan solo uno más dentro de la línea de casos del Primer Circuito que le ha reconocido al Estado Libre Asociado una autoridad igual a la de los estados de la Unión para múltiples propósitos.

establecida por la línea de casos del Primer Circuito.[176] Por esta razón, la decisión del Tribunal de Apelaciones para el Undécimo Circuito en *US v. Sánchez*, a la cual la Opinión mayoritaria da tanto peso, no es más que una decisión discordante dentro de la bien establecida norma de que Puerto Rico es tan soberano como los estados en asuntos que no estén controlados por la Constitución federal.[177]

**B**

**La Nueva Constitución ante el Tribunal Supremo federal**

El Tribunal Supremo de Estados Unidos expresó en torno a la naturaleza del Estado Libre Asociado en 1974 al publicar su opinión en *Calero-Toledo v. Pearson Yacht Leasing Co.*, *supra*. Al igual que el Primer Circuito en *Mora v. Mejías*, *supra*, el Supremo federal se enfrentó a la

---

[176] "Puerto Rico possesses a measure of autonomy comparable to that possessed by the States"; y "Congress maintains similar powers over Puerto Rico as it possesses over the federal states". US v. Laboy-Torres, 553 F.3d 715, 722 (3er Cir. 2009); "On July 3, 1952, Congress approved the proposed Constitution of the Commonwealth of Puerto Rico, which thenceforth changed Puerto Rico's status from that of an unincorporated territory to the unique one of Commonwealth". Romero v. United States, 38 F.3d 1204, 1208 (Fed. Cir. 1994).

[177] US v. Sánchez, 992 F.2d 1143 (11mo Cir. 1993). El Juez Casellas explicó que "[i]n doing so, [*US v. Sánchez*] – which is not binding and does not constitute precedent for the First Circuit - completely disregarded the long line of decisions which the First Circuit has rendered since 1953, and which the Supreme Court has issued since 1974, regarding the constitutional status of the Commonwealth... To the extent that it viewed Puerto Rico as a territory without sovereignty, *Sánchez* is an isolated case and does not modify the long-held and well-settled doctrine regarding the constitutional nature of the Commonwealth of Puerto Rico". Casellas, *supra*, pág. 959, n. 75.

pregunta de si las leyes de Puerto Rico se podían considerar leyes "estatales" para propósitos de la secc. 2281.[178]

Luego de un breve análisis de las relaciones entre Puerto Rico y Estados Unidos, el Tribunal expresó lo siguiente:

we believe that the established federal judicial practice of treating enactments of the Commonwealth of Puerto Rico as "State statute(s)" for purposes of the *Three-Judge Court Act*, serves, and does not expand, the purposes of sec. 2281.[179]

Para llegar a esta decisión, el Supremo federal tomó en consideración que los tribunales federales inferiores habían establecido, desde 1953, que Puerto Rico debe ser considerado soberano sobre los asuntos no que no estuviesen regidos por la Constitución federal.[180] El Supremo federal resaltó que en *Wackenhut Corp. v. Aponte*, una decisión de 1967, se había establecido que la doctrina de abstención judicial resultaba particularmente apropiada en torno a la legislación que aprobara el Estado Libre Asociado, de tal manera que fuera esa nueva entidad política la que determinara, en atención al convenio ("compact") que había alcanzado con el Congreso, el alcance y validez de su propia

---

[178] Calero-Toledo v. Pearson Yacht Leasing Co., *supra*, pág. 670. Específicamente *se* impugnó una ley de Puerto Rico mediante la cual el Gobierno confiscó un yate de lujo que había sido utilizado para transportar drogas a la isla. Luego de *Stainback v. Mo Hock Ke Lok Po* estaba claro que, respecto a las leyes promulgadas por un territorio, no existían razones de federalismo para aplicar la sec. 2281 si se intentaba invalidar un estatuto territorial. Calero-Toledo, *supra*, págs. 670-71, citando a Stainback v. Mo Hock Ke Lok Po 336 US 368, 377 (1949).

[179] Íd., pág. 675.

legislación al amparo de la Constitución del Estado Libre Asociado y la Constitución federal.[181]

La próxima expresión del Supremo federal sobre la naturaleza del Estado Libre Asociado ocurrió en *Examining Board of Engineers, Architects and Surveyors v. Flores Otero*.[182] En este caso estaba en controversia la legalidad de una ley de Puerto Rico que exigía ser ciudadano de Estados Unidos para poder ejercer la profesión de ingeniero.[183] Citando a *Calero-Toledo*, *supra*, el Tribunal Supremo federal reiteró que:

the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union, and accordingly, Puerto Rico "now elects its Governor and legislature; appoints its judges, all cabinet officials, and lesser officials in the executive branch; sets its own educational policies; determines its own Budget; **and amends its own civil and criminal codes"**.[184]

---

[180] Íd., pág. 674. (Traducción nuestra).

[181] Íd. Antes de llegar a esta conclusión, el Supremo federal había citado a *Mora v. Mejías*, *supra*, en cuanto a que "[t]he preamble to this constitution refers to the Commonwealth … which ´in the excercise of our natural rights, we (the people of Puerto Rico) now create within our union with the United States of America´. Puerto Rico has thus not become a State in the federal Union like the 48 States, but it would seem have become a State within a common and accepted meaning of the word. [Cita omitida] … It is a political entity created by the act and the consent of the people of Puerto Rico and joined in union with the United States of America under the terms of the compact". Calero-Toledo, *supra*, pág. 672, citando a Mora v. Mejías, *supra*. (Subrayado añadido)

[182] Examining Board of Engineers, Architects and Surveyors v. Flores Otero 426 US 572 (1976).

[183] Íd., pág. 577.

[184] Íd., pág. 594. (Énfasis añadido)

Tras un breve recuento sobre la aprobación del convenio entre Puerto Rico y el Congreso,[185] el Tribunal expresó que aunque Puerto Rico, al igual que el Distrito Federal, ocupaba un espacio excepcional dentro del sistema federal, ello no significaba que el Congreso había tenido la intención de dejar al Estado Libre Asociado fuera de la sección 1983 bajo la cual se había impugnado la ley en controversia en *Flores Otero*.[186] Como el Congreso carece de los medios para supervisar a los funcionarios estatales y territoriales, los tribunales federales deben tener jurisdicción para intervenir. A esos efectos el Tribunal explicó que:

[t]he same practical limitations on Congress´ effectiveness to protect the federally guaranteed rights of the inhabitants of Puerto Rico existed from the time of its cession and, after 1952, **when Congress relinquished its control over the organization of the local affairs of the island** and granted Puerto Rico a measure of autonomy comparable to that possessed by the States, the need for federal protection of federal rights was not thereby lessened.[187]

---

[185] Íd., pág. 593. [The condition was accepted, the compact became effective, and Puerto Rico assumed "Commonwealth" status].

[186] Íd., págs. 595-96. La sección 1983 le concede a un tribunal federal jurisdicción sobre controversias donde se plantee que un funcionario estatal o territorial, "so color de autoridad" ha negado a un ciudadano estadounidense algún derecho, privilegio o inmunidad garantizado por la Constitución federal o las leyes de Estados Unidos. 42 USC sec. 1983.

[187] Íd., pág. 596-97 (Énfasis añadido). Para entender la dificultad del Supremo federal para analizar si luego del 1952 los tribunales federales tenían jurisdicción bajo la secc. 1983 sobre actos realizados por funcionarios puertorriqueños, debemos recordar que dicho estatuto se refiere a "estados" o "territorios". Como Puerto Rico ya no podía clasificarse como ninguno de los dos debido a su "relación con Estados Unidos sin paralelo", el Tribunal Supremo federal recurrió a una aproximación práctica o

Como señalan ambas decisiones, luego del 1952 el control de los asuntos locales puertorriqueños estaba en manos del Estado Libre Asociado ya que el Congreso había renunciado al control que ejercía sobre los asuntos internos de la isla.[188] Desde entonces, Puerto Rico es "soberano en asuntos no gobernados por la Constitución."[189]

En el verano de 1982, dos decisiones adicionales afirmaron la norma que le reconocía al Estado Libre Asociado todos los poderes soberanos asociados a los estados de la Unión en asuntos internos. La primera de ellas, *Rodríguez v. Popular Democratic Party*, analizó la autoridad del Estado Libre Asociado para regular sus asuntos electorales.[190] Luego de reiterar que los derechos constitucionales de los habitantes de Puerto Rico están protegidos por las garantías del debido proceso de ley y la igual protección de las

---

funcional: como la secc. 1983 aplica expresamente tanto a estados como a territorios, Puerto Rico necesariamente debía estar situado en algún lugar entre ambos extremos, y el Congreso no hizo ninguna expresión eliminando la jurisdicción de los tribunales federales bajo la sección 1983 cuando se creó el Estado Libre Asociado, la sección 1983 necesariamente debía aplicarse a Puerto Rico. Id, pág. 597. Por la misma razón práctica, el Supremo federal no definió si la protección de los derechos de los habitantes de Puerto Rico estaba garantizada bajo la Quinta Enmienda de la Constitución federal o bajo la Decimocuarta enmienda. Íd., págs. 600-01.

[188] Íd., pág. 597.

[189] Calero-Toledo, *supra*, pág. 674. (Traducción nuestra)

[190] Estaba en controversia una ley de Puerto Rico que autorizaba a un partido político a llenar la vacante en la Asamblea Legislativa que hubiera dejado un legislador afiliado con dicho partido, si este moría, renunciaba o era removido del puesto. Rodríguez v. Popular Democratic Party, *supra*, pág. 6.

leyes, el Supremo federal expresó lo siguiente en torno al Estado Libre Asociado y su autoridad política:

> **At the same time, Puerto Rico, like a state, is an autonomous political entity, "sovereign over matters not ruled by the Constitution".** The methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference.[191] [Citas omitidas]

En el segundo de los casos decididos ese verano, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, el Supremo federal debía determinar si Puerto Rico tenía la autoridad reconocida a los estados para defender los derechos concedidos a sus ciudadanos por legislación federal.[192] La controversia se enmarcó en los derechos de *parens patrie* que tienen los estados para vindicar, no sus propios derechos soberanos, sino los derechos de sus ciudadanos cuando la violación de los mismos de alguna manera afectan los intereses quasi-soberanos del estado.[193] Sin embargo, para

---

[191] Íd., pág. 8. (Énfasis añadido)

[192] Alfred L. Snapp & Son, Inc. v. Puerto Rico 458 US 592 (1982). El secretario del Trabajo y Recursos Humanos del Estado Libre Asociado demandó a unos productores de manzanas en el estado de Virginia alegando que éstos habían discriminado en contra de trabajadores puertorriqueños que habían sido enviados a trabajar a dicho estado al amparo de la Ley federal *Wagner-Peyser Act*. Id, pág. 594. Esa ley estableció un sistema para aliviar el alto desempleo existente en algunos estados durante la Gran Depresión. Con este sistema, las oficinas estatales autorizadas por el Secretario del Trabajo federal identificaban si necesitaban mano de obra de fuera del estado para determinadas industrias, y luego esa mano de obra era suplida por trabajadores hábiles de otras jurisdicciones de Estados Unidos, los que debían tener prioridad sobre trabajadores extranjeros. íd., págs. 594-95.

[193] Íd., pág. 602.

nuestra controversia resultan importantes dos expresiones del Supremo federal en ese caso. Primero, el Tribunal identificó dos intereses soberanos que tienen los estados de la Unión:

Two sovereign interests are easily identified: First, **the exercise of sovereign power over individuals** and entities within the relevant jurisdiction -**this involves the power to create and enforce a legal code, both civil and criminal**; second, the demand for recognition from other sovereigns - most frequently this involves the maintenance and recognition of borders.[194]

Luego, el Tribunal explicó que los intereses quasi-soberanos de los estados se pueden dividir en dos categorías generales: la protección de la salud y bienestar de sus residentes, y la protección de su posición en el sistema federal.[195] El que la opinión en *Alfred L. Snapp* no hubiera dedicado ni un sólo párrafo a discutir la naturaleza de las relaciones entre Puerto Rico y Estados Unidos demuestra que ya para el verano de 1982 el Tribunal Supremo federal tenía claramente establecido que la naturaleza, ámbito de autoridad y soberanía en asuntos internos del Estado Libre Asociado era igual a la de los estados de la Unión.[196]

Entre las decisiones de *Calero-Toledo* y *Examining Board, supra,* y las decisiones en *Rodríguez* y *Snapp & Son*,

---

[194] Íd., pág. 601. (Énfasis añadido)

[195] Íd., pág. 607-08.

[196] Íd., pág. 608. Este tema lo despachó el Tribunal con una breve expresión en la nota al calce 15: "Although we have spoken throughout of a "State's" standing as *parens patriae*, ... the Commonwealth of Puerto Rico is similarly situated to a State in this respect: It has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State."

*supra*, el Tribunal Supremo de Estados Unidos emitió dos opiniones que parecerían sembrar dudas sobre la naturaleza de la autoridad y autonomía del Estado Libre Asociado. Se trata de las opiniones emitidas en *Califano v. Gautier Torres*[197] y *Harris v. Rosario.*[198] En ambos casos se decidió que el Congreso podía excluir a Puerto Rico de legislación federal que otorga beneficios de naturaleza económica a ciudadanos estadounidenses que vivan en los 50 estados. Sin embargo, en *Califano*, el Supremo federal no se expresó sobre si Puerto Rico se encuentra sujeto a la autoridad plenaria del Congreso a través de la cláusula territorial de la Constitución federal; sencillamente no discutió la relación política entre Puerto Rico y Estados Unidos.[199] Otro tanto ocurrió en *Harris*, una opinión de apenas dos páginas en la que el Supremo federal tampoco analiza las relaciones entre ambos países. En una parte de la breve opinión, el Tribunal expresa que, en virtud de la cláusula territorial de la

---

[197] Califano v. Gautier Torres, 435 US 1 (1978).

[198] Harris v. Rosario, 446 US 651 (1980). La Opinión mayoritaria argumenta que estos dos casos, junto a *Torres v. Puerto Rico*, *infra*, que trataremos por separado, demuestran que Puerto Rico siguió siendo un territorio sujeto a los poderes plenarios del Congreso. Opinión, pág. 50. Lo cierto es que ninguna de esas tres opiniones dice eso, y en *Califano* y *Harris* el Supremo federal ni siquiera discute la naturaleza de la autoridad y ámbito de autonomía del Estado Libre Asociado, lo cual provocó el disenso del Juez Asociado Marshall. Véase Harris v. Rosado, *supra*, pág. 652.

[199] El Supremo federal se refiere brevemente a que Puerto Rico tiene una relación con Estados Unidos sin "paralelos" y que el Tribunal de Distrito federal "aparentemente" había reconocido la capacidad del Congreso para tratar a Puerto Rico diferente. Califano, *supra*, pág. 907, n. 4.

Constitución federal el Congreso puede tratar de manera diferente a Puerto Rico siempre que haya una "base racional" para ello.[200] Contrario a lo que sostiene la Opinión del Tribunal en el caso que nos ocupa, estas decisiones no dan base a concluir que el Congreso tiene poder plenario sobre Puerto Rico para legislar en los asuntos internos de la isla.[201]

Estas dos decisiones son posteriores a *Calero-Toledo y Flores Otero*, por lo cual el Supremo federal las emitió con plena conciencia de sus expresiones en esos casos.[202] A nuestro entender, las decisiones de *Califano* y *Harris* se enmarcan en la postura funcionalista tradicional que ha asumido el Tribunal Supremo de Estados Unidos al enfrentarse a las preguntas difíciles que supone en ocasiones el Estado

---

[200] Harris v. Rosado, *supra*, págs. 651-52.

[201] Más bien, como señala Trías Monge, el alcance que se le ha pretendido dar a las expresiones del Supremo federal en *Harris* excede por mucho lo que realmente se dijo. "La cita de la cláusula territorial como base para la aprobación de tal o cual ley para Puerto Rico en circunstancias como la de *Harris*, en que el Congreso puede limitar constitucionalmente la naturaleza de un programa de ayudas para el caso de los estados, tratados conjuntamente, no significa necesariamente que el Congreso continúa poseyendo la facultad de legislar plenariamente para Puerto Rico. Lo que quiere decir es que el Congreso puede legislar de modo diferente para Puerto Rico... El tribunal no tenía ante sí el problema de si el Congreso conserva o no su poder plenario sobre Puerto Rico" Trías Monge, El Estado Libre Asociado ante los tribunales, 64 Rev. Jur. UPR 1, 26 (1995), citado en Álvarez González, op. cit, pág. 513. Véase además, Salvador E. Casellas, *supra*, págs. 958-59.

[202] Flores Otero, *supra*, pág. 596.

Libre Asociado en el sistema federal.[203] Nos parece muy poco convincente, por las razones que ya vimos, el intento de establecer que por lo dicho en estas dos decisiones se debe interpretar que Puerto Rico sigue sujeto irremediablemente a los poderes plenarios del Congreso.[204] De todos modos, como ya vimos, a pesar de lo dicho en *Califano* y *Harris*, el Tribunal Supremo federal volvió a reafirmar las competencias soberanas de Puerto Rico en sus decisiones posteriores en *Rodríguez, supra*, y *Snapp & Son, supra*.[205] Por último, como

---

[203] El propio Tribunal Supremo federal explicó que sus razones para sostener que el Congreso puede tratar a Puerto Rico de manera diferente fueron de naturaleza económica: "[W]e concluded [en *Califano v. Torres*] that a similar statutory classification was rationally grounded on three factors: Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State under the statute would be high; and greater benefits could disrupt the Puerto Rican economy." <u>Harris</u>, *supra*, pág. 652.

[204] El reconocido constitucionalista y profesor David M. Helfeld dijo lo siguiente, al referirse a la renuncia del Tribunal Supremo federal a resolver si a Puerto Rico le aplica la norma de debido procedimiento de ley de la Constitución federal a través de la Quinta o la Decimocuarta enmienda: "[i]n this area of Constitutional law the Supreme Court apparently wishes to avoid clarity and precision, preferring instead the pragmatic approach; responding to the degree of control which Puerto Rico has achieved over its internal affairs". *Véase*, Helfeld, <u>How Much of the Constitution and Statutes are Applicable to the Commonwealth of Puerto Rico?</u>, 110 FRD 452 (1986). Véase además, <u>Ramírez de Ferrer v. Mari Brás</u>, *supra*, pág. 160. El hecho de que el Congreso pueda legislar respecto a Puerto Rico sobre algunos asuntos al amparo de la cláusula territorial de la Constitución federal no significa que el Estado Libre Asociado no tenga poder soberano en cuanto a otros asuntos relativos a su autogobierno.

[205] En una decisión más reciente, *Puerto Rico v. Branstad*, 483 US 219 (1987), el Supremo federal volvió a utilizar un análisis funcionalista al resolver que Puerto Rico, al igual que los estados, podía solicitar a otro estado la entrega de un fugitivo al amparo de la cláusula de extradición de la Constitución federal, Artículo IV, Secc. 2, Cl. 2. El

muestra de lo complejo que puede resultar el tema de la soberanía dentro del federalismo estadounidense, en ocasiones excepcionales el Congreso ha legislado directamente para los estados de la Unión en áreas tradicionalmente reconocidas como privativas de la soberanía estatal.[206] De todas formas, de estar sujeto a los poderes plenarios del Congreso — lo cual rechazamos — ello no

---

tribunal prefirió resolver la controversia bajo la Ley de Extradición, 18 USC Sec. 3182, que claramente aplicaba tanto a los estados como a los territorios. Sin embargo el Supremo federal expresó que: "The subsequent change to Commonwealth status through legislation, did not remove from the Government of the Commonwealth any power to demand extradition which it had possessed as a Territory, for the intention of that legislation was 'to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union." Íd., pág. 229-30. (Cita omitida).

[206] Así fue con la ley conocida como "Voting Rights Act" de 1965, 42 USC Sec. 1973, *et seq.*, (eliminada por la Ley Pública Núm. 113-234 de 16 de diciembre de 2014, y convertida en la 52 USC sec. 10301). Esta ley establecía ciertos requisitos y hasta obligaba a solicitar autorización del Departamento de Justicia federal para que ciertos estados con historial de discriminación hacia los afroamericanos pudieran aprobar enmiendas a sus leyes electorales. *Ver*, 42 USC secs. 1973b(b) y 1973c(a). Esta ley del Congreso claramente intervenía con la soberanía de los estados, a pesar de que éstos no son territorios de Estados Unidos ni están sujetos a la cláusula territorial de la Constitución federal. La legislación fue validada por el Supremo federal, en *State of South Carolina v. Katzenbach*, 383 US 301, 334 (1966). Se estableció que "[t]he Act suspends new voting regulations pending scrutiny by federal authorities ... This may have been an uncommon exercise of congressional power, as South Carolina contends, but the Court has recognized that exceptional conditions can justify legislative measures not otherwise appropriate." Esta situación se sostuvo para estos estados con historial racista hasta *Shelby County v. Holder*, 133 SCt 2612 (2013). Pensar que el Estado Libre Asociado estaría libre de estas mismas condiciones excepcionales sería ir demasiado lejos, incluso para los creadores de la Constitución puertorriqueña de 1952.

impediría concluir que Puerto Rico es tan soberano como las tribus para fines de la doctrina de la doble soberanía.

Por otro lado, en *Torres v. Commonwealth of Puerto Rico*, el Tribunal Supremo federal revocó una decisión del Tribunal Supremo de Puerto Rico que confirmó la convicción de una persona al amparo de una ley puertorriqueña que autorizaba el registro en el aeropuerto de las maletas de cualquier viajero que llegara de Estados Unidos.[207] La ley fue impugnada al amparo de la cláusula contra registros y allanamientos de la Cuarta Enmienda de la Constitución federal. Tal y como señala la Opinión Mayoritaria, el Supremo federal utilizó la doctrina de los casos insulares para determinar si se justificaba aplicar a la isla esta disposición Constitucional.[208] Al decidir en la afirmativa, el Tribunal tomó en consideración que las anteriores leyes orgánicas aprobadas por el Congreso para la isla habían garantizado derechos individuales equivalentes a los de la Cuarta Enmienda a los residentes de la isla y que

[a] Constitution containing the language of the Fourth Amendment, as well as additional language reflecting this Court´s exegesis thereof **was adopted by the people of Puerto Rico and approved by Congress.**[209]

Siguiendo lo establecido en *Dorr v. United States*, *supra*, el Supremo federal expresó que en Puerto Rico no se ponían en peligro los intereses de Estados Unidos ni existía riesgo de

---

[207] Torres v. Commonwealth of Puerto Rico, 442 US 465, 466-67 (1979).
[208] Íd., págs. 468-70.

[209] Íd. (Énfasis añadido).

que se cometiera alguna injusticia si se aplicaba la protección contra registros y allanamientos de la Cuarta Enmienda directamente a la isla. Por lo tanto, la decisión en *Torres* nos deja exactamente en la misma posición que *Calero-Toledo* y *Flores Otero*, *supra*.[210]

La Opinión mayoritaria que motiva esta concurrencia reconoce las múltiples instancias en las que el Tribunal Supremo federal ha reconocido que Puerto Rico tiene una soberanía y jurisdicción similar a la de los estados sobre asuntos no gobernados por la Constitución federal. No obstante, expresa que "el análisis... no es si el ente se parece, actúa o tiene ciertas atribuciones de un verdadero soberano. La pregunta fundamental, de acuerdo al Tribunal Supremo federal, es si las dos entidades derivan su autoridad de la misma fuente de poder".[211] Como vimos, este análisis tiene graves fallas teóricas que no concuerdan con la realidad histórica de Estados Unidos. Tampoco concuerda con las expresiones del propio Tribunal Supremo federal en cuanto al poder plenario del Congreso sobre las tribus indígenas que, según dijo, es tanto que las podría hacer desaparecer a su antojo y aun así, las tribus indígenas son "soberanas" para efectos de la doctrina de la doble

---

[210] Íd., pág. 471. Sin embargo, fiel a la postura pragmática que había asumido desde *Calero-Toledo*, el Tribunal dijo expresamente que no era necesario decidir si la protección contra registros y allanamientos aplicaba a Puerto Rico en virtud de la Cuarta o de la Decimocuarta Enmienda. Si se hubiera expresado sobre esto hubiera atendido directamente el asunto de si Puerto Rico seguía siendo o no una mera extensión del Congreso, prefirió no hacerlo.
[211] Íd., pág. 57.

soberanía.[212] Más importante aún, la fuente última del poder punitivo del Estado Libre Asociado es el Pueblo de Puerto Rico.[213] Por estas razones no existe impedimento alguno para reconocer, como lo ha hecho el Tribunal Supremo federal en tantas otras ocasiones, que el Estado Libre Asociado posee autoridad suficiente para ser considerado un soberano para propósitos de la doctrina de la doble soberanía. La Opinión mayoritaria se equivoca al decidir hoy lo contrario.

**C**

**La norma del Tribunal Supremo de Puerto Rico desde el 1954 hasta el presente**

El Tribunal Supremo de Puerto Rico se ha expresado en múltiples instancias sobre el alcance y autoridad de nuestra Constitución. Por ejemplo, en *Pueblo v. Figueroa*, establecimos que la Constitución del Estado Libre Asociado

---

[212] US v. Lara, *supra*, pág. 202.

[213] Recordemos que nuestra Constitución inicia con las palabras "Nosotros, el Pueblo de Puerto Rico, a fin de organizarnos políticamente sobre una base plenamente democrática ... ordenamos y establecemos esta Constitución para el Estado Libre Asociado que en el ejercicio de nuestro derecho natural ahora creamos dentro de nuestra unión con los Estados Unidos de América". Const. ELA, Preámbulo, 1 LPRA, pág. 266. No fueron ni el Congreso ni el pueblo estadounidense quienes crearon la Constitución del Estado Libre Asociado. Como ya explicamos, no es nuestra tarea decidir si desde el punto de vista político este cambio verdaderamente significó la culminación de un proceso de autodeterminación para Puerto Rico. Pero desde el punto de vista de la autoridad de la Constitución del Estado Libre Asociado, y de la fuente de la cual emana su poder, no se puede decir que ésta no fue creada y se encuentra subordinada a la voluntad del pueblo puertorriqueño.

no era una ley del Congreso y que era este Tribunal quien

tenía la autoridad final para interpretar sus

disposiciones.[214] En torno a la fuente de autoridad de

nuestra Constitución, el entonces Juez Presidente Snyder,

expresó que nuestra Constitución descansaba sobre una base

distinta a una mera delegación del Congreso.[215] La razón para

concluir esto es que nuestra Constitución:

fue aprobada por los representantes electos del pueblo de
Puerto Rico en una Convención Constituyente. Esto tuvo lugar
luego de cuidadosa consideración de cada cláusula en
comisiones y en debate en el hemiciclo de la Convención.
Finalmente, el propio pueblo expresó su aprobación en las
urnas, [por lo que es] imposible creer que la Constitución —
un producto de redacción y debate locales — sea en efecto
una ley federal.[216]

Mientras, en *RCA v. Gobierno de la Capital*,[217] aclaramos

el ámbito y la fuente de autoridad del Estado Libre Asociado

para imponer tributos. Explicamos que la autoridad y poder

del Gobierno constitucional puertorriqueño:

no eran, como antes, meramente delegados por el Congreso,
sino que *emanaban de sí mismo, y estaban libres de una*

---

[214] Pueblo v. Figueroa 77 DPR 188, 200 (1954).

[215] Íd., pág. 194.

[216] Íd. El Primer Circuito confirmó estas expresiones en
*Figueroa v. People of Puerto Rico*, *supra*. En su Opinión, el
Juez Presidente Magruder dijo: "The answer to appellant's
contention is that the constitution of the Commonwealth is
not just another Organic Act of the Congress. We find no
reason to impute to the Congress the perpetration of such a
monumental hoax. ... This constitution is not an act of
Congress, though congressional approval was necessary to
launch it forth." Figueroa v. People of Puerto Rico, *supra,*
pág. 620.

[217] RCA v. Gobierno de la Capital, 91 DPR 416 (1964). Revocado
por otros fundamentos en cuanto a la aplicación a Puerto
Rico de la cláusula de comercio de la Constitución federal
en su estado durmiente. ELA v. Northwestern Selecta, infra.

*autoridad superior*, sujetos sólo "a las limitaciones de su propia Constitución ... y a aquellas obligaciones que el pueblo se impuso al aceptar las relaciones federales que habrían de existir y existen con los Estados Unidos a tenor de la Ley 600.[218]

Estas expresiones fueron reiteradas una y otra vez en distintas decisiones de este Tribunal, incluyendo *Pueblo v. Castro García*, *supra*, que hoy la Mayoría de este Tribunal ha decidido revocar, por fundamentos equivocados.[219] Por esta razón, en *Ramírez de Ferrer v. Marí Brás*, *supra*, reiteramos la validez de todos estos casos, y añadimos lo siguiente:

> Más aún... en los albores del siglo XXI... constituiría un crudo anacronismo jurídico suponer que los poderes mínimos de gobierno propio que actualmente ostenta el ELA no emanan del pueblo mismo, sino que son una mera delegación de autoridad congresional. Reiteramos... que la autoridad pública y los poderes gubernamentales del ELA, en el ámbito que le es privativo dentro de su relación con Estados Unidos de Norteamérica, emanan de la voluntad del pueblo de Puerto Rico y sólo pueden modificarse mediante el consentimiento consciente de ese pueblo, expresado directamente a través de las urnas.[220]

Señalamos entonces que el reconocimiento del Estado Libre Asociado como una entidad autónoma dentro del sistema federal estadounidense, con autoridad o jurisdicción plena y soberana sobre asuntos no gobernados por la Constitución federal es la norma constitucional establecida por este Tribunal "que rig[e] en el País, independientemente de las preferencias políticas de unos y otros, hasta tanto el

---

[218] Ramírez de Ferrer v. Marí Brás, *supra*, pág. 157, citando a RCA v. Gobierno de la Capital, *supra*, págs. 428-29.
[219] ELA v. Rodríguez, 103 DPR 636 (1975); Santa Aponte v. Secretario del Senado, 105 DPR 750 (1977); Pacheco Fraticelli v. Cintrón Antonsanti, 122 DPR 299 (1988); Silva v. Hernández Agosto, 118 DPR 45 (1986); PIP v. CEE, 120 DPR 580 (1988).

[220] Ramírez de Ferrer v. Marí Brás, *supra*, pág. 158.

régimen constitucional vigente sea alterado por medios legítimos".[221]

Estos fundamentos fueron los que consideró este Tribunal al decidir *Pueblo v. Castro García* en 1988. En ese caso, unas personas acusadas por delitos relacionados con la Ley de Armas de Puerto Rico solicitaron ante el Tribunal de Primera Instancia la desestimación de los cargos en su contra. Argumentaron que fueron enjuiciados por el Tribunal de Distrito federal y convictos por delitos idénticos, por lo cual el proceso seguido en su contra ante el foro puertorriqueño violaba la protección constitucional contra la doble exposición. Al revocar la desestimación decretada por el foro primario, analizamos las relaciones entre Puerto Rico y Estados Unidos tras la creación del Estado Libre Asociado. Enfocando la controversia en el reconocimiento que había recibido el Estado Libre Asociado como entidad soberana en aspectos no regulados por la Constitución federal, tal y como revelan los casos discutidos en la sección anterior, concluimos que:

> Puerto Rico está facultado, como si fuera un estado, para aprobar y hacer cumplir un código penal. El Estado Libre Asociado, en el ejercicio de su autonomía, tiene jurisdicción para aplicar sus leyes penales a todas las personas que cometan delito dentro de su extensión territorial.[222]

---

[221] Íd., págs. 160-61.

[222] Íd., págs. 754-55. (Cita omitida).

La fuente de esa autoridad no podía ser otra que el Pueblo de Puerto Rico y su Constitución,[223] por lo tanto, "el poder de [Puerto Rico] para crear y poner en vigor delitos emana [a diferencia de la situación prevaleciente en *Shell Co.*, *supra*] no sólo del Congreso, sino del consentimiento del Pueblo y, por tanto de sí mismo, por lo que le es de aplicación la doctrina de soberanía dual".[224]

La norma que reconoce la autoridad plena del Estado Libre Asociado en sus asuntos internos fue reiterada recientemente en *ELA v. Northwestern Selecta*.[225] Al resolver que a Puerto Rico le aplica la cláusula de comercio de la Constitución federal en su estado durmiente y declarar la inconstitucionalidad de una ley impositiva, reafirmamos que la relación entre Puerto Rico y Estados Unidos "ha ido evolucionando y se ha fortalecido de diversas maneras. En

---

[223] "En 1952 el Pueblo de Puerto Rico se organizó políticamente bajo el nombre de Estado Libre Asociado. ... [e]l Pueblo se reunió en asamblea mediante sus representantes elegidos y redactó su propia Constitución. Desde entonces, el [poder] político de la isla emana del consentimiento y la voluntad del Pueblo de Puerto Rico. ... Puerto Rico es entonces soberano en cuanto a sus asuntos internos". Íd., pág. 765.

[224] Íd., págs. 779-81.

[225] ELA v. Northwestern Selecta, 185 DPR 40, 48 (2012). En ese caso, se impugnó la constitucionalidad de una ley aprobada por la Asamblea Legislativa en la que se le impuso un tributo a la carne de res, tanto local como importada, con el cual se financiaría un programa del gobierno para el fomento, mejoramiento y promoción de la industria de la carne de res en el País. Una importadora de carne de Estados Unidos solicitó que el estatuto fuera declarado inconstitucional al amparo de la cláusula de comercio de la Constitución federal en su estado durmiente. La Jueza Asociada señora Fiol Matta emitió una Opinión disidente a la que se unió el Juez Presidente Hernández Denton.

múltiples ocasiones, el Tribunal Supremo federal ha expresado que Puerto Rico debe ser tratado como si fuera un estado para propósitos constitucionales o de aplicación estatutaria".[226] A esos efectos, citamos de una opinión del Tribunal de Apelaciones de Estados Unidos para el Tercer Circuito para recalcar que:

> It is not surprising that "although Puerto Rico is not a state in the federal Union, "it … seems to have become a State within a common and accepted meaning of the word." Consistent with this common and accepted understanding, Congress frequently uses the term "State" to refer also to Puerto Rico. … More significantly, when Congress fails explicitly to refer to Puerto Rico, courts must nonetheless inquire whether it intended to do so.[227]

En *Northwestern Selecta,* este Tribunal reconoció que al crearse el Estado Libre Asociado se tuvo la intención de "conceder a la isla un grado de autonomía e independencia normalmente asociada con los estados de la Unión".[228]

Hoy, la misma Mayoría que resolvió lo antes dicho en *Northwestern Selecta* se desdice y resuelve que Puerto Rico no es más que un mero territorio sujeto a la arbitrariedad del Congreso. Además de la clara inconsistencia doctrinal que esto representa, lo que está en juego en esta ocasión es mucho más que el interés económico de una empresa privada.[229] No tenemos la más mínima duda de que lo dicho en *Pueblo v.*

---

[226] Íd., pág. 67.

[227] Íd., pág. 67, citando a United States v. Laboy-Torres, *supra*, pág. 721.

[228] Íd., pág. 65.
[229] "It would not the first time that a majority discriminated against itself for self-deprecatory reasons". Álvarez González, The Great State, *supra*, pág. 432.

*Castro García, supra,* y reiterado en *Northwestern Selecta,* es el estado de derecho prevaleciente en los tribunales federales, incluido el Tribunal Supremo federal y el Primer Circuito, en cuanto a la autoridad del Estado Libre Asociado. Por tanto, para propósitos de la doctrina de la doble soberanía como excepción a la protección Constitucional contra la doble exposición, Puerto Rico goza de una soberanía igual a la de los estados de la Unión.

Sin embargo, en *Pueblo v. Castro García* erramos al concluir que el hecho de dicha autoridad era suficiente para obviar la garantía constitucional contra la doble exposición y aplicar la doctrina de la doble soberanía a Puerto Rico para permitir que un ciudadano pueda ser sometido dos veces a un proceso criminal por el mismo delito. [230] Por el contrario, debemos rechazar esta conclusión por sus graves implicaciones para la paz individual y la dignidad del ser humano que nuestro ordenamiento puertorriqueño busca proteger con la prohibición a la doble exposición que consagra el Artículo 11 de nuestra Constitución nos obliga a rechazar esa conclusión.

**VI**

---

[230] En este caso acogimos el errado razonamiento que usó el Supremo federal en *Bartkus* y *Abbate* para justificar la doctrina de la doble soberanía y expresamos que "[n]egarle a Puerto Rico el poder de poner en vigor sus leyes criminales, por el hecho de que el Gobierno federal o un estado ha ganado la carrera a los tribunales sería chocante y llevaría a una privación de su histórico derecho y obligación de mantener la paz y el orden dentro de su territorio". Pueblo v. Castro García, *supra*, pág. 782.

**La doctrina de la doble soberanía: críticas a su justificación**

En la Parte III de esta Opinión concurrente, discutimos las debilidades de la doctrina de la doble soberanía desde un contexto teórico-constitucional e histórico. Como señalamos, en *Lanza*, y luego en *Abbate* y *Bartkus*, el Tribunal Supremo federal justificó la doctrina de la doble soberanía utilizando dos supuestos. Primero, que la Quinta Enmienda no aplicaba directamente a los Estados, por lo que esta no impedía que un estado encausar múltiples veces, tampoco impedía que el Gobierno federal lo encausara luego de un estado. Segundo, que la doctrina era necesaria para el esquema de la distribución de poderes del federalismo estadounidense.

A

La primera de estas justificaciones quedó eliminada en 1969, cuando el Tribunal Supremo federal resolvió, en *Benton v. Maryland*, que la protección contra la doble exposición de la Quinta Enmienda aplica a los estados en virtud de la Decimocuarta Enmienda, ya que la protección "representa un ideal fundamental de nuestra herencia constitucional".[231] Luego de esta decisión, la excepción de la doble soberanía a la protección contra la doble exposición resulta una anomalía dentro del derecho constitucional estadounidense.[232] Cabe señalar que el Tribunal Supremo federal ha eliminado la

---

[231] <u>Benton v. Maryland</u>, 395 US 784, 794 (1969).
[232] Akhil Reed Amar y Jonathan L. Marcus, <u>Double Jeopardy Law After Rodney King</u>, 95 Col. L. Rev. 1, 2 (1995).

excepción de la doble soberanía para otras protecciones que ofrece la Carta de Derechos de la Constitución federal: el derecho a no incriminarse y la protección contra registros y allanamientos irrazonables.

**El Derecho a no incriminarse y la doble soberanía**

Antes de 1964, la declaración de un testigo realizada luego de una oferta de inmunidad federal era admisible en un procedimiento criminal presentado en su contra en el foro estatal, al igual que en la situación inversa.[233] El razonamiento detrás de esto era que la Carta de Derechos sólo vinculaba al Gobierno federal y no a los Gobiernos estatales. El Tribunal rechazó este razonamiento en *Murphy v. Waterfront Commision*.[234] Ese mismo día, el Supremo federal había resuelto que el privilegio contra la autoincriminación de la Quinta Enmienda vinculaba a los estados a través de la Decimocuarta Enmienda, así que el Tribunal formuló la controversia en *Murphy* de la siguiente forma: "si una jurisdicción dentro de nuestra estructura federal puede obligar a un testigo — a quien le ha ofrecido inmunidad bajo sus leyes — a ofrecer testimonio que podría utilizarse para hallarlo culpable en otra jurisdicción similar".[235]

---

[233] Íd., pág. 11; Chiesa, *supra*, pág. 543.

[234] Murphy v. Waterfront Comm. of New York Harbor, 378 US 52 (1964).

[235] Íd., pág. 53. (traducción nuestra). Molly v. Hogan, 378 US 1, (1964), publicado el mismo día que *Murphy*, resolvió que la Quinta Enmienda federal protegía a la persona de testificar en los tribunales estatales si ello lo exponía a responsabilidad criminal bajo las leyes estatales.

Al atender la controversia, el Supremo federal afirmó que la protección contra la autoincriminación encarna muchos de los valores más fundamentales de una sociedad civilizada. Razonó que dado el nivel de cooperación existente entre las autoridades federales y estatales en el ámbito criminal, obligar a un individuo a incriminarse en cualquiera de las dos jurisdicciones derrotaría los principios y la política pública de la protección constitucional contra la autoincriminación. Es notable que el Supremo federal incluyera la inviolabilidad de la personalidad humana como uno de los principios que informa la protección contra la autoincriminación que ofrece la Constitución federal.[236]

Según señaló el Supremo federal, desde antes de la Constitución estadounidense los tribunales de Inglaterra habían resuelto unánimemente que el privilegio contra la autoincriminación protegía a un testigo en un tribunal inglés de ser obligado a ofrecer testimonio que podría utilizarse en su contra en tribunales de otra jurisdicción.[237] Reconociendo que sus decisiones previas se habían apartado de esta norma, el Tribunal Supremo federal rechazó que la doctrina de la doble soberanía fuera una excepción al derecho constitucional a no incriminarse[238]

---

[236] Murphy, *supra*, págs. 55-56.
[237] La protección actuaba, incluso, entre tribunales del sistema inglés de jurisdicción concurrente como el Court of Chancery y los tribunales de *common law*. Id, págs. 57-58 (Citas omitidas).

[238] Íd., pág. 72. Sin embargo, el Tribunal limitó su decisión a jurisdicciones dentro de Estados Unidos y a la jurisdicción del Gobierno federal, pues expresa que no

Resolvió que la protección contra la incriminación que ofrece la Quinta Enmienda de la Constitución federal protege a un testigo federal de incriminarse en el foro estatal, al igual que protege a un testigo estatal de incriminarse en el foro federal.[239]

**La Protección contra Registros y Allanamientos y la Doble Soberanía**

Al amparo de la doctrina de la doble soberanía, se justificaba admitir en el foro estatal evidencia obtenida mediante un registro o allanamiento ilegal realizado por las autoridades federales, y viceversa, pues la Cuarta Enmienda de la Constitución federal sólo aplicaba a actuaciones de las agencias federales de orden público.[240] Esta doctrina, conocida como el *silver plate doctrine,* fue rechazada en *Elkins v. US*, decidido en 1960, un año después de *Bartkus y Abbate*.[241] El Supremo federal expresó que a la víctima no le importa quién violó su protección constitucional contra registros y allanamientos irrazonables y resolvió que lo

---

habría impedimento cuando el testimonio expone al testigo a responsabilidad penal en un país extranjero. Íd., pág. 56, n. 5.

[239] Murphy, *supra*, págs. 77-78.

[240] Reed Amar, *supra*, pág. 11.

[241] Elkins v. US, 364 US 206 (1960). En *Wolf v. Colorado*, 338 US 25 (1949), el Supremo federal había resuelto que aunque la Decimocuarta Enmienda prohibía los registros y allanamientos irrazonables por parte de oficiales estatales, no impedía que la evidencia obtenida ilegalmente por agentes estatales fuese luego utilizada por oficiales federales en un procedimiento federal, pues no se podía responsabilizar a un soberano cuando era otro el que violaba las garantías de la Cuarta Enmienda.

correcto era excluir la evidencia en el pleito federal independientemente de si quien violó su derecho constitucional fue un agente estatal o federal.[242] Posteriormente se extendió lo resuelto en *Elkins* para resolver que la prueba obtenida en violación a la Cuarta Enmienda por agentes federales era inadmisible en un procedimiento criminal estatal.[243]

Al comparar estas decisiones con las decisiones del Supremo federal sobre la doctrina de la doble soberanía y la protección contra la doble exposición, los Profesores Akhil Reed Amar y Jonathan L. Marcus señalan lo siguiente:

Here then, is the key puzzle: Whereas *Elkins* consciously built on *Wolf´s* application of Fourth Amendment principles against states to overturn the silver platter doctrine, and *Murphy* explicitly built on *Malloy´s incorporation* of the Incrimination Clause to overturn *Feldman,* the Court never chose to build on *Benton´s* incorporation of the Double Jeopardy Clause to overturn *Bartkus* and *Abbate*. The Court has never explained — or even focused on — this anomaly.[244]

Este análisis nos lleva a concluir que resulta muy difícil conciliar lo dicho en *Elkins* y *Murphy* con lo establecido en *Bartkus* y *Abbate*. Se agrava el desconcierto si consideramos que la protección contra la autoincriminación y la protección contra la doble exposición emanan de la misma fuente, la Quinta Enmienda de la Constitución estadounidense.

**B**

---

[242] Elkins v. US, *supra*, pág. 215.

[243] Mapp v. Ohio, 367 US 643 (1961).
[244] Reed Amar, *supra*, pág. 15.

La segunda justificación articulada en la jurisprudencia federal — que la doctrina de la doble soberanía es un requisito del federalismo — tampoco supera un análisis crítico. El Tribunal Supremo federal nunca ha atendido el fundamento histórico de la protección contra la doble exposición.[245] De hecho, las primeras críticas realizadas a la excepción de la doble soberanía a la protección contra la doble exposición resaltaron cómo el Supremo federal, en *Lanza*, torció las raíces de la protección contra la doble exposición en el derecho común.[246]

Los redactores de la Constitución federal deseaban que la cláusula contra la doble exposición recogiera la doctrina reconocida hasta ese momento en Gran Bretaña.[247] Cuando se redactó la Constitución federal y su Carta de Derechos, estaba firmemente establecido que la absolución o convicción de una persona en un tribunal con jurisdicción competente impedía que se le encausara nuevamente por la misma ofensa

---

[245] Dax Eric Lopez, Not Twice for the Same: How the Dual Sovereignty Doctrine is Used to Circumvent *Non Bis In Idem*, 33 Vand. J. Transnat´l L. 1263, 1295 (2000), citando a Susan Herman, Double Jeopardy All Over Again: Dual Sovereignty, Rodney King, and the ACLU, 41 UCLA L. Rev. 609, 625 (1994).

[246] J. A. C. Grant, Successive Prosecutions by State and Nation: Common Law and British Empire Comparisons, 4 UCLA L. Rev. 1 (1956). Para un recuento más detallado sobre la historia de la protección contra la doble exposición, véase Rudstein, op. cit, págs. 1-29; y Eric Lopez, *supra*, págs. 1266-71, comparándolo con el desarrollo de *non bis in idem* en la tradición civilista.

[247] Esto, aunque reconocemos que no hubo mucho debate en cuanto al significado de la cláusula. Eric Lopez, *supra*, pág. 1296. (Citas omitidas).

en los tribunales de Inglaterra.[248] Es decir, antes de que se incorporara la protección contra la doble exposición en la Constitución federal, los tribunales de Inglaterra ya habían rechazado la doble soberanía como una excepción a la protección contra la doble exposición.[249]

Siendo ello así, difícilmente podría sostenerse que la intención de los constituyentes estadounidenses fuera incluir la doble soberanía como una excepción a la protección contra la doble exposición.[250] Máxime, cuando los fundamentos de la doctrina de la doble soberanía no están articulados en la Constitución federal, sino que se desarrollaron jurisprudencialmente para acomodar los conflictos de jurisdicción concurrente entre los estados de la Unión y el Gobierno federal.[251]

---

[248] Reed Amar, *supra*, pág. 6; Eric Lopez, *supra*, pág. 1270. Por lo menos tres casos habían resuelto que una convicción o absolución en otra jurisdicción activaba la protección contra la doble exposición en Inglaterra. El caso más importante es *R. v. Hutchinson*. Hutchinson fue acusado de asesinar a un individuo en Portugal y fue absuelto por los tribunales de Portugal. Luego fue arrestado en Inglaterra y presentado ante el tribunal, que decidió, unánimemente, que como había sido absuelto por el tribunal de Portugal no podía ser juzgado nuevamente por el mismo delito en Inglaterra. Grant, *supra*, pág. 9. Véase también Rudstein, op. cit., págs. 1-29.

[249] Este estado de derecho era tan aceptado que fue articulado en varios tratados de la época, incluyendo el del célebre Blackstone. Rudstein, op. cit. pág. 4.

[250] De hecho, algunas de las primeras decisiones del Tribunal Supremo federal reconocieron como válidas las decisiones criminales de tribunales extranjeros. Véase, Eric Lopez, *supra*, pág. 1296.

[251] Eric Lopez, *supra*, pág. 1274-75 (citas omitidas). En *Bartkus*, el Juez Black también criticó la noción de que la excepción de la doble soberanía fuera un requisito del federalismo estadounidense:

Pero además de ser contrarias al desarrollo del derecho común inglés, las decisiones del Tribunal Supremo federal — particularmente *Heath v. Alabama* — confieren un valor injustificado a la soberanía del gobierno, ya sea el estatal o el federal, sacrificando el interés del individuo a no ser procesado criminalmente una segunda vez.[252] Como vimos en *Lanza,* el Tribunal articuló la doctrina de la doble soberanía sin discutir los intereses que informan la protección contra la doble exposición de la Quinta Enmienda, los cuales van dirigidos a proteger al individuo frente al poder inmenso del Estado. Por el contrario, la doctrina de la doble soberanía permite, injustificadamente, que dos gobiernos logren, en tándem, lo que cada uno no puede hacer por su cuenta: someter a un ciudadano a procedimientos y castigos múltiples por la misma ofensa.[253]

Las Opiniones disidentes del Juez Black en *Abbate y Bartkus* señalan claramente las principales deficiencias e

---

The Court, without denying the almost universal abhorrence of such double prosecutions, nevertheless justifies the practice here in the name of 'federalism.' This, it seems to me, is a misuse and desecration of the concept. Our Federal Union was conceived and created 'to establish Justice' and to 'secure the Blessings of Liberty,' not to destroy any of the bulwarks on which both freedom and justice depend. We should, therefore, be suspicious of any supposed 'requirements' of 'federalism' which result in obliterating ancient safeguards. I have been shown nothing in the history of our Union, in the writings of its Founders, or elsewhere, to indicate that individual rights deemed essential by both State and Nation were to be lost through the combined operations of the two governments.
Bartkus, *supra*, págs. 155-56 (Op. disidente del Juez Black).

[252] Reed Amar, *supra*, pág. 5.

inconsistencias de la doctrina de la doble soberanía como una excepción a la protección contra la doble exposición. En *Bartkus*, el Juez Black señaló que la decisión de la mayoría debilitaba la protección constitucional contra la doble exposición, uno de los valores principales del Pueblo estadounidense y un valor fundamental para toda la tradición occidental. También señaló que la excepción de la doble soberanía no atendía responsablemente el propósito de la prohibición contra la doble exposición, que no es otro que proteger al individuo frente al poder del Estado. Desde el punto de vista del individuo, poco importa el que lo castiguen dos soberanos distintos en vez de uno. En ambos casos, el ciudadano está expuesto dos veces a ser procesado o castigado por la misma conducta.[254]

Por otro lado, en *Abbate* el Juez Black señaló que la excepción de la doble soberanía permite que dos soberanos logren juntos lo que cada uno no puede hacer por su cuenta.[255] Reconociendo que la mayoría de las naciones con sistemas legales fundamentados en el derecho común consideran que una convicción en otra jurisdicción es un

---

[253] Íd., pág. 2.

[254] "Looked at from the standpoint of the individual who is being prosecuted, this notion is too subtle for me to grasp. If double punishment is what is feared, it hurts no less for two 'Sovereigns' to inflict it than for one. If danger to the innocent is emphasized, that danger is surely no less when the power of State and Federal Governments is brought to bear on one man in two trials, than when one of these 'Sovereigns' proceeds alone. In each case, inescapably, a man is forced to face danger twice for the same conduct". Bartkus, *supra*, pág. 155, Op. disidente del Juez Black (Citas omitidas).

[255] Abbate, *supra*, pág. 203, Op. disidente del Juez Black.

impedimento para encausar en la propia, Black caracterizó como insostenible concluir que los estados de la Unión son más extranjeros con relación al Gobierno federal que dos países totalmente desvinculados entre sí.[256]

El Supremo federal ha intentado levantar unas justificaciones prácticas, sobre la base del federalismo estadounidense, para sostener que la doctrina de la doble soberanía es necesaria. Por ejemplo, ha razonado que sin la doctrina de la doble soberanía, un soberano — i.e. un estado de la Unión — podría legislar una pena insignificante para impedir que otro soberano encause a sus ciudadanos por un delito más grave.[257] Según el Tribunal, esto menoscabaría la legislación penal del segundo soberano y le impediría poder hacer cumplir sus leyes.[258] Por consiguiente, cuando haya jurisdicción criminal concurrente, ambos soberanos simplemente competirían para ser el primero en traer a la persona imputada ante sus tribunales.[259]

Sin embargo, hay otras alternativas para atender la fricción que genera el federalismo estadounidense y que

---

[256] "It is as much an affront to human dignity and just as dangerous to human freedom for a man to be punished twice for the same offense, once by a State and once by the United States, as it would be for one of these two Governments to throw him in prison twice for the offense." Íd.

[257] Lanza, *supra*, pág. 80; Abbate, *supra*, pág. 195.

[258] Abbate, *supra*, pág. 195.

[259] Lanza, *supra*, pág. 385. No debemos pasar por alto que *Lanza* se decidió durante la Prohibición, cuando el Gobierno federal tenía muchas dificultades en implementar la prohibición del consumo y comercio del alcohol.

tanto preocupa al Tribunal Supremo federal. Por ejemplo, si existe una preocupación nacional por algún tema particular en el que el Gobierno federal y otro soberano compartan jurisdicción, como la comisión de un crimen o delito particularmente ofensivo o peligroso para la seguridad nacional, el Congreso puede simplemente legislar y ocupar el campo.[260]

Otra justificación práctica que ofreció el Supremo federal para sostener la doctrina de la doble soberanía es que esta promueve la administración eficiente de la justicia en la jurisdicción federal. Según esta postura, resultaría impráctico requerir que las autoridades federales se mantengan informadas de las investigaciones que realizan las autoridades estatales.[261] La misma lógica aplicaría a los Estados. Sin embargo, dado el alto grado de cooperación entre el gobierno federal y las agencias estatales de orden público, esta justificación responde a una concepción anticuada del federalismo estadounidense, algo que muchos comentaristas han criticado. Esto es particularmente preocupante hoy en día, considerando la colaboración estrecha que existe entre el Gobierno federal y otros soberanos en asuntos criminales.[262] Puerto Rico no es la

---

[260] Véase, Op. disidente del Juez Black en *Bartkus* y *Abbate*.

[261] Abbate, *supra*, pág. 195. Eric Lopez, *supra*, pág. 1277.

[262] Según Eric López esta cooperación ha llegado al punto que "las actividades de las agencias del orden público estatales y federales están tan entrelazadas que no se pueden considerar agencias separadas e independientes". Eric Lopez, *supra*, pág. 1299.

excepción, pues hemos realizado varios acuerdos de colaboración con las autoridades federales en varias áreas.

### C
### La doctrina de la doble soberanía y los estados

Para atender adecuadamente las consecuencias indeseables de la doctrina de la doble soberanía, algunos estados han prohibido su aplicación mediante legislación.[263] Otros redactaron su carta de derechos para incluir expresamente en la cláusula contra la doble exposición la protección del individuo que ha sido sometido a procedimiento por el mismo delito en otra jurisdicción.[264]

Aún sin rechazar expresamente la doctrina de la doble soberanía, algunos estados de la Unión han interpretado su cláusula constitucional contra la doble exposición de manera cónsona con los principios que dan forma a la Quinta Enmienda y le han otorgado el peso adecuado al interés del

---

[263] Varios estados han incorporado estatutariamente reglas similares a la Regla 1.10 del Código Penal Modelo, que limitaría considerablemente la facultad de una jurisdicción para encausar a un ciudadano por conducta que también constituya un delito en otra jurisdicción. La mayoría de éstos prohíbe el inicio de un segundo proceso criminal por un delito que ya fue castigado en otra jurisdicción, salvo que el delito de que se trate persiga un interés estatal distinto que no fue satisfecho en el primer procedimiento en la otra jurisdicción. Los comentarios a la Regla propuesta reconocen la incongruencia entre las decisiones del Tribunal Supremo federal avalando la excepción de la doble soberanía en el contexto de la protección contra la doble exposición y sus decisiones declarando la excepción inaplicable en cuanto a la protección contra la autoincriminación, a pesar de las similitudes entre los principios a los que responde cada protección. Model Penal Code and Commentaries, Sec. 1.10, pág. 169.

[264] Por ejemplo, la Constitución de Montana extiende expresamente la protección contra la doble exposición a

individuo frente al soberano. Por ejemplo, en 1971, el

Tribunal Supremo de Pennsylvania se pronunció en contra de

un segundo encausamiento y castigo en Pennsylvania luego de

un castigo en otra jurisdicción, salvo en ciertas

circunstancias.[265] El Tribunal Supremo de Pennsylvania

criticó el razonamiento del Supremo federal en *Bartkus*,

*supra*, y señaló que en ese caso la mayoría no contempló la

posibilidad de que ambos soberanos persigan los mismos

intereses al procesar al individuo. Más importante aún,

señala que tampoco se examinó el interés del ciudadano

frente los posibles intereses del soberano:

> When one examines the 'dual sovereignty' doctrine as it applies to the double jeopardy clause, we are really involved in a balancing process, whereby we place the interests of the two sovereigns on one side of the judicial scale, and on the other side we place the interest of the individual to be free from twice being prosecuted and punished for the same offense. The basic problem with *Bartkus* is that the majority first failed to recognize the interests of the two sovereigns might be the same, but more important they secondly failed to really examine the interest of the individual.
> ........
> The striking feature [of the double jeopardy clause's] general rules and policies is that the focus is always on the individual, on a person's basic and fundamental rights. This feature is the common thread that runs across all of the provisions of the Bill of Rights, and we believe this is the element the Supreme Court failed to adequately consider in *Bartkus*.
> ........
> We are talking about the two governments protecting their interests, when we really should be talking about the individual, since by focusing on the individual we see that it matters little where he is confined—in a federal or state

---

procedimientos en cualquier jurisdicción. Mont. Const. Art. II, Sec. 25

[265] Comm v. Mills, 447 Pa. 163, 169 (1971). Eventualmente, Pennsylvania incorporó a su ordenamiento, mediante legislación la Regla 1.10 del Código Penal Modelo y lo resuelto por su Tribunal Supremo.

prison—the fact is that his liberty is taken away twice for the same offence.[266]

## VII

**La dignidad del ser humano y la protección contra la doble exposición.**

Según expresamos en *ELA v. Hermandad de Empleados*, los delegados a la Asamblea Constituyente querían crear una Carta de Derechos de factura más ancha, que incorporase el sentir de distintas culturas y los desarrollos contemporáneos sobre nuevas categorías de derechos. Consecuentemente, los tribunales estamos obligados a interpretar liberalmente los derechos allí consagrados.[267]

La Carta de Derechos de nuestra Constitución comienza afirmando que "la dignidad del ser humano es inviolable".[268] Inspirados en la Declaración Universal de Derechos Humanos y

---

[266] Íd. El Tribunal Supremo de New Hampshire resolvió en 1978 que el Estado de New Hampshire estaba impedido de encausar a un acusado absuelto en el tribunal federal por los mismos hechos. Al hacerlo, el Tribunal recalcó la necesidad de considerar el interés del individuo en vez que los intereses del soberano:
"Looking at the matter from that standpoint, we cannot escape the conclusion that the individual citizen is as much endangered by a second prosecution by the same sovereign after an acquittal as he would be by such a second prosecution by a different sovereign under our federal system".
State v. Hogg, 118 NH 262, 267 (1978). También razonó que como su Constitución fue redactada antes de la Constitución federal, debía seguir la doctrina firmemente establecida en el derecho común inglés.

[267] Const. PR, Art. II, Sec. 19. "La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente".

[268] Const. PR, Art. II, Sec. 1.

la Declaración Americana de los Derechos y Deberes del Hombre, nuestros constituyentes insertaron a Puerto Rico en las corrientes constitucionales modernas que surgieron en respuesta a los horrores de la Segunda Guerra Mundial.[269] Al enunciar la inviolabilidad de la dignidad del ser humano como su punto de partida, nuestra Carta de Derechos no lo hace como si se tratara de un derecho adicional a todos los demás. La dignidad del ser humano se erige como un derecho independiente, exigible en sí mismo, y a la misma vez, como un principio al cual responden todos los demás derechos fundamentales que protege nuestro ordenamiento jurídico:

Recordemos que [la inviolabilidad de la dignidad humana] está contenida en una Carta de Derechos, en una enumeración que antecede los artículos correspondientes a la estructura del gobierno. Esta Carta de Derechos no aparece como enmienda a la Constitución. De sus propios términos se enuncia como un derecho, es decir, no se articula como un valor o principio. Está expresada en términos absolutos. No admite excepciones. No es posible que se tolere una violación temporal de la misma. No admite valores superiores. No solo está dirigida al Estado únicamente como límite al ejercicio de sus poderes; está dirigida también a la sociedad: nadie puede violar la dignidad humana.[270]

La Carta de Derechos de la Constitución de Estados Unidos, que también inspiró nuestra Carta de Derechos, tiene el propósito principal de limitar los poderes del Estado frente al individuo. Sin embargo, nuestra Carta de Derechos no sólo limita los poderes del Estado para proteger al

---

[269] López Vives v. Policía de PR, 118 DPR 219, 226-27; Carlos E. Ramos González, La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño, 10 Academia Puertorriqueña de Jurisprudencia y Legislación 1, 1-2. (2010).

[270] Carlos Ramos, supra, pág. 5.

individuo, sino que también le impone al Estado la obligación de vindicar los derechos que reconoce, pues así lo exige la dignidad humana. El principio fundamental de nuestra Carta de Derechos, nuestra Constitución y nuestro ordenamiento jurídico es, por tanto, la protección de la dignidad humana.

No es fácil definir un concepto como la dignidad humana porque su significado intrínseco está condicionado en gran medida por factores culturales.[271] Aunque también sea la crítica principal que se levanta en su contra, es precisamente en la ambigüedad aparentemente inherente al concepto de la dignidad humana donde reside su inmenso potencial normativo.[272] Somos nosotros, constituidos en la sociedad puertorriqueña, quienes debemos proveerle contenido concreto según los principios que valoramos y atesoramos como Pueblo. Este Tribunal Supremo es sólo una de las muchas entidades que ejercen el poder soberano del Pueblo de Puerto Rico y comparten la responsabilidad de definir el contenido

---

[271] Oscar Schachter, Human Dignity as a Normative Concept, 77 The Am. J. of Int. L. 848, 849 (1983).

[272] Algunos sostienen que la dignidad humana es un concepto legal vacío, sujeto a manipulación judicial significante. Matthias Mahlmann, The Basic Law at 60—Human Dignity and the Culture of Republicanism, 11 German L. J. 9, 10, 12 (2010) (citas omitidas). Como bien señala el Profesor Álvarez González, "[q]ue el concepto de dignidad sea difícil de definir y de aplicar no debe significar que rehusemos intentarlo y desterremos esta disposición constitucional", particularmente si consideramos su primacía en nuestro ordenamiento jurídico y el imperativo constitucional de proveerle contenido. José J. Álvarez González, Contestación al discurso del profesor Carlos E. Ramos González, 10 Academia Puertorriqueña de Jurisprudencia y Legislación 31, 39 (2010).

específico de la dignidad humana en nuestra sociedad. Como

expresó Jaime Benítez en nuestra Asamblea Constituyente:

> Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta [la proposición de la Comisión de Carta de Derechos]. Tal vez toda ella está resumida en la primera oración de su primer postulado: *la dignidad del ser humano es inviolable*. Esta es la piedra angular y básica de la democracia. En ella radica su profunda fuerza y vitalidad moral. Porque antes que ninguna otra cosa, es la democracia una fuerza moral y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla.[273]

Articular la dignidad humana como principio rector de

nuestra Carta de Derechos no tiene paralelos en las

declaraciones internacionales de derechos humanos que la

inspiraron, o en la Constitución federal o de alguno de los

estados.[274] Sin embargo, hay otros ordenamientos que colocan

la dignidad del ser humano en una posición análoga al

nuestro, por ejemplo el de la República Federal de Alemania.

Por eso es útil recurrir a la jurisprudencia del Tribunal

Constitucional federal alemán para aclarar las implicaciones

de declarar que la dignidad humana es la piedra angular de

nuestro ordenamiento.[275]

---

[273] 2 Diario de sesiones de la Convención Constituyente de Puerto Rico 1103 (1961) (Énfasis original).

[274] Carlos Ramos, *supra*, pág. 7. Aunque el estado de Montana, cuya constitución se nutrió de la nuestra, incluye la inviolabilidad de la dignidad del ser humano en su carta de derechos, éste no ocupa el mismo lugar primordial que le otorga nuestra Constitución. Véase, Vicki C. Jackson, Constitutional Dialogue and Human Dignity: States and Transnational Constitutional Discourse, 65 Mont. L. Rev. 15 (2004).

[275] Arroyo v. Ratan, *supra*, pág. 60; Figueroa Ferrer v. ELA, *supra*, pág. 250.

Al igual que en nuestra Constitución, en la Constitución alemana la inviolabilidad del ser humano es el principio cardinal del cual se derivan sus demás derechos fundamentales.[276] El Tribunal Constitucional federal ha expresado que la inviolabilidad del ser humano es la característica esencial de su Constitución.[277] Incluso ha llegado a dotarla de significado normativo, adscribiéndole consecuencias jurídicas concretas. Por ejemplo, a partir de la inviolabilidad de la dignidad humana, la jurisprudencia del Tribunal Constitucional alemán ha desarrollado la prohibición de utilizar al ser humano como un instrumento, al igual que la obligación de respetar la autonomía del ser humano sobre su vida personal y social, y respetar su humanidad.[278] Específicamente, el Tribunal Constitucional federal alemán ha resuelto que una condena perpetua sin posibilidad de excarcelación viola la dignidad del individuo, no porque lo utiliza como un instrumento, sino porque no respeta su humanidad, al no reconocer la posibilidad de que el ser humano, como sujeto autónomo,

---

[276] Para una comparación entre cómo el ordenamiento alemán y el puertorriqueño han abordado la inviolabilidad de la dignidad humana, véase Luis A. Avilés, Human Dignity, Privacy and Personal Rights in the Constitutional Jurisprudence of germany, the United States and the Commonwealth of Puerto Rico, 67 Rev. Jur. UPR 343, 346 (1998).

[277] Mahlmann, *supra*, pág. 10.

[278] Íd., pág. 24.

modifique su comportamiento y vuelva a integrarse a la sociedad.[279] Por lo tanto:

El principio rector que la jurisprudencia alemana ha derivado de su cláusula de dignidad es que el ser humano es un fin en sí mismo y nunca puede convertirse en un objeto del poder del Estado. Partiendo de ese concepto central la jurisprudencia alemana ha derivado consecuencias concretas, tanto sustantivas como procesales.[280]

Durante los debates que se desarrollaron en nuestra Asamblea Constituyente en torno a la Carta de Derechos de nuestra Constitución, el Informe de la Comisión de la Carta de Derechos señaló que incluir la inviolabilidad de la dignidad humana como el primer derecho de la Carta tenía el propósito de fijarlo como el principio cardinal que informa a todos los demás derechos, y, por extensión, al ordenamiento jurídico. También indica que el ordenamiento jurídico puertorriqueño, incluyendo a este Tribunal, está obligado a ampliar las disposiciones de nuestra Carta de Derechos para adecuarlas a las necesidades de la sociedad puertorriqueña.[281] Es decir, la llamada "factura más ancha" de nuestra Constitución no sólo ocurre en función de la interpretación liberal que exige la sección 19 de la Carta de Derechos, sino que es un imperativo resultante de la inviolabilidad de la dignidad del ser humano. Precisamente

---

[279] Íd., pág. 27. Para una discusión más detallada, véase Avilés, *supra*, págs. 352-53.

[280] Álvarez González, Contestación, *supra*, pág. 40. El Profesor Álvarez también señala que esta jurisprudencia está en conflicto con la nuestra en ciertas áreas, como la de libertad de expresión, que allá recibe menos protección.

[281] 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2561 (1961).

porque informa los demás derechos fundamentales y permea todo nuestro ordenamiento jurídico, la dignidad del ser humano exige darle mayor eficacia a los principios que el Pueblo de Puerto Rico consagró en la Carta de Derechos.

Concebir los derechos humanos como derivados de la dignidad humana legitima a este Tribunal para formular derechos nuevos y ampliar los existentes para adaptarlos a los contextos nuevos de nuestra sociedad.[282] Ésta es la lógica jurídica y política que fundamenta la factura más ancha de nuestra Carta de Derechos.

De manera consecuente con esta realidad, hemos reconocido que la dignidad humana informa los derechos incluidos en la Carta de Derechos, entre ellos el derecho a la intimidad, a la protección contra registros y allanamientos irrazonables, y a la prohibición de interceptaciones telefónicas.[283] Por ejemplo, hemos expresado que el derecho a la intimidad y el derecho al trabajo son consustanciales con la dignidad humana.[284] También hemos expandido los derechos existentes, refiriéndonos a la dignidad humana, para atender nuevos contextos y formular derechos nuevos.[285]

---

[282] Schachter, *supra*, pág. 853.

[283] Const. PR, Art. II, Sec. 8; Const. PR, Art. II, Sec. 10.
[284] Arroyo v. Rattan, *supra*, pág. 61.

[285] En *Arroyo v. Rattan*, *supra*, resolvimos que la protección de la intimidad protege al empleado que se niega a someterse a una prueba de polígrafo. En *Figueroa Ferrer*, resolvimos que al amparo del derecho a la intimidad y a la dignidad que en nuestro ordenamiento existe la causal de divorcio por consentimiento mutuo o divorcio sin culpa.

Sin embargo, pocas de nuestras opiniones dan un tratamiento independiente y detenido a la inviolabilidad de la dignidad del ser humano y nunca hemos articulado la dignidad humana como un derecho independiente.[286]

## VIII

Por su propia naturaleza, la doctrina de la doble soberanía derrota los principios fundamentales de la protección contra la doble exposición. Como ya hemos discutido, no obstante estar firmemente establecida en la jurisprudencia del Tribunal Supremo federal, varias consideraciones minan su legitimidad. La doctrina de la doble soberanía no concuerda con los antecedentes históricos de la protección contra la doble exposición en Inglaterra. Tampoco concuerda con el principio teórico de la soberanía del Pueblo estadounidense sobre el Gobierno federal y el de los estados de la Unión, ni con los procesos históricos de la admisión de nuevos estados a la Unión. Varios estados han decretado su invalidez, ya sea mediante interpretación constitucional o estatutariamente. Adicionalmente, el propio Tribunal Supremo federal ha rechazado aplicar la doctrina de la doble soberanía a otros derechos fundamentales de la Carta de Derechos de la Constitución federal — incluyendo otros derechos de la Quinta Enmienda — y las preocupaciones

---

[286] Véase, Carlos Ramos, *supra*, pág. 10; Álvarez González, Contestación, *supra*, págs. 36-37; Hiram Meléndez Juarbe, La Constitución en ceros y unos: un acercamiento digital al

sobre el federalismo pueden atenderse de otras maneras. Por lo tanto, ninguno de los fundamentos que ha articulado el Tribunal Supremo federal nos mueve a mantener la doctrina de la doble soberanía en nuestro ordenamiento.

Más importante aún, la doctrina de la doble soberanía ni siquiera intenta balancear el interés del soberano en castigar un delito con el derecho del individuo a no ser castigado o procesado múltiples veces por el mismo delito. De esta manera, se atenta directamente contra la dignidad del ser humano al convertirlo en un mero instrumento del interés punitivo del Estado.

Nuestro análisis confirma indubitablemente que el Estado Libre Asociado de Puerto Rico es soberano para propósitos de la protección constitucional contra la doble exposición y la doctrina de la doble soberanía. Sin embargo, también confirma que la inviolabilidad de la dignidad del ser humano es el principio cardinal que informa todo nuestro ordenamiento jurídico. La doble exposición a un proceso penal en virtud de la doble soberanía es incompatible con esta realidad constitucional. Por eso, para ser fiel a las aspiraciones y los valores que el Pueblo de Puerto Rico plasmó en su Constitución, debemos eliminar la doctrina de la doble soberanía de nuestro ordenamiento.

Por los fundamentos antes expuestos, revocaría parcialmente lo resuelto por este Tribunal en *Pueblo v. Castro García* y resolvería que la protección constitucional

derecho a la intimidad y la seguridad pública, 77 Rev. Jur.

contra la doble exposición plasmada en la Constitución de Puerto Rico prohíbe que el Estado Libre Asociado encause a un individuo por el mismo delito que ya otro soberano castigó. Por lo tanto, aunque por fundamentos distintos, concurro con el resultado de la Opinión mayoritaria y modificaría la sentencia del Tribunal de Apelaciones para desestimar todas las denuncias contra el señor Sánchez Valle y el señor Gómez Vázquez por el Art. 5.01 de la Ley de Armas.

Liana Fiol Matta
Jueza Presidenta

UPR 45 (2008); Avilés, *supra*.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

Recurrido

v.

Luis M. Sánchez Valle

Peticionario
_____

El Pueblo de Puerto Rico

Recurrido

v.

Jaime Gómez Vázquez

Peticionario
_____

El Pueblo de Puerto Rico

v.

René Rivero Betancourt
_____

El Pueblo de Puerto Rico

v.

Rafael A. Delgado Rodríguez

CC-2013-0068
CC-2013-0072

"[E]l Estado constitucional se sustenta, precisamente, en la proclamación normativa de que hay un soberano y de que ese soberano es el pueblo".[287]

"Whether God alone is sovereign, that is, the one who acts as his acknowledged representative on earth, or the emperor, or prince, or the people, meaning those who identify themselves directly with the people, the question is always aimed at the subject of sovereignty, at the

---

[287] Manuel Aragón, *Constitución, democracia y control* 15 (2002), disponible en http://biblio.juridicas.unam.mx/libros/1/288/4.pdf.

application of the concept to a concrete situation."[288]

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 20 de marzo de 2015

Una vez más, una mayoría de este Tribunal se apresura a revocar, en virtud de fundamentos cuestionables, precedentes firmemente establecidos en nuestro ordenamiento jurídico.[289] De esta forma, trastoca inopinadamente

---

[288] Carl Schmitt, *Political Theology. Four Chapters on the Concept of Sovereignty* 10 (George Schwab trans., 2005).

[289] Véase, por ejemplo, *Rivera Schatz v. Estado Libre Asociado de Puerto Rico*, 2014 T.S.P.R. 122, 191 D.P.R. ___ (2014) (revocando *Col. de Abogados de P.R. v. Schneider*, 112 D.P.R. 540 (1982)); *E.L.A. v. Northwestern Selecta*, 185 D.P.R. 40 (2012) (revocando *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416 (1964)); *Roselló Puig v. Rodríguez Cruz*, 183 D.P.R. 81 (2011) (revocando parcialmente *Toppel v. Toppel*, 114 D.P.R. 775 (1983)); *E.L.A. v. Crespo Torres*, 180 D.P.R. 776 (2011) (revocando, entre otros, *Sepúlveda v. Depto. de Salud*, 145 D.P.R. 560 (1998); *Aulet v. Depto. Servicios Sociales*, 129 D.P.R. 1 (1991); *A.C.A.A. v. Bird Piñero*, 115 D.P.R. 463 (1984);*Cartagena v. E.L.A.*, 116 D.P.R. 254 (1985); *American R.R. Co. of P.R. v. Wolkers*, 22 D.P.R. 283 (1915); *Arandes v. Báez*, 20 D.P.R. 388 (1914)). Es de interés destacar que, quizás por designio o por casualidad, al menos tres de los cuatro casos señalados revocan precedentes establecidos durante el período histórico en que este Tribunal fue presidido por nuestro más célebre jurista, don José Trías Monge. Véase *Schneider*, 112 D.P.R. 540; *Toppel*, 180 D.P.R. 775; *Cartagena*, 116 D.P.R. 254. No cabe duda de que don José Trías Monge, quien presidió este Tribunal desde el 19 de abril de 1974 al 30 de septiembre de 1985, ha sido nuestro más ilustre jurista; muestra de ello, por ejemplo, son sus valiosas aportaciones a nuestro acervo jurídico e intelectual. Además, fue la *Corte Trías* la que se encargó sistemáticamente de ensanchar el disfrute de los derechos civiles y fundamentales en el País. Véase, por ejemplo, *Ortiz Angleró v. Barreto Pérez,* 110 D.P.R. 84 (1980); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975). A dicha corte le debemos, además, por mencionar sólo una de sus muchas aportaciones, el desarrollo de nuestra "factura más ancha". Véase Ernesto L. Chiesa, *Los derechos de los acusados y la*

entendidos que van a la médula de la legitimidad de nuestro sistema político y del Estado de Derecho que ha de imperar en nuestra jurisdicción.

Así, disiento enérgicamente del criterio suscrito por una mayoría de este Tribunal al revocar la norma establecida en *Pueblo v. Castro García*, 120 D.P.R. 740 (1988), en virtud de la cual se reconoció que el Estado Libre Asociado de Puerto Rico (ELA) era un soberano para propósitos de la doctrina de soberanía dual para fines de la protección constitucional contra la doble exposición.

Más importante aún, el proceder de la mayoría priva injustificadamente al Estado de un valioso instrumento en la lucha contra el crimen. Bajo el "razonamiento" mayoritario, se impide que el Estado Libre Asociado pueda acusar criminalmente a personas procesadas a nivel federal. En otras palabras, casos de corrupción como los que ocurrieron durante la incumbencia de Víctor Fajardo como Secretario de Educación, en la década de los noventa, no hubiesen podido instarse en nuestros tribunales, tal y como se hizo en el pasado. Más recientemente, gracias a esta decisión, el ELA, si así lo estimara conveniente, no podrá presentar cargos por soborno bajo las leyes de Puerto Rico contra el convicto Lutgardo Acevedo. Resultado inevitable

---

*factura más ancha. Discurso pronunciado en el acto de incorporación como Académico de Número de la Academia Puertorriqueña de Jurisprudencia y Legislación el 9 de febrero de 1995*, 5 Rev. Acad. Puer. Juris. y Leg. 61 (1998); Ernesto L. Chiesa, *Los derechos de los acusados y la factura más ancha*, 65 Rev. Jur. U.P.R. 83 (1996). Véase, además,

de lo anterior: quedarán impunes las violaciones a las leyes de Puerto Rico en lo que ha sido la mancha más grave para la Judicatura del País. Irónicamente, es la propia Judicatura, por voz de una mayoría de este Tribunal, la que sanciona dicha impunidad.

Además, la infortunada decisión de hoy, más ideológica que jurídica, muy bien podría tener un impacto negativo sobre los acuerdos de colaboración entre las agencias del gobierno de Estados Unidos y las de Puerto Rico. Ello así, pues el procesamiento a nivel federal supondrá que las violaciones a las leyes de Puerto Rico no se pueden vindicar. A fin de cuentas dichas violaciones salen "de gratis".[290] De otra parte, auguro que, más pronto que tarde, habrá un aluvión de *habeas corpus* ante los tribunales del País. Tal parece que estos efectos nocivos y perjudiciales a la administración de la justicia poco importan a la mayoría, puesto que no podemos decir que desconocen lo que habrá de suceder. Valga repetirlo: disiento.

---

Carmelo Delgado Cintrón, *José Trías Monge: Las dimensiones del saber y del poder*, 73 Rev. Jur. U.P.R. 185 (2004).
[290] La respuesta que ofrece la mayoría a esta eventualidad es poco menos que simplista. Acusa, además, un vasto desconocimiento de cómo operan, y han operado, los acuerdos de colaboración entre el Departamento de Justicia del ELA con los funcionario del Departamento de Justicia de Estados Unidos que laboran en Puerto Rico. Por último, apunta a un claro y lamentable menosprecio al interés de cualquier Estado o entidad política debidamente constituida de hacer valer sus leyes, así como a la labor que el Departamento de Justicia de nuestro País y sus fiscales llevan a cabo diariamente. Lo que correspondería, pues, es respetar y reconocer esa labor, no ningunearla.

Por último, este infausto dictamen coloca nuevamente a este Tribunal al margen de la Constitución de Estados Unidos y la normativa que su más Alto Foro ha pautado respecto al alcance y contenido de esa Constitución. La determinación de la mayoría es incompatible con *U.S. v. Wheeler*, 435 U.S. 313 (1978); además, se aleja, por no decir contradice, los dictámenes de ese foro en *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974); *Examining Bd. of Engineers v. Flores de Otero*, 426 U.S. 572 (1976); *Rodríguez v. Popular Democratic Party*, 457 U.S. 1 (1982), y *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328 (1986). Ello debería ser suficiente para que el Tribunal Supremo de Estados Unidos interviniese en este caso para regresar a la mayoría de este Tribunal al redil constitucional estadounidense.

I

Dado que la aplicación de la doctrina de soberanía dual, en tanto cuestión de umbral, hace innecesaria la relación prolija de los hechos del caso, me remitiré a lo indispensable.

A

El 28 de septiembre de 2008, al Sr. Luis M. Sánchez del Valle se le imputaron infracciones al artículo 5.01 de la *Ley de armas de Puerto Rico*, 25 L.P.R.A. sec. 458, por presuntamente vender armas de fuego sin licencia. Asimismo, se le imputó una infracción ulterior al mismo artículo por

vender municiones sin licencia para ello. Por último, se le imputó una violación al artículo 5.04 del referido estatuto penal, el cual tipifica como delito la portación ilegal de un arma de fuego. 25 L.P.R.A. sec. 458c.

Antes de que se dilucidara la causa penal contra el señor Sánchez del Valle en el foro estatal, un Gran Jurado federal acusó a éste por infracciones a los estatutos penales federales que tipifican como delito el comercio ilegal de armas y municiones en el comercio interestatal. 18 U.S.C. secs. 922(a)(1)(A), 923(a), 924(a)(1)(D) y 924(2). Luego de los trámites de rigor, el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico encontró al señor Sánchez del Valle culpable de los delitos imputados y procedió a sentenciarlo a cinco meses de prisión, cinco meses de restricción domiciliaria y tres años de libertad supervisada.[291]

En virtud de lo anterior, el señor Sánchez del Valle presentó ante el Tribunal de Primera Instancia una moción de desestimación al amparo de la Regla 64(e) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 64(e), en la

---

[291] En lo pertinente, valga señalar que los mismos delitos, en Puerto Rico, conllevan penas significativamente mayores. Véase 25 L.P.R.A. sec. 458 ("Toda infracción a esta sección constituirá delito grave y será sancionada con pena de reclusión por un término fijo de quince (15) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinticinco (25) años; de mediar

que alegó, en síntesis, estar cobijado por la protección contra la doble exposición, según consagrada en la Constitución federal, Const. EE.UU. Enmda. V, y en la Constitución del Estado Libre Asociado de Puerto Rico, Const. P.R. Art. II, Sec. 11. Así, argumentó que la doctrina de soberanía dual, reconocida por este Tribunal en *Pueblo v. Castro García*, no debía aplicar, puesto que Puerto Rico seguía siendo un *territorio* para efectos de la misma. El Ministerio Público, por su parte, se opuso; adujo, pues, que el ELA y el gobierno de los Estados Unidos (EEUU) derivan su *ius puniendi* -es decir, su autoridad para castigar delitos- de fuentes diversas.

Atendida la moción de desestimación, el foro primario falló a favor del peticionario, señor Sánchez del Valle. Determinó, en esencia, que el ELA y los EEUU no son jurisdicciones distintas para propósitos de la doctrina de soberanía dual. Por tanto, el peticionario no podía ser procesado nuevamente en el foro estatal por los delitos por los cuales había sido encontrado culpable en el foro federal,[292] en tanto éstos constituyen *la misma ofensa* en el ámbito de la protección constitucional contra la doble exposición. El Ministerio Público recurrió ante el foro apelativo intermedio.

B

---

circunstancias atenuantes, podrá ser reducida hasta un mínimo de diez (10) años".).

[292] Cabe destacar que, al señor Sánchez del Valle, no se le acusó en el foro federal por delito alguno relacionado a la portación ilegal de armas de fuego.

El 28 de septiembre de 2008, por hechos relacionados al caso discutido anteriormente, el Sr. Jaime Gómez Vázquez fue imputado por infracciones al artículo 5.01 de la *Ley de armas de Puerto Rico*, 25 L.P.R.A. sec. 458, disposición que tipifica como delito la venta y el traspaso ilegal de un arma de fuego. Además, se le imputaron violaciones a los artículos 5.07, 25 L.P.R.A. sec. 458f -que pune la portación de rifles-, y 5.10, 25 L.P.R.A. sec. 458i -que prohíbe el traspaso de un arma mutilada-.

De otro lado -y, de nuevo, antes de que se dilucidara la causa penal en el foro estatal-, un Gran Jurado federal, en lo pertinente, acusó al señor Gómez Vázquez, en virtud de los mismos hechos, por presuntamente vender ilícitamente armas en el comercio interestatal. 18 U.S.C. secs. 922(a)(1)(A), 923(a) y 924(a)(1)(D).[293] Luego de diversas incidencias, el señor Gómez Vázquez presentó ante el foro federal una alegación pre-acordada de culpabilidad. Así, el 26 de junio de 2010, dicho foro procedió a dictar sentencia, condenándolo a cumplir dieciocho meses de cárcel y tres años de libertad condicionada.

Dado lo anterior, el señor Gómez Vázquez procedió a presentar ante el Tribunal de Primera Instancia una moción de desestimación al amparo de la Regla 64(e) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 64(e). En

---

[293] Al igual que en el caso del señor Sánchez del Valle, al señor Gómez Vázquez no se le acusó por la presunta portación ilegal de armas de fuego, ni por la mutilación de éstas. Asimismo, la pena por los mismos delitos, en nuestra

ésta, alegó, en esencia, lo mismo que el señor Sánchez del Valle; a saber: que su procesamiento en el foro estatal, habiendo sido convicto por *las mismas ofensas* en el foro federal, contravenía la protección constitucional contra la doble exposición, según consagrada en la Constitución federal, Const. EE.UU. Enmda. V, y la Constitución del ELA, Const. P.R. Art. II, Sec. 11. Por consiguiente, arguyó que Puerto Rico y los EEUU no podían ser considerados soberanos distintos, y que la doctrina de soberanía dual no era aplicable. El Ministerio Público se opuso y defendió lo resuelto por este Tribunal en *Pueblo v. Castro García*. Es decir, arguyó que el ELA es un ente soberano distinto a los EEUU para efectos de la protección constitucional contra la doble exposición y que, por ende, la doctrina de soberanía dual aplica.

El foro primario, entonces, procedió a desestimar y, en consecuencia, determinó que, en efecto, Puerto Rico y los EEUU han de ser considerados un solo soberano para los efectos de la protección contra la doble exposición. El Ministerio Público recurrió ante el foro apelativo intermedio.

C

El Tribunal de Apelaciones consolidó los recursos presentados por el Ministerio Público en ambos casos. Atendiendo los méritos de éstos, procedió a revocar las

---

jurisdicción, es significativamente mayor. Véase 25 L.P.R.A. sec. 458.

determinaciones recurridas, por entender que, conforme lo resuelto por este Tribunal en *Pueblo v. Castro García*, la doctrina de soberanía dual era aplicable.

Los peticionarios recurrieron independientemente de la determinación del foro apelativo intermedio. Este Tribunal, por su parte, consolidó los recursos y hoy revoca la apreciación normativa que este Tribunal había suscrito en *Pueblo v. Castro García* respecto a la situación del ELA dentro del complejo andamiaje constitucional norteamericano.

II

Entre las diversas protecciones que dispensa la Carta de Derechos de nuestra Constitución, se encuentra la protección contra la doble exposición, la cual dispone que "[n]adie será puesto en riesgo de ser castigado dos veces por el mismo delito". Const. P.R. Art. II, Sec. 11; véase *Pueblo v. Santiago Pérez*, 160 D.P.R. 618 (2003). Asimismo, la Constitución federal consagra una protección análoga en su Quinta Enmienda: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." Const. EE.UU. Enmda. V. Véase *Benton v. Maryland*, 395 U.S. 784 (1969) (revocando a *Dalko v. Connecticut*, 302 U.S. 319 (1937)) (en donde se revuelve que la protección contra la doble exposición es oponible ante los estados en virtud de la Decimocuarta Enmienda). De hecho, la formulación de nuestra protección constitucional se hizo en función de su contraparte federal, con tal de que se

entendiera incorporado el significado judicial de ésta, elaborado a través de numerosas opiniones suscritas por el Tribunal Supremo de los EEUU.[294] Véase *Diario de Sesiones de la Convención Constituyente de Puerto Rico* 2568-69, T. IV (1961). Así, "[n]o hay base para sostener que se le haya dado o que se le debe dar un contenido mayor a la cláusula" en el orden constitucional puertorriqueño. Ernesto L. Chiesa Aponte, *Doble exposición*, 59 Rev. Jur. UPR 479, 480 (1990). Además, después de *Benton*, es innegable que la doctrina constitucional federal atinente a la cláusula es el mínimo irreductible aplicable en Puerto Rico.

En apretada síntesis, para que proceda invocar la protección, es imperativo que se trate de una acción penal y que la exposición sea en relación a una *misma ofensa*. *Santiago Pérez*, 160 D.P.R. en las págs. 628-29. Por otra parte, el alcance de la protección, según interpretada por las instancias judiciales, no sólo se reduce a evitar castigos múltiples. Así,

> [l]a garantía constitucional contra la doble exposición protege al ciudadano en cuatro instancias, a saber: (i) contra ulterior exposición tras *absolución* por la misma ofensa; (ii) contra ulterior exposición tras *convicción* por la misma ofensa; (iii) contra ulterior exposición tras *exposición*

---

[294] Véase, por ejemplo, *U.S. v. Dixon*, 509 U.S. 688 (1993) (revocando a *Grady v. Corbin*, 495 U.S. 508 (1990)); *Illinois v. Vitale*, 447 U.S. 410 (1980); *Harris v. Oklahoma*, 433 U.S. 682 (1977); *Brown v. Ohio*, 432 U.S. 161 (1977); *Benton*, 395 U.S. 784; *Green v. U.S.*, 355 U.S. 184 (1957); *Blockburger v. U.S.*, 284 U.S. 299 (1932); *Gavieres v. U.S.*, 220 U.S. 338 (1911); *Vilas v. City of Manila*, 220 U.S. 345 (1911); *Grafton v. U.S.*, 206 U.S. 333 (1907); *Kepner v. U.S.*, 195 U.S. 100 (1904); *Ex parte Nielsen*, 131 U.S. 176, 187 (1889) (citando a *Morey v. Com.*, 108 Mass. 433 (1871)).

anterior por la misma ofensa (tras haber comenzado el juicio, que no culminó ni en absolución ni en convicción), y (iv) contra *castigos múltiples* por la misma ofensa. *Id.* en la pág. 628 (citando a *Pueblo v. Martínez Torres, 126 D.P.R. 561, 568-569 (1990)*; *Ohio v. Johnson, 467 U.S. 493, 498 (1984)*; *Brown v. Ohio, 432 U.S. 161, 165 (1977)*; *North Carolina v. Pearce, 395 U.S. 711, 717 (1969)*; *Wade v. Hunter, 336 U.S. 684 (1949)*).

Además, como veremos a continuación, en virtud de la doctrina de soberanía dual, la invocación de la protección presupone que ésta se haga frente a un mismo soberano.

III

La doctrina de la soberanía dual,[295] en cierta medida, es consecuencia lógica del sistema federal norteamericano, el cual le reconoce a los estados una soberanía residual, tutelada en virtud de la Décima Enmienda, Const. EE.UU. Enmda. X, y la Undécima Enmienda, Const. EE.UU. Enmda. XI. Esta doctrina fue elaborándose paulatinamente a través del siglo diecinueve, en casos tales como *Fox v. Ohio*, 46 U.S. 410 (1847);[296] *U.S. v. Marigold*, 50 U.S. 560 (1850),[297] y *Moore v. People of State of Illinois*, 55 U.S. 13 (1852).[298] Véase, también, *Cross v. State of North Carolina*, 132 U.S. 131, 139-40 (1889). Sin embargo, no fue hasta *U.S. v.*

---

[295] Para un breve recuento del desarrollo de la doctrina de soberanía dual, véase Ernesto L. Chiesa Aponte, *supra*, págs. 540-545.

[296] Véase *Fox*, 46 U.S. en la pág. 434 ("The punishment of a cheat or a misdemeanour practised within the State, and against those whom she is bound to protect, is peculiarly and appropriately within her functions and duties, and it is difficult to imagine an interference with those duties and functions which would be regular of justifiable.").

[297] Véase *Marigold*, 50 U.S. en las págs. 569-70 ("With the view of avoiding conflict between the State and Federal jurisdictions, this court in the case Fox v. The State of Ohio have taken care to point out, that the same act might, as to its character and tendencies, and the consequences it involved, constitute an offence against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each. We think this distinction sound . . . .").

[298] Véase *Moore*, U.S. en la pág. 20 ("[T]his court has decided, in the case of Fox v. The State of Ohio, (5 How. 432,) that a State may punish the offence of uttering or passing false coin, as a cheat or fraud practised on its citizens; and, in the case of the United States v. Marigold (9 How. 560,) that Congress, in the proper exercise of its authority, may punish the same act as an offence against the United States.").

*Lanza*, 260 U.S. 377 (1922), cuando la doctrina de soberanía dual fue reconocida, sin ambages, como una excepción a la protección constitucional contra la doble exposición.[299] Véase, en general, William J. Bach, *Modern Constitutional Law* 507-509 (3rd ed. 2011).

En *Lanza*, los acusados alegaron que dos castigos por el mismo acto delictivo, uno bajo el *National Prohibition Act* y otro bajo estatutos estatales, contravenía la protección contra la doble exposición consagrada en la Quinta Enmienda de la Constitución federal. *Lanza*, 260 U.S. en la pág. 379. En este caso, los acusados, al momento de ser procesados en la jurisdicción federal, habían sido encontrados culpables en las cortes estatales por delitos relacionados a los mismos hechos, a saber, manufacturar, transportar y poseer bebidas embriagantes.[300] El Tribunal Supremo de los EEUU, sin embargo, resolvió que al tratarse de dos soberanos distintos, que derivaban su autoridad de fuentes distintas, la protección contra la doble exposición no era aplicable. Esto es, redujo el posible ámbito de aplicación de dicha protección. Así, a partir de *Lanza* es incuestionable que la protección contra la doble exposición sólo opera en relación a un mismo soberano.

---

[299] Véase *U.S. v. Wheeler*, 435 U.S. 313, 316 n.7 (1978) ("The first case in which actual multiple prosecutions were upheld was *United States v. Lanza . . . .*").

[300] Es preciso señalar que, dada la aplicación de la doctrina de soberanía dual, poco importa si los delitos eran los mismos para efectos de la protección contra la doble exposición. Esto, debido a que al tratarse de soberanos distintos la protección simplemente no puede ser invocada.

> We have here two sovereignties, deribing [sic] power from different sources, capable of dealing with the same subjecmatter [sic] within the same territory. . . . . Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
>      It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.

*Lanza*, 260 U.S. en la pág. 382.

Unos quince años después de *Lanza*, el Tribunal Supremo de los EEUU resolvió *People of Puerto Rico v. Shell Co.*, 302 U.S. 253 (1937); caso de particular interés para el asunto que nos atañe, sobre todo, dado el peso desproporcional que una mayoría de este Tribunal le otorga. De entrada, es preciso despejar cualquier duda en torno a la controversia puntual que atiende dicho caso. La misma, según las palabras del propio Tribunal Supremo federal, se limita a resolver si la tercera sección del *Sherman Act*, 15 U.S.C. sec. 3, impedía que la legislatura insular puertorriqueña de entonces promulgara un estatuto local con tal de atender los mismos asuntos que atendía la ley federal, esto es, prácticas ilícitas o monopolísticas en el mercado. *Shell Co.*, 302 U.S. en la pág. 255 ("The single question which we have to decide is whether the existence of section 3 of the Sherman Act . . . precluded the adoption of the local act by the insular legislature.").[301]

---

[301] El limitado alcance estatutario de la controversia que atiende el Tribunal Supremo federal en *Shell Co.* es evidente; para ello, baste solamente con consignar la formulación ulterior que de ésta hace dicho foro: "The only question,

Es evidente, por tanto, que lo que resuelve el más alto foro federal en esa ocasión, ante todo, se reduce a una interpretación estatutaria al amparo del *Sherman Act*. Además, es importante señalar que, al momento de decidirse *Shell Co.*, Puerto Rico se regía por la *Ley Jones de 1917*,

---

therefore, is whether the word 'territory,' **as used in section 3 of the Sherman Act**, properly can be applied to a dependency now bearing the relation to the United States which is borne by Puerto Rico." *Shell Co.*, 302 U.S. en la pág. 257. Véase, en general, *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., et al.*, 649 F.2d 36, 38-39. (1st Cir. 1981) (resolviendo la misma controversia luego de la creación del ELA). Pretender darle un sentido más amplio a lo decidido por el Tribunal Supremo federal en aquella ocasión, dadas las palabras inequívocas utilizadas por ese foro, sería atentar contra una "realidad jurídica objetiva"; a saber, el limitado alcance de dicha opinión judicial. *Cf.* Opinión Mayoritaria, pág. 61.

Asimismo, extrapolar el significado del término "territorio" en *Shell Co.* a otros contextos mucho más complejos es, a lo sumo, un ejercicio adjudicativo sumamente acomodaticio. Si bien es cierto que Puerto Rico tradicionalmente ha sido considerado un "territorio" para efectos de la *cláusula territorial* de la Constitución federal, ello no necesariamente predetermina, por sí solo, las relaciones constitucionales entre Puerto Rico y los EEUU a través del tiempo. Es decir, es concebible, por ejemplo, que dichas relaciones se alteren por el mero transcurso del tiempo y la manera en la que el Congreso ha legislado con relación a Puerto Rico. Véase *Consejo de Salud Playa de Ponce v. Rullán*, 586 F.Supp.2d 22 (D.P.R. 2008) (donde se resuelve que, en vista de la relación histórica entre los EEUU y Puerto Rico, éste ha pasado a ser un territorio incorporado). Admitir esa posibilidad, por ende, abona a admitir, también, la posibilidad de que las relaciones entre ambos hayan cambiado a partir de la promulgación de la Constitución del ELA, lo que supuso la creación de un Estado y, como presupuesto de éste, el reconocimiento de la soberanía de sus constituyentes.

No obstante, es preciso señalar que, según se desprende de un examen sosegado de la enmarañada historia del gobierno federal en sus relaciones con sus posesiones territoriales, y la complejidad que las subyace, es inevitable concluir que dichos poderes plenarios están sujetos, *y pueden sujetarse*, a limitaciones puntuales. Por ejemplo, baste con señalar los propios *Casos insulares*, que en tanto determinan la aplicabilidad de la Constitución federal en los territorios,

39 Stat. 951, ley orgánica promulgada por el Congreso en el ejercicio de sus poderes plenarios sobre los territorios de los EEUU. Véase Const. EE.UU. Art. IV, Sec. 3.[302]

En *Shell Co.*, en síntesis, los acusados en el foro local plantearon que el estatuto promulgado por la legislatura insular era inaplicable, debido a que la tercera sección del *Sherman Act* -legislación federal- atendía los mismos asuntos. Por otro lado, plantearon que permitir que se les procesara en los foros locales los expondría al riesgo de ser procesados en más de una ocasión por los mismos delitos en contravención de la protección contra la doble exposición que consagra la Constitución federal, puesto que, en virtud del *Sherman Act*, los tribunales federales también podrían hacer lo propio. En los méritos, sin embargo, *Shell Co.* resolvió únicamente que el estatuto antimonopolístico local no estaba en conflicto con la disposición relevante del *Sherman Act*; o sea, dicho estatuto fue un ejercicio válido de la legislatura insular puertorriqueña. En resumidas cuentas, pues, la impronta doctrinal de *Shell Co.* se reduce a resolver que la tercera

---

suponen una primera limitación a los poderes plenarios del Congreso respecto a éstos.

[302] Sobre los poderes plenarios del Congreso en relación a los territorios de los EEUU, véase, por ejemplo, *Late Corporation of the Church of Jesus Christ of Latter-Day Saints et al. v. United States*, 136 U.S. 1 (1890); *First. Nat. Bank v. Yankton County*, 101 U.S. 129; (1879) *American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511 (1826). Además, es inevitable tomar en consideración los llamados *Casos insulares*, que giran en torno a la aplicabilidad de la Constitución federal en los territorios, según éstos estén o no incorporados a los EEUU. Véase, entre otros, *Balzac v. Porto Rico*, 258 U.S. 298

sección del *Sherman Act* no impedía que la legislatura insular de Puerto Rico promulgara un estatuto local relacionado a la misma materia.

En cuanto al planteamiento relacionado a la posible doble exposición, el Tribunal Supremo federal, en *Shell Co.*, se limitó a señalar, mediante *dicta*,[303] que la protección constitucional en cuestión, en cualquier caso, no se vulneraría. Así, tomando en consideración las circunstancias históricas imperantes,[304] determinó que

> [t]he risk of double jeopardy does not exist. Both the territorial and federal laws and the courts, whether exercising federal or local jurisdiction, are creations emanating from the same sovereignty. Prosecution under one of the laws in the appropriate court, necessarily, will bar a prosecution under the other law in another court.
> *Shell Co.*, 302 U.S. en la pág. 264 (citando a *Balzac v. Puerto Rico*, 258 U.S. en la pág. 312; *Grafton v. United States*, 206 U.S. 333 (1907)).

Por último –en lo que a *Shell Co.* respecta–, es preciso enfatizar que, como se dijo, dicho caso fue resuelto en otras circunstancias históricas. Su

---

(1922); *Dorr v. U.S.*, 195 U.S. 138 (1904); *Downes v. Bidwell*, 182 U.S. 244 (1901).

[303] Véase *Waller v. Florida*, 397 U.S. 387, 393 n.5 (1970) ("See also Puerto Rico v. Shell Co. (P.R.), Ltd., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937), where the Court **dicta** approved of Grafton."). (Énfasis nuestro.) Véase, además, *Castro García*, 120 D.P.R. en la pág. 761 ("[E]n el caso de Puerto Rico v. Shell Co. . . . no estaba en controversia la aplicación de la doctrina de soberanía dual a Puerto Rico, por lo que las expresiones allí vertidas son dictum".).

[304] Muestra irrefutable de que el Tribunal Supremo federal, en efecto, tomó en consideración las circunstancias históricas imperantes es que dicho foro procuró auscultar la situación constitucional de Puerto Rico en aquel momento y, además, tomó en consideración las leyes orgánicas que, entonces,

interpretación sobre la situación constitucional de Puerto Rico en sus relaciones con los EEUU es, a lo sumo, anacrónica. Por tanto, las expresiones en *Shell Co.*, hechas en un momento histórico en el que el sistema político puertorriqueño era una criatura del Congreso de Estados Unidos, en virtud de la *Ley Jones*, no pueden utilizarse para interpretar el ELA, en tanto la creación de éste supone el reconocimiento de una comunidad política debidamente constituida a través de su propio proceso constitucional. La importancia desproporcional que una mayoría de este Tribunal le otorga a dicho precedente es, a todas luces, desacertada.

Resuelto *Shell Co.*, el desarrollo posterior de la doctrina de soberanía dual no supuso mayores desviaciones en relación al criterio rector de ésta: la soberanía de la autoridad que pretende procesar penalmente a un individuo. En *Jerome v. U.S.*, 318 U.S. 101 (1943), por ejemplo, y en función de dicho criterio, se reafirmó, en términos generales, que "the double jeopardy provision of the Fifth Amendment does not stand as a bar to federal prosecution though a state conviction based on the same acts has already been obtained." *Id.* en la pág. 105 (citando a *Lanza*, 260 U.S. 377; *Herbert v. State of La.*, 272 U.S. 312 (1926)). Asimismo, en *Bartkus v. People of State of Ill.*, 359 U.S. 121 (1959), el Tribunal Supremo de EEUU resolvió que, dado que se trataba de soberanos distintos, una

---

imperaban en el País. Véase *Shell Co.*, 302 U.S. en las págs.

absolución en un proceso penal a nivel federal no era impedimento para un procesamiento ulterior, por los mismos delitos, en un foro estatal. *Bartkus*, 359 U.S. en las págs. 133-34. De otra parte, en *Abbate v. U.S.*, 359 U.S. 187 (1959), resolvió, por consideraciones similares, que una convicción a nivel estatal no impedía un procesamiento posterior en el foro federal. *Abbate*, 359 U.S. en las págs. 193-96.[305]

No es hasta *U.S. v. Wheeler*, 435 U.S. 313 (1978), cuando el Tribunal Supremo de EEUU se enfrenta, por primera vez, a un *soberano atípico* en el ámbito de la doctrina de la soberanía dual.[306] En *Wheeler*, un miembro de la tribu

---

257-64.

[305] En *Abbate* los peticionarios solicitaron que se revocara la norma establecida en *Lanza*. Ello, sin embargo, no prospero. El Tribunal Supremo de los EEUU, por tanto, reiteró expresamente la vigencia de dicha norma. *Abbate*, 359 U.S. en la pág. 195. Fundamentó lo anterior en la divergencia entre los intereses federales y estatales, y la disparidad en la vindicación de éstos que podría resultar al revocar la norma establecida en *Lanza*, en la medida en que ésta permite atender satisfactoriamente ambos intereses.

[306] De entrada, resulta curioso que la decisión del Tribunal de Apelaciones de Estados Unidos para el Noveno Circuito que revoca el Tribunal Supremo federal en *Wheeler* había comparado a las tribus indígenas con el ELA para determinar que aquéllas no eran soberanas para efectos de la doctrina de soberanía dual. Véase *U.S. v. Wheeler*, 545 F.2d 1255, 1257 (9th Cir. 1976) ("But, at the same time, they [las tribus indígenas] do not have the sovereign status of a state. Nor is their 'semi-independence' like that accorded the Commonwealth of Puerto Rico.") (citas omitidas) (revocado en *Wheeler*, 435 U.S. 313). De igual forma, dicho circuito apelativo fundamentó su decisión de no reconocer a las tribus indígenas como soberanas en la interpretación restrictiva que el Tribunal Supremo federal había hecho de la doctrina de la soberanía dual. Véase *id.* en la pág. 1257 ("The Court has construed its 'dual sovereignty' rationale narrowly and has never applied it outside of the federal court or state court context.") (citando a *United States v. Kagama*, 118 U.S. 375, 379 (1886) ("Indians are within the geographical limits of

Navajo -Anthony Robert Wheeler- fue sentenciado por un tribunal tribal, luego de haber presentado alegación de culpabilidad, por alteración a la paz (*disorderly conduct*) y corrupción de menores (*delinquency of a minor*), ambas conductas tipificadas como delito por el *Navajo Tribal Code*. Poco más de un año después, éste fue acusado por violación técnica (*statutory rape*) en el Tribunal Federal para el Distrito de Arizona. Wheeler, por su parte, solicitó que se desestimara la acusación, debido a que su convicción en el tribunal tribal por un delito menor incluido impedía su procesamiento en el foro federal. Es decir, alegó que la doctrina de soberanía dual no aplicaba entre la tribu indígena y el gobierno federal.

El Tribunal Supremo federal, atendiendo tales reclamos, determinó que las tribus indígenas, dadas las peculiaridades históricas que han determinado su desarrollo en el seno del federalismo norteamericano, habían retenido una soberanía primitiva (*primeval sovereignty*),[307] en virtud

---

the United States. The soil and the people within these limits are under the political control of the government of the United States, or of the states of the Union. There exists within the broad domain of sovereignty but these two.")). Esta interpretación restrictiva, sin embargo, fue expresamente rechazada por el Tribunal Supremo federal. *Wheeler*, 435 U.S. en la pág. 330.

[307] Soberanía, sin embargo, que, en un principio, estaba limitada al procesamiento penal de los miembros de la tribu. *Duro v. Reina,* 495 U.S. 676 (1990). Ello, sin embargo, cambió a partir de la legislación del Congreso que le *reconoció* a las tribus indígenas autoridad para procesar a indígenas no miembros. 25 U.S.C. sec. 1301(2). El Tribunal Supremo de los EEUU, en *U.S. v. Lara*, 541 U.S. 193 (2004), interpretó que dicho proceder legislativo por parte del Congreso no supuso una mera *delegación de poder* por parte de éste, sino que, en efecto, ensanchó la soberanía primitiva retenida por las

de la cual habían de ser consideradas un soberano distinto para efectos de la doctrina de la soberanía dual. *Wheeler*, 435 U.S. en las págs. 327-29. Por tanto, la autoridad de dichas tribus provenía de una fuente distinta a la del gobierno federal. Asimismo, en *Wheeler*, el más alto foro federal, ante la contención de que el poder plenario del Congreso sobre las tribus indígenas hacía que éstas no fueran soberanas,[308] determinó:

> We think that the respondent . . ., in relying on federal control over Indian tribes, have misconceived the distinction between those cases in which the "dual sovereignty" concept is applicable and those in which it is not. It is true that Territories are subject to the ultimate control of Congress, and cities to the control of the State which created them. But that fact was not relied upon as the basis for the decisions in *Grafton*, *Shell Co.*, and *Waller*. What differentiated those cases from *Bartkus* and *Abbate* was not the extent of control exercised by one prosecuting authority over the other but rather the ultimate source of the power under which the respective prosecutions were undertaken.
> *Wheeler*, 435 U.S. en las págs. 319-20 (citas omitidas).

Es menester señalar, además, que, en *Wheeler*, el Tribunal Supremo federal rechazó expresamente limitar el alcance de la doctrina de soberanía dual a las relaciones

---

tribus indígenas. Así, validó el *reconocimiento* que el Congreso hizo de ésta a través de la promulgación de un estatuto.

[308] Sobre los poderes plenarios del Congreso en relación a las tribus indígenas, véase *Wheeler*, 435 U.S. en la pág. 319 ("[C]ongress has plenary authority to legislate for the Indian tribes in all matters, including their form of government.") (citando a *Winton v. Amos*, 255 U.S. 373 (1921); *In re Heff*, 197 U.S. 488, 498-499 (1916) (revocado, por otro fundamentos, por *U.S. v. Nice*, 241 U.S. 591 (1916));

entre el gobierno federal y los diversos estados de la unión norteamericana. *Wheeler*, 435 U.S. en la pág. 330 ("The respondent contends that, despite the fact that successive tribal and federal prosecutions are not 'for the same offence,' the 'dual sovereignty' concept should be limited to successive state and federal prosecutions. But we cannot accept so restrictive a view of that concept, a view which, as has been noted, would require disregard of the very words of the Double Jeopardy Clause."). En consecuencia, el más alto foro federal reconoció la soberanía *atípica* de las tribus indígenas en relación con el gobierno federal.[309]

---

*Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903); *Talton v. Mayes*, 163 U.S. 376, 384, (1896)).

[309] La *atipicidad* de dicha soberanía, si se le compara con la de los estados –protegida constitucionalmente por la Décima Enmienda y jurisdiccionalmente tutelada por la Undécima Enmienda–, es producto innegable de la peculiar situación histórica –"*unique*"– de las tribus indígenas y el gobierno federal. Véase *Wheeler*, 435 U.S. en la pág. 323 ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . .") (citando a *U.S. v. Mazurie*, 419 U.S. 544, 557 (1975)). *Cf. Examining Bd. of Engineers v. Flores de Otero*, 426 U.S. 572, 596 (1976) ("We readily concede that Puerto Rico occupies a relationship to the United States that has no parallel in our history . . . ."); *Romero v. United States*, 38 F.3d 1204, 1208 (Fed. Cir. 1994) ("On July 3, 1952, Congress approved the proposed Constitution of the Commonwealth of Puerto Rico, which thenceforth changed Puerto Rico's status from that of an unincorporated territory to the unique one of Commonwealth."); *Córdova & Simonpietri*, 649 F.2d en la pág. 41 ("In sum, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth.").

Una vez más, y dada su importancia en la decisión del Tribunal Supremo federal en *Wheeler* y en *Lara*, es imperativo recordar que las circunstancias históricas son fundamentalmente importantes para determinar quién es un soberano y en cuanto a qué lo es. Circunstancias históricas que, sin embargo, han de ser evaluadas jurídicamente. Ello,

Por último, es importante destacar los elementos indispensables que, de una manera u otra, condicionan el reconocimiento de la soberanía en estos casos; ante todo, la divergencia de intereses entre el gobierno federal y el tribal, puesto que la vindicación de éstos por parte de uno, no necesariamente supone la vindicación de los mismos por parte del otro. La articulación de dichos intereses independientes, por ende, se sustenta en el hecho de que, en uno y otro caso, se trata de comunidades políticas distintas ("*distinct political communities*"). *Wheeler*, 435 U.S. 313 (1978). Así, estas comunidades políticas –al margen de la sujeción política de una a la otra, en virtud de los poderes plenarios del Congreso- se distinguen, justamente, en función de sus diversas tradiciones y costumbres. Véase *Wheeler*, 435 U.S. en la pág. 331 ("They [las tribus indígenas] have a significant interest in maintaining orderly relations among their members and in preserving tribal customs and traditions, apart from the federal interest in law and order on the reservation."). Sería un absurdo pensar que Puerto Rico, en tanto comunidad política debidamente constituida en un orden constitucional, no tiene intereses similares.

---

es consistente con la doctrina de soberanía dual, la cual no ha de ser aplicada restrictivamente, siempre y cuando los intereses que tutela sean satisfechos. *Wheeler,* 435 U.S. en las págs. 330-332. Además, dicha concepción de la soberanía, históricamente contextualizada, da cuenta, en su debida complejidad, de los diversos matices que informan las relaciones de poder en el federalismo norteamericano.

Como se observa, de la discusión anterior puede colegirse el elemento indispensable que condiciona la aplicación de la doctrina de soberanía dual: que se trate de soberanos diferentes que deriven su autoridad, para punir, de fuentes distintas. En el caso de Puerto Rico, pues, habrá que auscultar si, en efecto, la autoridad que ostenta el ELA para punir se deriva de una fuente distinta a la autoridad del gobierno federal.[310] Se trata, entonces, de determinar la procedencia del poder coercitivo que ejerce el ELA. Antes, sin embargo, es menester plantearse con seriedad qué significa ese poder y cuáles son sus atributos esenciales; sobre todo, en el contexto particular de Puerto Rico como parte integral del sistema federal

---

[310] Sobre la naturaleza *distinta* del ELA, en comparación con el régimen político bajo las cartas orgánicas promulgadas por el Congreso, baste con citar al más preclaro de los juristas puertorriqueños, don José Trías Monge:

**Si algo significó la fundación del Estado Libre Asociado fue la creación de una entidad distinta a la existente bajo las antiguas cartas orgánicas.** Sus contornos no son muy precisos, pero las decisiones del Tribunal Supremo y la Corte de Apelaciones de Estados Unidos no dejan duda sobre la naturaleza *diferente* del nuevo cuerpo político. La aplicación de algunas disposiciones de la Constitución de Estados Unidos a Puerto Rico se explica mejor por otro concepto: el pueblo de Puerto Rico simplemente *consintió* a ello. Una de las condiciones impuestas por la Ley 600 o Ley de Bases fue que la Constitución de Puerto Rico se ajustase a sus términos y a 'las disposiciones aplicables . . . de la Constitución de los Estados Unidos'. El consentimiento del pueblo de Puerto Rico, expresado a través del referéndum aprobatorio de la Ley 600, es claramente la base actual para la aplicación a él de ciertas disposiciones de la Constitución de los Estados Unidos.

José Trías Monge, *El Estado Libre Asociado ante los tribunales 1952-1994*, 64 Rev. Jur. UPR 1, 42 (1995) (citas omitidas). (Énfasis nuestro.)

norteamericano. Ello, nos lleva inevitablemente a preguntarnos, a diferencia de la mayoría que suscribe la opinión de este Tribunal, que evade la pregunta: *¿qué es la soberanía?*[311]

IV

El término soberanía no es susceptible de definición precisa, de contención semántica certera. Véase *United States v. Spelar*, 338 U.S. 217, 224 (1949) (Frankfurter,

---

[311] La opinión mayoritaria, atinadamente, señala que "[e]l uso de la palabra 'soberanía' *en otro contexto y para otros propósitos* es irrelevante para resolver la controversia que nos ocupa". Opinión Mayoritaria, pág. 19. (Énfasis nuestro.) Sin embargo, habría entonces que delimitar las implicaciones del uso de la palabra "soberanía" en el contexto de esta controversia. Por tanto, tal aseveración, sin más, no satisface el rigor que amerita la controversia que ocupa a este Tribunal. Es decir, en un tema tan complejo como el asunto de la doctrina de soberanía dual, es imperativo abordar las dimensiones semánticas del término "soberanía" con tal de precisar su significado en el contexto que nos compete. De igual forma, es fundamental examinar la naturaleza misma del poder soberano, y en qué ámbito se ejerce, en aras de dilucidar, verdaderamente, cuál es la última fuente de éste o, mejor, de dónde dimana. Para ello, además, es indispensable no perder de vista la complejidad que subyace las relaciones políticas que se suscitan en el federalismo norteamericano. Así, plantear que la soberanía es meramente "la última fuente de poder" sorprende, pues es, a lo sumo, una definición incompleta e irresponsable. Esto, en la medida en que no atiende toda una serie de asuntos incidentales a dicha definición, los cuales son de particular relevancia en un caso como el del ELA, entidad política *sui generis* en el constitucionalismo norteamericano. En resumidas cuentas, en aras de dirimir el asunto de si el ELA ha de ser considerado "soberano" para efectos de la doctrina de soberanía dual, es necesario articular una definición precisa del término "soberanía" y de la naturaleza del poder que ejerce, propiamente, el soberano. Definición, además, que ha de ser doctrinalmente consistente y, por tanto, aplicable a los estados, al gobierno federal y a las tribus indígenas. Una vez se articule tal distinción, procede evaluar el caso del ELA, cuya particularidad hace que resulte un tanto impropio resolver el complejo dilema con una invocación anacrónica del término "territorio".

J., Op. Concurrente) ("The very concept of 'sovereignty' is in a state of more or less solution these days."); Naomi Hirayasu, *The Process of Self-Determination and Micronesia's Future Political Status Under International Law*, 9 U. Haw. L. Rev. 487, 526 (1987) ("Commentators agree that sovereignty is an elusive and relative concept."). Desde su formulación teórica inicial en las postrimerías del siglo XVI hasta hoy, dicho concepto ha adquirido diversos significados.[312] En palabras de nuestro insigne jurista, don José Trías Monge:

> Another fanciful issue is the question of sovereignty. This old concept, which harks back to the sixteenth and seventeenth centuries, when it had a role in the development of the modern state, has for a long time now been put to use in the field of colonial governance, besides at times having temporarily become a hurdle to the growth of associations or peoples like the European Community. Sovereignty has been primarily and wrongly used as a synonym of indivisible power and as an indispensable attribute of a nation. Present thinking about sovereignty deals with the concept in a very different manner. **Sovereignty, like power, can be shared and does not necessarily rest in a single place.**
> José Trías Monge, *Injustice According to Law*, en *Foreign in a Domestic Sense. Puerto Rico, American Expansion, and the Constitution* 236 (Christina Duffy Burnett & Burke Marshall eds., 2001). (Énfasis nuestro.)[313]

---

[312] Véase, en general, Ruth Lapidoth, *Autonomy. Flexible Solutions in Ethnic Conflicts* 41-47 (1997).

[313] Véase, también, José Trías Monge, *Injustice According to Law*, *supra*, pág. 237 ("'Sovereignty,' again, is another of the concepts in territorial parlance which should be rethought, together with those of 'participation,' 'plenary powers,' 'possession,' 'foreign in a domestic sense,' and the like. Talk about 'sovereignty' adds nothing meaningful to the realities of power and succeeds only in being offensive to the dignity of relationships based on the principle of equality or comparability of rights. **Old talk about undivided sovereignty is part of the language of subjection and should**

De igual forma, al abordar las complejidades que suscita definir –jurídicamente,[314] para nuestros propósitos- el concepto *soberanía*, es dable distinguir entre *soberanía interna* y *soberanía externa*.[315] *Cf.* Donard Pharand, *Perspectives on Sovereignty in the Current Context: A Canadian Viewpoint*, 20 Can.-U.S. L.J. 19 (1994). En el contexto que nos ocupa –entiéndase, si el ELA es un ente

---

**have no place in the decolonization context**.") (citas omitidas); Ruth Lapidoth, *supra*, pág. 47 ("[T]he concept of sovereignty –in its classic meaning of total and indivisible state power- has been eroded by modern technical and economic developments, as well as by certain principles included in modern constitutional and international law. As a result of innovations in the sphere of communications and transportation, state boundaries are no longer impermeable, and all national economic systems have become interdependent. . . . . Similarly, according to Luzius Wildhaber, '[s]overeignty must be mitigated by the exigencies of interdependence.' This can be done, since 'sovereignty is a relative notion, variable in the course of times, adaptable to new situations and exigencies.'")(citas omitidas). *Cf.* Joseph E. Horey, *The Right of Self-Government in the Commonwealth of the Northern Mariana Islands*, 4 Asian-Pac. L. & Pol'y J. 180, 191 (2003) ("It has long and widely been recognized, however, that absolute power to rule is not the only, or even the ordinary, meaning of the term and that other meanings of 'sovereignty' exist that are fully capable of accommodating a 'self-government' conformable to the U.N.'s definitions.") (citas omitidas). Véase, también, *id.* n.42 (citando numerosas interpretaciones judiciales del concepto *soberanía*).

[314] Tautología que, empero, conviene repetir: los conceptos, en tanto construcciones discursivas insertas en diversos planos semánticos, son susceptibles de adquirir distintos significados. Así, resulta imperativo no perder de vista esta *realidad* al momento de delimitar las acepciones de un concepto dado al ámbito jurídico. Lo contrario sería un ejercicio de abstracción que poco contribuye a la labor interpretativa que le compete al juez, y a la legitimidad de su quehacer jurídico.

[315] Sobre la *soberanía externa*, esto es, en el ámbito del Derecho Internacional Público, véase, entre otros, Ian Brownlie, *Principles of Public International Law* 290-298 (7th ed. 2008).

soberano para efectos del procesamiento penal de un individuo-, es evidente que nos interesa el aspecto interno de la soberanía. Este tipo de soberanía bien pudiera definirse, en tiempos modernos, como la autoridad que tiene una comunidad política, debidamente constituida -esto es, constitucionalmente constituida[316]-, de regir sus propios designios en lo que concierne a las relaciones sociales primarias entre los sujetos que la conforman. En otras, palabras: el poder que tiene un ente político particular de regir esas zonas de intereses que tradicionalmente se han subsumido en el concepto de *police power* o razón de Estado. Véase D. Benjamin Barros, *The Police Power and the Takings Clause*, 58 U. Miami L. Rev. 471, 473 (2004)("The term "police power" is generally, but vaguely, understood in American jurisprudence to refer to state regulatory power."); Justice Philip A. Talmadge, *The Myth of Property Absolutism and Modern Government: The Interaction of Police*

---

[316] Véase Gerardo Pisarello, *Un largo Termidor: Historia y crítica del constitucionalismo antidemocrático* 29 (2012) ("[L]a expresión Constitución, derivada del latín *cum-statuire* (instituir junto a), está lejos de ser una invención moderna. Por el contrario, también fue utilizada en la Antigüedad y en la Edad Media en contextos en los que no existía el Estado tal como se conoce a partir de la modernidad. Con ella se pretendía designar lo que luego ha venido a denominarse el concepto material de Constitución, es decir, el modo de ser de una comunidad política y las estructuras de poder que la fundamentan, incluidas las relaciones de clase existentes en ellas".) (citas omitidas). Se utiliza, por tanto, el término *constitución* en este sentido material, para significar la manera en que modernamente se han constituido los poderes soberanos de los estados, si bien sujetos a las complejas y plurales relaciones de poder e interdependencia que, a la vez, suponen un límite en el ejercicio de dichas soberanías constitucionalmente constituidas.

*Power and Property Rights*, 75 Wash. L. Rev. 857, 861 (2000) ("The exercise of police power--governmental action to advance public health, safety, peace, and welfare--has long been a part of the very nature of government itself."); véase, también, Santiago Legarre, *The Historical Background of the Police Power*, 9 U. Pa. J. Const. L. 745 (2007).

Tomando en consideración la discusión precedente, cabe refinar el concepto de soberanía interna para adecuarlo al contexto que nos atañe. Así, bien podría decirse que la soberanía interna, en la esfera jurídica, puede traducirse como la autoridad -soberana- que ostenta determinada entidad política para regular aspectos relacionados a la familia, las relaciones patrimoniales privadas, la seguridad y, en general, el bienestar. *E. N.Y. Sav. Bank v. Hahn*, 326 U.S. 230, 232-33 (1945) ("A more candid statement is to recognize, as was said in Manigault v. Springs, supra, that the power 'which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the general welfare of the people, and is paramount to any rights under contracts between individuals.'") (citas omitidas). Véase, además, *Barbier v. Connolly*, 113 U.S. 27, 31 (1884). Es menester precisar, además, que esa autoridad (soberana) -subsumida en el concepto de razón de Estado- no es una mera delegación de poder, puesto que su fuente es una comunidad política distinta (como los estados, por ejemplo),

debidamente reconocida por el poder superior que la sujeta (el del Congreso).

En cuanto al reconocimiento por una entidad política superior que presupone la soberanía interna de la que venimos hablando -en el contexto del sistema federal norteamericano-, es imperativo no perder de vista la facultad que tiene el Congreso para reconocer, legislativamente, la soberanía de una entidad política, aun cuando ésta esté sujeta a sus poderes plenarios. Como se discutió anteriormente, no cabe duda de que las tribus indígenas están sujetas a los poderes plenarios del Congreso. Empero, el Congreso, en el ejercicio de dichos poderes plenarios, está autorizado a reconocerle a éstas un mayor ámbito de soberanía, si bien por vía legislativa. El Tribunal Supremo federal, por su parte, ha reconocido esta prerrogativa del Congreso expresamente. Así, en *Lara*, determinó que el Congreso usualmente ha legislado para modificar el grado de autonomía disfrutado por entidades soberanas dependientes que, sin embargo, no son estados de la unión: "[T]o modify the degree of autonomy enjoyed by a dependent sovereign that is not a State- is not an unusual legislative objective." *Lara*, 541 U.S. en la pág. 203. Por último, resulta interesante, además, notar que el Tribunal Supremo federal, en *Lara*, para llegar a dicha conclusión se refirió, a modo de ejemplo, a otras entidades soberanas dependientes ("*other such dependent entities*"); entre éstas, mencionó al ELA. *Id.* en la pág. 204 (citando con

aprobación a *Córdova & Simonpietri*, 649 F.2d 36, 39-41 (1st Cir. 1981)).

Se admite, pues, la posibilidad de distintos poderes soberanos, jerárquicamente delimitados y horizontalmente distribuidos,[317] si bien sujetos a un poder central limitado, a saber, el gobierno federal. José Trías Monge, *Injustice According to Law*, *supra*, pág. 236 ("[T]he United States is itself, like other federations, a prime example of sovereignty apportioned between various units and a central government."). De lo anterior, es innegable colegir que el concepto soberanía, en atención a la madeja de relaciones de poder que significa y predetermina en el sistema federal norteamericano, no tiene un significado unívoco. Más aun, resulta imperativo significarlo tomando en consideración los diversos contextos en los que opera; en este caso, las relaciones internas de determinada comunidad política, debidamente reconocida como tal por el Congreso.

---

[317] La distribución horizontal de los poderes soberanos en el sistema federal norteamericano alude, fundamentalmente, a la posición de todos aquellos poderes que no son federales. Habría que distinguir, sin embargo, entre diversos posicionamientos en dicha horizontalidad. Es decir, el alcance de los poderes soberanos delimitados por la soberanía superior del gobierno federal sería relativa a la identidad de la entidad política que los encarna. Así, un estado estaría sujeto a limitaciones distintas a las que estaría sujeta, por ejemplo, una tribu indígena, un territorio o un ente *sui generis*, como el ELA, aun cuando los poderes que el Congreso ejerce sobre éste dimanen de la cláusula territorial. *Cf. Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 596 (1976) ("We readily concede that Puerto Rico occupies a relationship to the United States that has no parallel in our history . . . .").

V

A

Como se sabe, culminada la Guerra Hispanoamericana, Puerto Rico, cual botín, pasó a ser una posesión de los EEUU, sujeta a la soberanía de dicho país. Véase Tratado de París, 30 Stat. 1754 (1899). Luego de un breve período de gobierno militar, en 1900 el Congreso de los EEUU, en el ejercicio de sus poderes territoriales al amparo del artículo IV de la Constitución federal, promulgó la *Ley Foraker*, 31 Stat. 77 (1900), la cual proveyó, si bien limitadamente, para el gobierno civil de la Isla. Asimismo, poco después, en 1917, el Congreso legisló la *Ley Jones*, 39 Stat. 351 (1917), que profundizó, si bien someramente, las medidas de auto-gobierno que le habían sido concedidas a la Isla bajo la legislación anterior; además, le otorgó a los puertorriqueños la ciudadanía norteamericana.

Rasgo sobresaliente de esta legislación, el Congreso la promulgó exclusivamente en virtud de sus poderes plenarios sobre Puerto Rico. Así, no hubo, en lo más mínimo, participación alguna por parte del Pueblo puertorriqueño. La legitimidad de las estructuras de poder que se crearon conforme a dicha legislación provenía, entonces, de la propia legitimidad del Congreso en el ejercicio de sus poderes. En puridad, aún no había Estado que gobernara la Isla, salvo el federal. Por tanto, el poder público que se ejerció durante esos años fue un poder delegado en

propiedad, en la medida en que los puertorriqueños no participaron en la configuración de éste.

B

Tras insistentes reclamos de autonomía, en 1950, el Congreso promulgó la *Ley 600*, 64 Stat. 319 (1950), la cual facultó a los puertorriqueños a emprender la tarea de redactar y promulgar su propia constitución.[318] Más aún, la promulgación de dicha ley supuso el reconocimiento de Puerto Rico como comunidad política distinta[319] y sentó las

---

[318] Cabe destacar que el mecanismo de autorizar la redacción y adopción de una constitución es harto similar al proceso de admisión de los estados a la unión americana. Véase Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 46 Am. J. L. Hist. 119, 127-28 (2004). **En el caso de Puerto Rico, sin embargo, no existe controversia en torno a que la adopción de nuestra Constitución no fue un preludio a la eventual admisión, en calidad de estado, a la unión americana.** Tal vez, esto último explica el interés en ningunear o minusvalorar ese proceso histórico.

[319] En aras de disipar cualquier duda respecto a las implicaciones que la promulgación de la *Ley 600* tuvo para el desarrollo político puertorriqueño, baste con citar las palabras del Juez Magruder:

**The answer to appellant's contention is that the constitution of the Commonwealth is not just another Organic Act of the Congress. We find no reason to impute to the Congress the perpetration of such a monumental hoax. Public Law 600 offered to the people of Puerto Rico a 'compact' under which, if the people accepted it, as they did, they were authorized to 'organize a government pursuant to a constitution of their own adoption.'** 64 Stat. 319. Public Law 600 required that such local constitution contain a bill of rights, but it did not require that the bill of rights so adopted by the people of Puerto Rico must contain a guaranty of jury trial. Notwithstanding the fact that under the terms of the compact the constitution as drafted by the local constitutional convention and approved by the people of Puerto Rico had also to be approved by the Congress of the United States before going into effect, it is nevertheless true that when such constitution did go into effect pursuant to the resolution of approval by

bases de una nueva relación territorial entre los EEUU y la Isla. Dicha ley, además, fue aprobada por el Pueblo de Puerto Rico mediante un referéndum celebrado a tales efectos. Por tanto, es imperativo señalar que

> [t]he keystone and legitimacy of Commonwealth status is the principle of the consent of the governed. It was so stated by Congress in laying the foundations upon which Puerto Rico's new status was to be built: "fully recognizing the principle of government by consent,"' Congress declared in 1950, "this act [Public Law 6oo] is now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption."" At first glance, Public Law 6oo may be read merely as having furthered the right of the Puerto Rican people to constitute themselves, as a polity, according to their own design; that is, to establish a local government. A finer reading of its provisions, however, shows that Public Law 6oo was not so narrow in scope;

---

the Congress, 66 Stat. 327, it became what the Congress called it, a 'constitution' under which the people of *Puerto* Rico organized a government of their own adoption. This constitution was drafted by the people of Puerto Rico through their duly chosen representatives in constitutional convention assembled. It stands as an expression of the will of the Puerto Rican people.

*Figueroa v. People of Puerto Rico*, 232 F.2d 615, 620 (1st Cir. 1956).

Para todos los fines prácticos, la mayoría considera que la *Ley 600* es una ley federal más. Ello, a su vez, supone que el consentimiento que el Pueblo de Puerto Rico expresó democráticamente en las urnas fue un mero espectáculo insignificante de poca o ninguna relevancia, aun cuando dicho consentimiento fue condición indispensable para la validez y legitimidad de ese estatuto y la Constitución que viabilizó. De otra parte, la opinión que suscribe la mayoría respecto a la *Ley 600* ignora y desprecia la interpretación que sobre ésta ha hecho el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito, cuyos pronunciamientos, dada su relación centenaria con Puerto Rico, han de tener un peso significativo en lo atinente al significado y alcance del proceso político que precedió la creación del ELA. Evidentemente es que la mayoría piensa que ese proceso político entre el gobierno de Estados Unidos y el Pueblo de Puerto Rico fue una burla, una falsa, un elaborado engaño.

> it also set forth the basis for a new relationship between the people of Puerto Rico and the United States."
>
> Salvador E. Casellas, *Commonwealth Status and the Federal Courts*, 80 Rev. Jur. UPR 945, 948-49 (2011).[320]

Así, celebrada la Convención Constituyente, en 1952, tras su aprobación en referéndum por el Pueblo de Puerto Rico, la Constitución entró en vigor. Con ella, pues, advino a la vida política y jurídica el ELA. Al margen de la divergencia de criterios en torno al *significado* del proceso constitucional que permitió la creación del ELA en las relaciones entre Puerto Rico y los EEUU, es imperativo concluir que la legitimidad del ente político que impera en nuestro País está cifrada en el reconocimiento condicionado de la soberanía que supuso el proceso constituyente que le

---

[320] Véase, también, Resolución Núm. 23, *Diario de Sesiones de la Convención Constituyente de Puerto Rico, supra,* T. IV, pág. 2410 ("Con la vigencia de la Constitución el pueblo de Puerto Rico quedará organizado en un estado libre asociado, constituido dentro de los términos de convenio establecidos por mutuo consentimiento, que es la base de nuestra unión con los Estados Unidos de América. . . . . Así llegamos a la meta del pleno gobierno propio, desapareciendo en el principio de convenio todo vestigio colonial, y entramos en el tiempo de nuevos desarrollos en civilización democrática. Nada puede sobrepasar en dignidad política los principios de mutuo consentimiento y de convenio libremente acordado. El espíritu del pueblo de Puerto Rico ha de sentirse libre para sus grandes empresas del presente y del futuro. Sobre su plena dignidad política pueden desarrollarse otras modalidades del Estado puertorriqueño al variarse el convenio, por mutuo acuerdo".); José Trías Monge, *supra*, pág. 46 ("La teoría del consentimiento provee aquí también una base más adecuada para explicar la relación resultante entre las partes".); Hon. Calvert Magruder, *The Commonwealth of Puerto Rico*, 15 U. Pitt. L. Rev. 1, 10 (1953) ("There is no doubt they [los puertorriqueños] thought something great and significant was happening . . . .") (citas omitidas).

precedió, no en una mera delegación de poderes sancionada *única y unilateralmente* por el Congreso.

Lo cierto es que el Congreso, al aprobar nuestra Constitución, *renunció* a sus poderes plenarios respecto a Puerto Rico en lo que concierne a los asuntos internos, los cuales habrían de regirse, entonces, por *nuestras* propias leyes, conforme a *nuestra* propia Constitución. Tal aseveración, además, es respaldada por interpretaciones del más alto foro federal en torno al proceso constituyente que culminó con la creación del ELA. Así, el Tribunal Supremo federal, en *Flores de Otero*, al pasar juicio sobre el significado del proceso político que precedió la creación del ELA, entendió que el Congreso renunció a su control sobre los asuntos internos de la Isla. Véase *Flores de Otero*, 426 U.S. en la pág. 596 ("[A]fter 1952, when Congress **relinquished** its control over the organization of the local affairs of the island and granted Puerto Rico a measure of autonomy comparable to that possessed by the States . . . .").[321] En función de dicha renuncia, pues, el ELA advino soberano en todos aquellos asuntos no regulados por la Constitución federal. Véase *Calero-Toledo*, 416 U.S. en las págs. 673-74 (citando con aprobación *Mora v. Mejías*, 115 F.Supp. 610 (D.P.R. 1953); *Marín v. University of Puerto*

---

[321] Nótese el uso del término *relinquished*, el cual se puede definir de la siguiente forma: "voluntarily cease to keep or claim; give up." *The New Oxford American Dictionary* 1439 (2001). El uso de dicho término, por ende, contradice, una vez más, cualquier noción de que el Congreso, cuando sancionó el proceso constituyente puertorriqueño, meramente delegó sus poderes.

*Rico*, 346 F.Supp. 470, 481 (D.P.R. 1972); *Suarez v.*
*Administrator del Deporte Hípico de Puerto Rico*, 354
F.Supp. 320 (D.P.R. 1972); *Posadas de Puerto Rico*
*Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 339
(1986) (citando con aprobación *Calero-Toledo*); *Rodríguez*,
457 U.S. en la pág. 8 (citando con aprobación *Calero-Toledo*
y *Córdova & Simonpietri*).

Lo anterior, por tanto, supone reconocer que el
Congreso, en virtud de sus poderes plenarios, puede auto-
imponerse límites en el ejercicio de dicho poder
concediéndole a sus territorios medidas de auto gobierno
las cuales generan derechos adquiridos sobre esas
facultades de gestión de gobierno que no pueden ser
retiradas por un Congreso posterior.[322]   Véase, *Cincinnati*
*Soap Co. v. U.S.*, 301 US 308 (1937) (donde el Congreso le
cede al *Commonwealth* de las Filipinas parte de los poderes
plenarios que ejercía bajo el estatus territorial previo).
Y es que ello no es una situación anómala en la historia

---

[322] Así lo reconoce quien fuera Juez Presidente del Tribunal
Supremo de Estados Unidos, William Rehnquist. En memorando
que suscribiera en ocasión de las negociaciones del gobierno
federal con Micronesia escribió:
"[T]he Constitution does not inflexibly determine the
incidents of territorial status, *i.e.,* that Congress
must necessarily have the unlimited and plenary power
to legislate over it. **Rather, Congress can gradually**
**relinquish those powers and give what was once a**
**Territory an ever increasing measure of self-**
**government.   Such legislation could create vested**
**rights of a political nature, hence it would bind**
**future Congresses and cannot be 'taken backward' unless**
**by mutual agreement."**   Memorandum, Micronesian
Negotiations, William Renhquist, August 8, 1971, Office
of Legal Counsel, Department of Justice.   (Énfasis
nuestro.)

del constitucionalismo norteamericano. A modo de ejemplo,
baste con señalar el *Northwest Ordinance de 1787*, ordenanza
en la cual el Congreso dispuso la manera en que habrían de
tratarse los territorios al noroeste del río Ohio. En
dicho instrumento, además, el Congreso, al amparo de sus
poderes plenarios bajo la cláusula territorial, se auto-
impuso limitaciones en el ejercicio de éste:

> It is hereby Ordained and declared by the
> authority aforesaid, That the following articles
> shall be considered as Articles of **compact**
> between the original States and the people and
> the states in the said territory, *and forever
> remain unalterable, unless by common consent . .
> . .*
> *Ordinance for the Government of the Territory of
> the United States North-West of the River Ohio*
> (July 13, 1787), en *Contexts of the Constitution*
> 74 (Neil H. Cogan ed., 1999).[323]

Es inevitable, por ende, concluir que el Congreso es
capaz de auto-limitarse en el ejercicio de sus poderes
plenarios, tal y como lo hizo al promulgar la *Ley 600* y
proveer para que el Pueblo puertorriqueño adoptara su
propia Constitución, en el reconocimiento cabal de su
soberanía en lo que a sus asuntos internos se refiere.
Recordemos que esta Ley dispone con meridiana claridad:
"Fully recognizing the **principle of government by consent,**

---

[323] El *Northwest Ordinance*, una vez se ratificó la
Constitución federal, fue ratificado, a su vez, por el
Congreso. Véase George H. Alden, *The Evolution of the
American System of Forming and Admitting New States into the
Union*, 18 Annals of the Am. Acad. Pol. & Soc. Sd. 469, 479
(1901) ("[W]ith the adoption of the ordinance of 1787 and its
ratification by Congress under the Constitution the outlines
of the system [of admission of states] were definitely
established.") (citado en Eric Biber, *supra*, pág. 126 n.18).

this Act is now adopted **in the nature of a compact** so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." 48 USC sec. 731b. No debe sorprender, por tanto, que en lo que respecta a los asuntos internos de Puerto Rico, los tribunales federales hayan optado por hablar de *pacto* ("*compact*"). Véase *Calero-Toledo*, 416 U.S. en las págs. 671-73; *U.S. v. Quiñones*, 758 F.2d 40, 42 (1st Cir. 1985); *Córdova & Simonpietri*, 649 F.2d en las págs. 39, 41; *Reeser v. Crowley Towing & Transp. Co., Inc.*, 937 F.Supp. 144, 146-47 (D.P.R. 1996). Tales auto-limitaciones al poder del Congreso sobre sus territorios, además, son consistentes con el desarrollo histórico del poder legislativo federal. En palabras del Juez Magruder:

> In a sense it is true that one Congress cannot limit a succeeding Congress in the exercise of its legislative powers under the Constitution. But there are certainly instances of what amounts to a *fait accompli* pursuant to legislation, which subsequently cannot be undone by the repeal of the legislation. Thus the Congress could not, by the repeal of the Tydings-McDuffie Act undo the grant of independence to the Philippine Islands. Again, when a territory has been admitted to statehood, the status thereby achieved by the people concerned cannot be undone by a repeal of the act of admission and the passage of a new organic act for the local government of the former territory. Nor could a grant of private title to public lands under the homestead laws be recalled by a subsequent Act of Congress. Likewise, it would not be within the power of a subsequent Congress to recall a grant of American citizenship duly and lawfully obtained under an existing naturalization act. **These are instances of vested rights, which Congress cannot constitutionally take away.** (Énfasis nuestro.)

Hon. Calvert Magruder, *supra*, pág. 14 (citas omitidas).[324]

Reconocer lo anterior, sin embargo, no implica pretender que la *Ley 600* es lo que no fue. Con la promulgación de dicho estatuto por parte del Congreso, quedaba claro que la relación territorial de Puerto Rico en cuanto a los asuntos no comprendidos en tal legislación no sufriría cambio alguno. El alcance de los poderes que se retenían no estaría sujeto a las diversas limitaciones que contiene la Constitución federal respecto a los estados.[325]

El reconocimiento de la soberanía interna del ELA, y la interpretación de los hechos relevantes que subyace dicho reconocimiento, no contraviene, en lo absoluto, lo

---

[324] Véase, también, José Trías Monge, *supra*, págs. 48-49 ("[C]abe descartar también el gastado y superficial concepto que un Congreso no puede atar las manos de otro. ¿Por qué? ¿Puede el Congreso deshacer la concesión de independencia a Filipinas? Si el Congreso puede desprenderse de la totalidad de su soberanía sobre un pueblo determinado, ¿qué recóndito principio de derecho le impide abjurar de parte de ella? **La dificultad de reconocer la potestad del Congreso para celebrar pactos con pueblos antiguamente dependientes es más emocional que jurídica**".).

[325] El Congreso, en el ejercicio cabal de sus poderes, puede legislar para favorecer tributariamente a Puerto Rico sin atenerse a las limitaciones de la cláusula de uniformidad de la Constitución federal. Const. EE.UU. Art. I, Sec. 8. Así, por ejemplo, la derogada sección 936 del Código Federal de Rentas Internas por largo tiempo le reconoció ventajas contributivas considerables a ciertas empresas en el País. 26 U.S.C. sec. 936, según enmendada. Véase *Pepsi-Cola v. Mun. Cidra*, 186 D.P.R. 713, 729 (2012) ("Desde la década de 1920, la política del Congreso de Estados Unidos ha sido eximir de tributación federal los ingresos que sus corporaciones domésticas generan en sus posesiones, entre las cuales se incluye Puerto Rico. Este beneficio se consignó en la Sección 936 del Código Federal de Rentas Internas".) (citando a C.E. Díaz Olivo, *La autonomía de Puerto Rico y sus lecciones en términos fiscales y económicos*, 74 Rev. Jur. U.P.R. 263, 276 (2005); F. Hernández-Ruiz, *A Guide Across the Spectrum of*

resuelto por el Tribunal Supremo federal en *Califano v. Gautier Torres*, 435 U.S. 1 (1978), y en *Harris v. Rosario*, 446 U.S. 651 (1980). En estos casos, en síntesis, el Tribunal Supremo de los EEUU validó que el Congreso legislara, en virtud de sus poderes plenarios, de manera distinta respecto a Puerto Rico, siempre y cuando tuviera una base racional para ello. *Harris*, 446 U.S. en las págs. 651-52; *Califano*, 435 U.S. en la pág. 4. El ejercicio de dichos poderes, evidentemente, rebasa el ámbito soberano del ELA; es decir, la legislación que estuvo ante la consideración del más alto foro federal en estos casos estaba relacionada con aspectos de la soberanía externa de Puerto Rico, a saber, su relación con el gobierno federal y determinados programas de beneficencia. La impronta normativa de estos casos, pues, se reduce a reconocer que el Congreso puede legislar para Puerto Rico sin las trabas que supone la Constitución federal respecto a los estados. Véase *Ramírez de Ferrer v. Mari Brás*, 144 D.P.R. 141, 160 (1997); *Castro García*, 120 D.P.R. en la pág. 774; *Northwestern Selecta*, 185 D.P.R. en las págs. 102-3 (Rodríguez, J., Op. Disidente).[326]

C

Como Tribunal, no nos compete suscribir una apreciación histórica y política de los hechos que han determinado la

---

*Section 936*, 19 Rev. Jur. U.I.P.R. 131 (1984)). *Cf. Downes*, 182 U.S. 244.

[326]Véase, también, Casellas, *supra*, pág. 958; José Trías Monge, *supra*, págs. 26-27, 46.

creación y el desarrollo del ELA.[327] Más bien, nos corresponde evaluar *jurídicamente* dichos hechos. Además, esa evaluación ha de ceñirse a la dilucidación de la controversia puntual que se nos presenta: determinar si para efectos de la doctrina de soberanía dual el ELA debe ser considerado un soberano.

---

[327] Ciertamente la historia y la política –en tanto disciplina académica– son indispensables para el análisis jurídico cabal de cualquier controversia; por ende, en la medida en que sea pertinente, tal y como se ha hecho en el transcurso de esta opinión disidente, se recurrirá a éstas. Lo que no podemos hacer como juristas es torcer la historia y el Derecho para adelantar nuestros criterios políticos e ideológicos, tratando de lograr a través del dictamen judicial, lo que compete exclusivamente al proceso político.

VI

Tomando en consideración la discusión precedente en torno a la soberanía interna –fundada en intereses que le son propios a determinada comunidad política, debidamente constituida–, es evidente que al ELA se le ha reconocido el poder de razón de Estado (*police power*). Este poder, por otro lado, tutela intereses soberanos, análogos y equivalentes a los intereses de los estados de la unión norteamericana. Véase, por ejemplo, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) (donde se le reconoce al ELA legitimación activa en virtud de su poder *parens patriae*). Véase, de nuevo, *Flores de Otero*, 426 U.S. en la pág. 594 ("[T]he purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union . . . .").

Además, este Tribunal consistentemente ha reconocido que el ELA ostenta poder de razón de Estado para vindicar sus propios intereses en atención a sus asuntos internos. Véase *Bomberos Unidos v. Cuerpo de Bomberos*, 180 D.P.R. 723, 738-42 (2011); *Domínguez Castro v. E.L.A.*, 178 D.P.R. 1, 36-38 (2010). Véase, además, *Northwestern Selecta*, 185 D.P.R. en las págs. 60, 84; *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405 (1993); *Marina Ind., Inc. v. Brown Bovery Corp.*, 114 D.P.R. 64 (1983); *The Richards' Group v. Junta de Planificación*, 108 D.P.R. 64 (1983). Es interesante, por demás, evaluar la definición que del concepto suscribió una

mayoría de este Tribunal en *Domínguez Castro*. En aquella ocasión, se dijo que el poder de razón de Estado se refería a "[a]quel poder **inherente** *al Estado que es utilizado por la Legislatura* para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y *bienestar general de la comunidad*, el cual puede delegarse a los municipios". *Id.*, en la pág. 36. Baste con señalar que el calificativo *inherente* contraviene cualquier noción de delegación de poderes. Es decir, reconocer que el poder de razón de Estado que ostenta la legislatura del ELA es inherente, implica reconocer que, en efecto, el ELA es un ente soberano, al menos, en lo atinente a sus asuntos internos, que ejerce los poderes correspondientes sin que ello presuponga delegación de poder alguna. Dicha apreciación, en cuanto a la soberanía interna del ELA, ha sido avalada por el Tribunal Supremo federal. Véase *Rodríguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982) ("At the same time, Puerto Rico, like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution.'") (citando a *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 673 (1974); *Mora v. Mejías*, 115 F.Supp. 610 (PR 1953)). Véase, también, *Cordova & Simonpietri*, 649 F.2d 36, 39-42. Después de todo, **no** se trata de auscultar si tras la adopción de la Constitución "Puerto Rico continuó siendo un territorio de los Estados Unidos sujeto al poder del Congreso, según lo dispuesto en

la cláusula territorial de la Constitución federal". Opinión Mayoritaria, pág. 58. Más bien, se trata de reconocer el alcance actual de dicho poder, tomando en consideración las propias actuaciones legislativas del Congreso, el reconocimiento que éste hizo de la soberanía del Pueblo puertorriqueño en cuanto a sus asuntos internos y los precedentes judiciales relevantes. Como se ha visto en el caso de las tribus indígenas, el mero hecho de que el Congreso ostente poderes plenarios no impide, por sí sólo, el reconocimiento de entidades soberanas, si bien sujetas a dichos poderes.

Dicho lo anterior, es ineludible el hecho de que el ELA, en el ámbito que concierne sus asuntos internos, es un ente soberano que ha de ser considerado como tal para efectos de la doctrina de soberanía dual. Recuérdese que "with respect to double jeopardy, the framework supports shifting the doctrine's emphasis away from formalistic questions of 'sovereignty' and towards consideration of the degree to which prosecutions reflect autonomous political and moral decisionmaking." Zachary S. Price, *Dividing Sovereignty in Tribal and Territorial Criminal Jurisdiction*, 113 Colum. L. Rev. 657, 665 (2013).

VII

En *Castro García*, este Tribunal, luego de un análisis profundo, ponderado e informado por la doctrina constitucional norteamericana, determinó que el ELA era un soberano para efectos de la doctrina de la soberanía dual.

Así, al aplicar ésta estimó que un procesamiento a nivel federal no impedía que el ELA vindicara sus intereses –soberanos- en velar por el bienestar y la seguridad de la comunidad puertorriqueña. Tal proceder, de hecho, fue consistente con la apreciación de algunos tribunales federales. Véase, *U.S. López Andino*, 831 F.2d 1164 (1st Cir. 1987), *cert.* denegado, 486 U.S. 1034 (1988); *U.S. v. Vega Figueroa,* 984 F.Supp. 71 (D.P.R. 1997). Véase, además, *U.S. v. González de Modestini*, 145 F.Supp.2d 171, 174 (D.P.R. 2001). En aquella ocasión, asimismo, este Tribunal procuró repasar los precedentes relevantes, la doctrina precisa, con tal de dirimir la compleja controversia ante su consideración. No claudicó, pues, conforme a Derecho, en hacer valer los intereses legítimos de un Estado que fue fundado sobre la base democrática del consentimiento de los puertorriqueños: el ELA. Hoy, este Tribunal, en una opinión mayoritaria que acusa un revisionismo histórico desconcertante, desmerece el análisis jurídico sosegado y, en vez, opta por claudicar ante su función de interpretar –no rehacer a su antojo- las pautas jurídicas pertinentes.

## VIII

Concluyo, resaltando lo evidente: la mayoría de este Tribunal tiene como norte, que no quepa duda, adelantar su visión ideológica sobre el estatus de Puerto Rico y ha utilizado, y continuará utilizando, los dictámenes jurídicos para ello. Esto, aun cuando las campañas

ideológicas son propias del proceso político, no de la adjudicación judicial. En ese afán, poco importa qué disponga nuestra Constitución, nuestras leyes, qué exija el bienestar social de nuestro País e incluso lo dispuesto en la Constitución federal y los precedentes del Tribunal Supremo de esa nación. En fin, nada persuade, nada importa, todo es pura nadería cuando resulta incómodo para determinada postura ideológica. Lo importante parece ser alcanzar a través de los tribunales aquello que no se ha logrado mediante el proceso político, donde corresponde. Esto es, utilizar la función judicial como un mecanismo más de presión política en pos de adelantar posturas ideológicas, que, convenientemente, se traducen en interpretaciones jurídicas simplistas y descontextualizadas. Desmantelando en ese proceso todos nuestros entendidos previos sobre nuestro andamiaje constitucional. El uso de este alto foro para esos propósitos es profundamente antidemocrático y, por lo tanto, marcada e irónicamente anti-americano. Contraviene, pues, nociones elementales de cómo ha de hacerse política y, de paso, mancilla la legitimidad de este Tribunal. Como ya dije en otra ocasión: ¡qué lástima!

Por todo lo anterior, disiento enérgicamente del proceder ahistórico de una mayoría del Tribunal que conlleva apartarse de precedentes del Tribunal Supremo de Estados Unidos y afectar perniciosamente el procesamiento penal en nuestro País. En su lugar, confirmaría las

sentencias emitidas por el Tribunal de Apelaciones y reafirmaría la aplicación de la doctrina de soberanía dual en Puerto Rico.


                                    Anabelle Rodríguez Rodríguez
                                         Juez Asociada